UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT NEW YORK

---------------------------------------------------------------------------x

JUSTIN GOLDMAN,                 :

                        :

            Plaintiff,      :

                        :

         v.             :

                        :

BREITBART NEWS NETWORK, LLC; HEAVY,  :    17 Civ. 3144 (KBF)
INC.; TIME, INC.; YAHOO, INC.; VOX MEDIA,  :
INC.; GANNETT COMPANY, INC.; HERALD  :
MEDIA, INC.; BOSTON GLOBE MEDIA  :
PARTNERS, LLC; NEW ENGLAND SPORTS  :
NETWORK, INC.,  :

                        :

          Defendants.    :

---------------------------------------------------------------------------x


# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ................................................................................ 1

I.      FACTUAL BACKGROUND ........................................................................ 2

      A.    Defendants' Websites ................................................................ 2

      B.    Twitter ...................................................................................... 5

      C.    The "Tom Brady" Photo ........................................................... 6

      D.    Defendants Embedded Tweets Containing the Photo, Without Hosting the Tweet and Photo On Their Servers ................................................................ 7

      E.    Procedural History ................................................................... 11

II.     ARGUMENT ........................................................................................... 12

      A.    Standard of Review ................................................................. 12

      B.    Defendants' Embedding the Photo Hosted by Twitter Does Not Constitute Direct Infringement Under *Perfect 10* and Its Progeny ........................................ 13

            1.    *Perfect 10* Held That In-line Linking a Full-Sized Photo Hosted on a Third Party Site Was Not a "Display" by the Linking Website .............. 14

            2.    Defendants' Embedding of Tweets Is Not Materially Different from the In-line Linking at Issue in *Perfect 10* ................................................. 20

            3.    No Case Has Rejected the *Perfect 10* "Server Test" Approach for Online Infringement ................................................................. 25

      C.    The *Perfect 10* Test Does Not Foreclose Other Remedies for Content Owners .. 31

CONCLUSION ................................................................................................ 35

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*A&M Records, Inc. v. Napster, Inc.*,
    239 F.3d 1004 (9th Cir. 2001) ...................................................................................34

*Akamai Techs., Inc. v. Cable & Wireless Internet Servs., Inc.*,
    344 F.3d 1186 (Fed. Cir. 2003)...................................................................................4

*Am. Broad. Cos. v. Aereo, Inc.*,
    573 U.S. __, 134 S.Ct. 2498 (2014) (Scalia, J., dissenting)......................................32

*Boarding Sch. Review, LLC v. Delta Career Educ. Corp.*,
    No. 11 Civ. 8921(DAB), 2013 WL 6670584 (S.D.N.Y. Mar. 29, 2013) ..................5

*British Telecomms. PLC v. Prodigy Commc'ns Corp.*,
    217 F. Supp. 2d 399 (S.D.N.Y. 2002).........................................................................3

*Capitol Records, LLC v. ReDigi Inc.*,
    934 F. Supp. 2d 640 (S.D.N.Y. 2013)........................................................................28

*Cartoon Network, LP v. CSC Holdings, Inc.*,
    536 F.3d 121 (2d Cir. 2008).......................................................................................13

*Cifarelli v. Vill. of Babylon*,
    93 F.3d 47 (2d Cir. 1996)...........................................................................................12

*Complex Sys., Inc. v. ABN Ambro Bank N.V.*,
    979 F. Supp. 2d 456 (S.D.N.Y. 2013)........................................................................12

*Distributorsoutlet.com, LLC v. Glasstree, Inc.*,
    No. 11-cv-6079(PKC)(SLT), 2016 WL 3248310 (E.D.N.Y. June 10, 2016)............8

*Farah v. Esquire Magazine, Inc.*,
    863 F. Supp. 2d 29 (D.D.C. 2012), *aff'd*, 736 F.3d 528 (D.C. Cir. 2013)................5

*Flava Works, Inc. v. Gunter*,
    689 F.3d 754 (7th Cir. 2012) ............................................................................25, 26, 29, 30

*Goldman v. Advance Publications, Inc., et al.*,
    No. 16 Civ. 9031 (ALC) (S.D.N.Y.)..........................................................................11

*Grady v. Iacullo*,
    No. 13 Civ. 624, 2017 WL 1176415 (D. Colo. Mar. 29, 2017).................................30

*Grady v. Iacullo*,
   No. 13-cv-00624-RM-KMT, 2016 WL 1559134 (D. Colo. Apr. 18, 2016)....................29, 30

*Kelly v. Arriba Soft Corp.*,
   336 F.3d 811 (9th Cir. 2003) ................................................................16

*Leveyfilm, Inc. v. Fox Sports Interactive Media, LLC*,
   No. 13 C 4664, 2014 WL 3368893 (N.D. Ill. July 8, 2014) ..............................28, 29

*Live Face on Web, LLC v. Biblio Holdings LLC*,
   No. 15 Civ. 4848 (NRB), 2016 WL 4766344 (S.D.N.Y. Sept. 13, 2016) ......................27, 28

*Live Face on the Web, LLC v. Smart Move Search, Inc.*,
   No. 15-4198(JHR/AMD), 2017 WL 1064664 (D.N.J. Mar. 21, 2017) ..................28

*In re M/V MSC FLAMINIA*,
   229 F. Supp. 3d 213 (S.D.N.Y. 2017)...................................................12

*McClellan v. Smith*,
   439 F.3d 137 (2d Cir. 2006)...............................................................12

*In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*,
   MDL No. 1358, 2013 WL 6869410 (S.D.N.Y. Dec. 30, 2013)..............................8

*MyPlayCity, Inc. v. Conduit Ltd.*,
   No. 10 Civ. 1615(CM), 2012 WL 1107648 (S.D.N.Y. Mar. 30, 2012),
   *adhered to on recons.*, 2012 WL 2929392 (S.D.N.Y. July 18, 2012) ..............26, 27

*O'Toole v. Northrop Grumman Corp.*,
   499 F.3d 1218 (10th Cir. 2007) ............................................................5

*Orozco v. Fresh Direct, LLC*,
   No. 15-CV-8226 (VEC), 2016 WL 5416510 (S.D.N.Y. Sept. 27, 2016),
   *appeal dismissed*, No. 16-3629 (2d Cir. Mar. 10, 2017) ....................................8, 18

*Patsy's Italian Rest., Inc. v. Banas*,
   575 F. Supp. 2d 427 (E.D.N.Y. 2008), *aff'd*, 658 F.3d 254 (2d Cir. 2011).............5

*Pearson Educ., Inc. v. Ishayev*,
   9 F. Supp. 3d 328 (S.D.N.Y. 2014) .............................................................33, 34

*Pearson Educ., Inc. v. Ishayev*,
   963 F. Supp. 2d 239 (S.D.N.Y. 2013).............................................................4, 33

*Perfect 10, Inc. v. Amazon.com, Inc.*,
   508 F.3d 1146 (9th Cir. 2007) ......................................................... *passim*

*Perfect 10 v. Google, Inc.*,
    416 F. Supp. 2d 828 (C.D. Cal. 2006) ........................................................................... *passim*

*Pond Guy, Inc. v. Aquascape Designs, Inc.*,
    No. 13-13229, 2014 WL 2863871 (E.D. Mich. June 24, 2014) .................................8

*Sekisui Am. Corp. v. Hart*,
    15 F. Supp. 3d 359 (S.D.N.Y. 2014).......................................................................5

*Totally Her Media, LLC v. BWP Media USA, Inc.*,
    No. CV 13-8379-AB, 2015 WL 12659912 (C.D. Cal. Mar. 24, 2015) ..................................30

*United States v. Bari*,
    599 F.3d 176 (2d Cir. 2010)......................................................................5

*Wells Fargo & Co. v. WhenU.com, Inc.*,
    293 F. Supp. 2d 734 (E.D. Mich. 2003).......................................................5

*Wensink Farm Seeds, Inc. v. Lafever*,
    No. 16-CV-1282, 2017 WL 2735573 (N.D. Ohio June 23, 2017) ...........................8

**Federal Statutes**

17 U.S.C.
    § 101................................................................................................18, 19, 35
    § 512(c) .................................................................................................31

Digital Millennium Copyright Act, 17 U.S.C. § 512.............................................31, 34

**Rules**

Federal Rule of Evidence 201 ...............................................................................8

Federal Rules of Civil Procedure 56(a) ..................................................................12

Defendants Heavy, Inc. ("Heavy"), Time Inc. ("Time"), Yahoo Holdings, Inc. ("Yahoo"), Gannet Company, Inc. ("Gannett"), Herald Media, Inc. ("Herald"), Boston Globe Media Partners, LLC ("Globe"), and New England Sports Network, Inc. ("NESN") (collectively, the "Defendants") respectfully submit this memorandum of law in support of their motion for partial summary judgment that the in-line linking of Plaintiff's alleged work from servers owned and controlled by third parties does not constitute direct copyright infringement.[1]

## PRELIMINARY STATEMENT

The question on this motion is a narrow one:  Is the process by which a Twitter post incorporating a photograph allegedly owned by Plaintiff ("the Photo") appeared in articles published by Defendants materially different, for the purposes of copyright law, from the "in-line linking" held to be non-infringing in *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1156 (9th Cir. 2007) ("*Perfect 10*")?  The answer is <u>no</u>.  The undisputed evidence in the record shows the Photo was hosted on and transmitted from servers owned and controlled not by Defendants, but by third parties.  Under *Perfect 10,* and every case to confront the issue since then (including cases applying *Perfect 10* in this District), these facts compel a conclusion that Defendants did not infringe any distribution or display rights in the Photo.

---

[1] Defendants Heavy, Gannett, Herald and NESN are moving for full summary judgment dismissing all claims against them.  Certain of the Defendants, namely Globe, Time, and Yahoo, are moving for summary judgment with respect to only a subset of alleged uses, since not all of these Defendants' alleged uses involved embedded tweets.  In particular, Globe is moving for summary judgment as to the article published by Boston.com (*see* Second Amended Complaint, ECF No. 38 ("SAC") SAC Ex. I at 3), but not the article published by BostonGlobe.com (*see id.* at 2).  Time is moving for summary judgment as to the article published by FanSided (*see* SAC Ex. D at 3), but not the article published by SI.com (*see id.* at 2).  Yahoo is moving for summary judgment as to the article published by Yahoo Sports (*see* SAC Ex. E at 3), and not for the article published by Yahoo News (*see id.* at 2).  For the sake of simplicity, throughout this brief, when discussing actions that the Defendants did or did not take, Defendants are referring only to the uses of the photo at issue through the embedding of tweets from Twitter and not any other uses.  For example, when Defendants state that the photo at issue was not hosted on or served from their own servers, they refer only to the appearance of the photo as part of embedded tweets, as set forth above, and not the appearance of the photo in connection with publications not part of this motion.

When Plaintiff's Photo appeared on the Defendants' websites in the form of embedded tweets, the Photo was hosted on servers owned by Twitter, not Defendants, and uploaded to the Twitter servers by a third party whom, for unknown reasons, Plaintiff has chosen not to sue. Defendants' sites acted as, essentially, a "window" between the users and Twitter, just as Google acted as a "window" to underlying content in *Perfect 10*.  The users' computers communicated directly with *Twitter*, whose servers communicated the Photo directly to the users, which caused the Photo to appear on the users' screens.  On these undisputed facts,[2] there is no direct infringement of Plaintiff's exclusive rights to distribute or display the Photo by the Defendants. Accordingly, Plaintiff's claims for direct infringement based on the embedding of these tweets should be dismissed.

## I.    FACTUAL BACKGROUND

### A.    Defendants' Websites

Each of the defendants publishes one or more news, sports-oriented or general interest websites.  Heavy publishes Heavy.  *See* Defendants' Statement of Undisputed Facts Pursuant to Local Rule 56.1 ("56.1 Stmt.") ¶ 2. Time publishes FanSided.  *Id.* ¶ 3.   Gannett publishes The Big Lead.  *Id.* ¶ 5.   Herald publishes the Boston Herald and its website bostonherald.com.  *Id.* ¶ 6.   Globe publishes Boston.com.  *Id.* ¶ 7.   NESN publishes NESN.com.  *Id.* ¶ 8.   And Yahoo publishes Yahoo Sports.  *Id.* ¶ 4.   (These websites are collectively referred to herein as the "Websites.").

---

[2] Plaintiff maintains that there are facts in dispute here, but as Defendants demonstrate, there are no *relevant* disputed facts on this motion.  For instance, Plaintiff has argued at various points that Defendants' general practices regarding the licensing of photography for their articles are relevant to this motion.  But Defendants do not dispute that here they did *not* license Plaintiff's Photo – Defendants contend that their embedding of the Photo was not a public display under the Copyright Act and relevant case law (and in any event, a claim for infringement of the display right does not turn on questions relating to corporate or industry practices, or a defendant's state of mind).  *See infra* Section II.A.

Although, from a user's perspective, visiting a site on the Internet seems to load a single webpage onto a computer screen, the reality is more complicated.  For all material purposes for this case, each of the Websites functions in substantially the same manner, which, as discussed below, is consistent with how courts have found websites function generally:

Each Website comprises numerous individual webpages, each with its own unique web address (referred to as a Uniform Resource Locator or "URL").  *Id.* ¶ 9.  Each webpage contains articles or other content.  When a user visits a webpage within one of the Websites—either by entering the URL in her browser program or by clicking on a hyperlink located on another site— the user's browser software, stored on her own computer, transmits a request to a computer controlled by the owner of the Website, called a "server."  *Id.* ¶ 10.  The server responds to the request by transmitting a file to the user's browser.  *Id.* ¶ 11.

The file that the Defendant's server transmits is a text document that contains the text that appears on the webpage on the user's screen, as well as instructions written in various computer programming languages, including HyperText Markup Language ("HTML").  *See id.*; *see also British Telecomms. PLC v. Prodigy Commc'ns Corp.*, 217 F. Supp. 2d 399, 406-07 (S.D.N.Y. 2002) ("HTML is the language in which Web pages are formatted.  This language is a kind of publishing mother tongue that all computers may potentially understand." (internal citation and quotation marks omitted)).

The document transmitted from the Defendant's server (the "HTML Document") does not contain the other content that ultimately appears on a user's screen, such as photos, videos, or advertisements.  56.1 Stmt. ¶ 12.  It contains only the text of the page and HTML instructions. *Id.* ¶¶ 11-12.  The HTML instructions, in turn, include URLs for other sites containing the content that will be incorporated into the final webpage that the user will see.  *Id.* ¶ 13.  In other

words, what Defendants' websites transmit to users could be considered a series of hidden (from the user) hyperlinks to other locations on the Internet where the content that ultimately appears on the pages resides.

Some of those URLs may point to servers controlled by Defendants; others point to servers owned and controlled by third parties. *Id.* ¶ 14. The HTML code instructs the user's browser software to retrieve the content directly from those various servers. *Id.* ¶ 15. The HTML instructions also include "tags" that specify how the content should be laid out on the page. *Id.* ¶ 16. The HTML Document that is transmitted from the webpage publisher's server can usually be viewed by selecting special menu options in an internet browser (for example, in the Chrome browser, by "right-clicking" on the page and selecting "View Page Source"); otherwise, the HTML instructions (including the URLs for the content and the tags) are not visible to the user. *Id.* ¶¶ 17-18.

This process is consistent with the process employed by Google in *Perfect 10*, and other sites described in countless decisions since the advent of the Internet. *See, e.g.*, *Perfect 10*, 508 F.3d at 1155 ("A webpage consists of text interspersed with instructions written in Hypertext Markup Language ('HTML') that is stored in a computer. No images are stored on a webpage; rather, the HTML instructions on the webpage provide an address for where the images are stored, whether in the webpage publisher's computer or some other computer."); *Pearson Educ., Inc. v. Ishayev*, 963 F. Supp. 2d 239, 250-51 (S.D.N.Y. 2013) ("A hyperlink (or HTML instructions directing an internet user to a particular website) is the digital equivalent of giving the recipient driving directions to another website on the Internet. A hyperlink does not itself contain any substantive content." (citation omitted)).[3]

---

[3] *See also Akamai Techs., Inc. v. Cable & Wireless Internet Servs., Inc.*, 344 F.3d 1186, 1189 (Fed. Cir.

### B.      Twitter

Twitter is, by its own description, "a service for friends, family, and coworkers to communicate and stay connected through the exchange of quick, frequent messages," which are known as "Tweets" and "may contain photos, videos, links and up to 140 characters of text." 56.1 Stmt. ¶ 19.[4]  Each Tweet has its own unique URL.  *Id.* ¶ 20.[5]

One of the ways that content posted to Twitter can be seen more broadly is when it is "embedded" on another website.  As Twitter explains on its site:

---

2003) ("A typical web page has a Hypertext Markup Language ('HTML') base document, or 'container' document, with 'embedded objects,' such as graphics files, sound files, and text files. Embedded objects are separate digital computer files stored on servers that appear as part of the web page. These embedded objects must be requested from the origin server individually. Thus, each embedded object often has its own URL. To receive the entire web page, including the container document and the embedded objects, the user's web browser must request the web page and each embedded object. Thus, for example, if a particular web page has nine embedded objects, a web browser must make ten requests to receive the entire web page: one for the container document and nine for the embedded objects."); *Wells Fargo & Co. v. WhenU.com, Inc.*, 293 F. Supp. 2d 734, 747 (E.D. Mich. 2003) ("When a user accesses a website, the website is not transferred to the user's desktop.  All that exists on the computer screen is an image generated by the user's web browser based on instructions received from the text-based HTML code of the webpage.").

[4] The general background information about Twitter set forth herein is not in dispute and is drawn in part from publicly available online material. Courts in this Circuit have repeatedly held that they "generally ha[ve] the discretion to take judicial notice of internet material." *Boarding Sch. Review, LLC v. Delta Career Educ. Corp.*, No. 11 Civ. 8921(DAB), 2013 WL 6670584, at *1 n.1 (S.D.N.Y. Mar. 29, 2013); *see Sekisui Am. Corp. v. Hart*, 15 F. Supp. 3d 359, 365 n.59 (S.D.N.Y. 2014) ("tak[ing] judicial notice of the public information on [a third party's] website …"); *Patsy's Italian Rest., Inc. v. Banas*, 575 F. Supp. 2d 427, 443 n.18 (E.D.N.Y. 2008) ("It is generally proper to take judicial notice of articles and Web sites published on the Internet."), *aff'd*, 658 F.3d 254 (2d Cir. 2011); *see also O'Toole v. Northrop Grumman Corp.*, 499 F.3d 1218, 1225 (10th Cir. 2007) ("It is not uncommon for courts to take judicial notice of factual information found on the world wide web.").  *Farah v. Esquire Magazine, Inc.*, 863 F. Supp. 2d 29, 35 (D.D.C. 2012) (taking judicial notice of "various Internet postings"), *aff'd*, 736 F.3d 528, 534 (D.C. Cir. 2013) (affirming that "[j]udicial notice is properly taken of publicly available [online] historical articles"); *cf. United States v. Bari*, 599 F.3d 176, 179-81 (2d Cir. 2010) (holding that it was not error for district court to "confirm … common sense supposition" with independent Internet search).

[5] The Terms of Service for Twitter in place at the time relevant to this case (July 2016) provide that posting content to the site grants Twitter a license to "use, copy, reproduce, process, adapt, modify, publish, transmit, display and distribute such Content in any and all media or distribution methods," which includes the right for Twitter to make that content "available to other companies, organizations or individuals who partner with Twitter for the syndication, broadcast, distribution or publication of such Content on other media and services, subject to our terms and conditions for such Content use."  *See* 56.1 Stmt. ¶ 27. Users are also required to represent and warrant that they have "all the rights, power and authority" to grant that license to Twitter.  *Id*.

> Embedded Tweets bring your pick of content from Twitter into your website articles.  An embedded Tweet includes photos, video and cards media created for display on Twitter, and can even stream live video from Periscope.  All aspects of Twitter's display requirements are handled for you by using our tools; author attribution, Tweet actions, hashtags, mentions, and other key components of the Twitter experience.

56.1 Stmt. ¶ 22.

Embedded tweets contain certain consistent formatting elements dictated by the Twitter embed code, including a light gray box (with slightly rounded corners) that frames the tweet and any accompanying media content.  *Id.* ¶ 25.  In addition, the embedded tweet itself functions as a hyperlink, such that clicking almost anywhere on the tweet will bring the user directly to that tweet on twitter.com.  *Id.* ¶ 26.

Twitter's website instructs its users that "[e]very Tweet displayed on Twitter.com and in TweetDeck includes an embed code to easily copy-and-paste into your webpage. Activate the Tweet menu and select 'Embed Tweet' to generate markup to include on your webpage …"  *Id.* ¶ 23.  If the author of a tweet that is embedded on another site deletes that tweet, the "widgets" used by Twitter's embed HTML code will no longer cause the tweet to appear as a "fully-rendered Tweet," and will instead show only the text of the tweet itself, without any media that had been attached to it.  *Id.* ¶ 24.

### C.     The "Tom Brady" Photo

Plaintiff Justin Goldman allegedly took a photograph of NFL player Tom Brady walking in the Hamptons in New York on July 2, 2016.  SAC ¶ 14.  At some point thereafter, the Photo was posted to Twitter by numerous users, including, *inter alia*, in tweets posted by users with the screennames @CassidyHubbarth (the "Hubbarth Tweet"); @RealBobManning (the "Manning Tweet"); @RCH1I1 (the "Rob H Tweet"); and @SneakerReporter (the "Sneaker Reporter Tweet") (collectively, the "Embedded Tweets").  56.1 Stmt. ¶ 28.

This led to widespread reporting on the Photo by the online sports media, including by Defendants.

### D.   Defendants Embedded Tweets Containing the Photo, Without Hosting the Tweet and Photo On Their Servers

Between July 2 and July 4, 2016, each of the Defendants published one or more articles that included one of the Embedded Tweets containing the Photo.  56.1 Stmt. ¶ 29 (collectively, the "Articles").[6]  In order to embed the Embedded Tweets in the Articles, writers for each of the Defendants' websites incorporated HTML embed code for the Embedded Tweets into the HTML Document for the web page containing that article.  *Id.* ¶ 34.  The embed code for the Embedded Tweets included HTML tags, the URL of the tweet itself, the URL of any media that was included in the tweet, and the URLs for scripts executed by Twitter that direct a user's browser to format the content as an embedded tweet.  *Id.* ¶ 36.  Based on these instructions, the user's browser software assembled the elements to present the Embedded Tweet on the user's screen, within the context of the webpage.  *Id.*  And because each of the Embedded Tweets included a copy of the Photo, the Photo appeared as part of the Embedded Tweets in each of the Articles, and was visible to users who visited the webpages containing the Articles (as seen in the partial screenshots attached as Exhibits C-J of the Second Amended Complaint).  *See id.* ¶ 37; SAC Exs. C-J.

However, the Embedded Tweet and the accompanying Photo were <u>not</u> stored on, hosted by, or transmitted from servers owned or controlled by the Defendants.  56.1 Stmt. ¶ 38.  Instead, for each of the Articles that included an Embedded Tweet, the Photo that was part of that

---

[6] In particular, the articles published by the Globe for boston.com, Time for FanSided, Yahoo for Yahoo Sports, and NESN each contained an embed of the Rob H Tweet.  56.1 Stmt. ¶ 30.  The article published by Herald contained an embed of the Hubbarth Tweet.  *Id.* ¶ 31.  The article published by Gannett contained an embed of the Manning Tweet.  *Id.* ¶ 32.  And the article published by Heavy contained an embed of the Sneaker Reporter Tweet.  *Id.* ¶ 33.

Embedded Tweet was hosted on and served from a server with the domain name pic.twitter.com, which is not owned or controlled by any of the Defendants. *Id.* ¶ 39.  In other words, when a tweet was embedded, the display of any included images was controlled solely through direct interactions between the user's computer and Twitter's servers.

At some point after the Articles were published, some of the tweets containing the Photo were removed from the Internet (or the Photo was removed from the tweet).  56.1 Stmt. ¶¶ 41-43.  As a result, websites that embedded those tweets now show only the raw text of the tweet itself, and no longer incorporate the Photo.  *Id.* ¶ 44.  In addition, after receiving notice of the claim in this case, some Defendants removed the embed code for the tweets containing the Photo.  *Id.* ¶ 45.  As a result, the current versions of some of the webpages containing the Articles no longer contain any reference to the Photo or the previously embedded tweets. However, using a commonly accepted webpage archiving site, the Internet Archive (also known as the "Wayback Machine"),[7] it is possible to see the text and source code for the webpages containing the Articles as they looked at—or shortly after—the pages were published.[8]

---

[7] The Court can take judicial notice of the prior versions of the Articles as they appear on the Wayback Machine.  "[C]ourts have taken judicial notice of the contents of the web pages available through the Wayback Machine as facts that can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned under Federal Rule of Evidence 201."  *Distributorsoutlet.com, LLC v. Glasstree, Inc.*, No. 11-cv-6079(PKC)(SLT), 2016 WL 3248310, at *2 (E.D.N.Y. June 10, 2016) (collecting cases, including, *inter alia*, *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, MDL No. 1358, 2013 WL 6869410, at *4 n.65 (S.D.N.Y. Dec. 30, 2013)); *see also Wensink Farm Seeds, Inc. v. Lafever*, No. 16-CV-1282, 2017 WL 2735573, at *6 (N.D. Ohio June 23, 2017) (explaining that "the Internet Archive, found at https://archive.org/web/, has been found to be an acceptable source for the taking of judicial notice," and "tak[ing] judicial notice of the Internet Archive which shows the statement in question was published on [a particular] webpage sometime between February 2, 2016 and April 3, 2016," (citation and brackets omitted)); *Orozco v. Fresh Direct, LLC*, No. 15-CV-8226 (VEC), 2016 WL 5416510, at *5 n.9 (S.D.N.Y. Sept. 27, 2016) (on motion to dismiss, reviewing website "through the Way Back Machine archive" where plaintiffs incorporated by reference into their complaint a particular website "as it existed prior to July 2014"), *appeal dismissed*, No. 16-3629 (2d Cir. Mar. 10, 2017); *Pond Guy, Inc. v. Aquascape Designs, Inc.*, No. 13-13229, 2014 WL 2863871, at *4 (E.D. Mich. June 24, 2014) ("turn[ing] to the Internet Archive, found at https://archive.org/web/, for the taking of judicial notice[,] [a]s a resource the accuracy of which cannot reasonably be questioned" where the parties "made reference to the history of their respective presence on the internet," but "[n]either party … submitted

In addition, in one instance, the underlying Embedded Tweet that appeared in one of the Articles has not been removed from the Internet and therefore, using that publication's "preview" software, can be viewed in a manner similar to how it appeared in its original context as an embedded tweet:

---

sufficient evidence to the Court detailing exactly what their historical internet presence consisted of").

[8] *See* Declaration of Simon Assaad, Ex. B (source code for archived version of Heavy article); Declaration of Matthew Blake, Ex. B (source code for archived version of Time article); Declaration of Brian Wallace, Ex. 2 (source code for archived version of Yahoo article); Declaration of Mark Hiland, Ex. A (source code for archived version of Gannett article); Declaration of Justin Emond, Ex. B (source code for archived version of Herald article); Declaration of Anthony Bonfiglio Ex. C (source code for archived version of Globe article); Declaration of Michael R. Hall, Ex. B (source code for archived version of NESN article).



Declaration of Jason Lisk, Ex. C ("preview" of original version of Gannett article) at 1-2.

As can be seen in the screenshot, the Embedded Tweet is framed with a box made of a light gray line with slightly rounded corners.  The Photo appears in the top portion of this frame.  Below the Photo is the tweet, which features the profile picture of the user, the user's handle ("Bobby Manning"), the user's Twitter user name (@realBobManning), the text of the tweet, and the time and date of the tweet.  The tweet also contains a button labeled "Follow," along with the Twitter "bird" logo.  The tweet also contains other information about the number of tweets that have been posted in response (as of this screenshot, three), the number of times it has been retweeted (nine) and the number of times someone has "liked" the tweet (17).  *See id.*

### E.    Procedural History

Plaintiff initiated this lawsuit on April 28, 2017, by filing a bare bones complaint that largely purported to incorporate by reference the allegations contained in an earlier complaint he filed in *Goldman v. Advance Publications, Inc.*, *et al.*, No. 16 Civ. 9031 (ALC) (S.D.N.Y.), which remains pending before Judge Carter.  Before serving the complaint, Plaintiff made minimal amendments to the complaint.  *See* ECF No. 5.  On May 26, 2017, Plaintiff filed the Second Amended Complaint, which provided some further detail on the nature of the claims against each of the defendants, and included exhibits containing partial screenshots of the Articles.  ECF No. 38.

On July 13, 2017, eight out of the nine defendants moved to dismiss the complaint on the basis that Plaintiff failed to state a claim because embedding of the Photo from Twitter did not directly infringe Plaintiff's alleged copyright in the Photo.  ECF No. 57.  All defendants filed an additional motion to dismiss on the grounds that the use of the Photo constituted fair use as a matter of law.  ECF No. 59.

On August 21, 2017, the Court denied the motions, on the grounds that "[t]he case law in this area, and the facts necessary to resolve the motions, make the motions a poor fit for a motion to dismiss." ECF No. 91 at 1-2. The Court then set a schedule for discovery and briefing of the instant motion. ECF No. 109.

## II.    ARGUMENT

### A.    Standard of Review

Under Fed. R. Civ. P. 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "Once a movant has demonstrated that no material facts are in dispute, the non-movant must set forth specific facts indicating a genuine issue for trial exists in order to avoid the granting of summary judgment." *Cifarelli v. Vill. of Babylon*, 93 F.3d 47, 51 (2d Cir. 1996). "'To defeat summary judgment, a party may not rely on mere speculation or conjecture as to the true nature of facts to overcome a motion for summary judgment' as '[m]ere conclusory allegations or denials . . . cannot themselves create a genuine issue of material fact where none would otherwise exist.'" *Complex Sys., Inc. v. ABN Ambro Bank N.V.*, 979 F. Supp. 2d 456, 467 (S.D.N.Y. 2013) (quoting *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010)). And "[t]he nonmoving party cannot defeat summary judgment by 'simply show[ing] that there is some metaphysical doubt as to the material facts.'" *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Finally, "[o]nly disputes relating to material facts—*i.e.*, 'facts that might affect the outcome of the suit under the governing law'—will properly preclude the entry of summary judgment." *In re M/V MSC FLAMINIA*, 229 F. Supp. 3d 213, 219 (S.D.N.Y. 2017) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

B.    **Defendants' Embedding the Photo Hosted by Twitter Does Not Constitute Direct Infringement Under *Perfect 10* and Its Progeny**

The Second Amended Complaint alleges that each defendant violated plaintiff's exclusive right to publicly display the Photo by "its separate public display of it without plaintiff's knowledge or consent."  SAC ¶ 34.  Under well settled law, when the publisher of a website embeds a photo on its site using an in-line link to a file hosted on and transmitted from a server controlled by a third party, the publisher has not directly infringed the owner's public display right in the work, even if the photo visually "appears" on the site.  That is not because the work is not being displayed at all—when a photo is transmitted to users' computer screens, there can be little dispute that a display is taking place.  The question, however, is *who* is doing the displaying?  *Cf. Cartoon Network, LP v. CSC Holdings, Inc.*, 536 F.3d 121, 126 (2d Cir. 2008) (holding in copyright case that "the dispositive question was '*who* makes the copies?'") (citation omitted).

Under *Perfect 10* and its progeny, and other cases addressing the related practice of hyperlinking, when a website provides a link to content hosted and transmitted directly from a third party server to the user, it is that third party that is displaying and distributing the work, not the publisher.  As discussed in Section II.C below, this does not mean that a publisher could not be held liable for *contributory* infringement in appropriate circumstances (not present or alleged here), but it does mean a publisher that merely provides an in-line link to content already being published on the Internet by a third party is not liable for direct copyright infringement.

As the Ninth Circuit held in *Perfect 10*, this analysis "comports with the language of the Copyright Act," 508 F.3d at 1160, and, as the district court in the case had previously observed, the approach also "reflects the reality of how content actually travels over the internet before it is shown on users' computers."  416 F. Supp. 2d 828, 843 (C.D. Cal. 2006).  As a result, every

court to consider the "server test" approach since *Perfect 10* has ultimately embraced the rule. *See infra* Section II.B.3.

Plaintiff has tried throughout this litigation to distinguish this case from this unbroken line of authority (devoting the bulk of his complaint to allegations of purported differences between what was decided in *Perfect 10* and what is before this Court).  But Plaintiff fundamentally misunderstands the nature of the technology at issue in these cases, as discussed in Sections II.B.2 below. Plaintiff also proposes a slew of hypotheticals that he says demonstrate that the server test, if taken to its extreme, could lead to inequitable results.  These hypotheticals are for the most part based on Plaintiff's misinterpretation of copyright law, as discussed in Section II.C below.  In any event, they are well beyond the scope of this case.

Perhaps there are forms of "embedding" content where, as a technical matter, that content is copied onto, and delivered by, servers owned by the publisher—or where the facts would otherwise distinguish the case from *Perfect 10*.  However, this is not such a case.  Here, the facts are clear that the type of embedding used by each of the moving Defendants is for all relevant purposes indistinguishable from the in-line linking held to be non-infringing by the Ninth Circuit.

      **1.**    ***Perfect 10* Held That In-line Linking a Full-Sized Photo Hosted on a Third Party Site Was Not a "Display" by the Linking Website**

In *Perfect 10*, the plaintiff (a publisher of magazines featuring nude photographs) ("P10") claimed that the defendant, Google, infringed its exclusive right to publicly display its photos when unauthorized copies of those photos appeared on Google's website in the context of results from Google's Image Search service.  That service enabled users to search the web for images that matched particular search terms, much like Google's regular search engine would return websites that matched search terms.  Results were delivered in the form of a grid of "thumbnail"-

14

sized images.  When the user clicked on a thumbnail, a full-sized version of the image would appear on the site, along with additional information about the image.  *See* 508 F.3d at 1155-56.

Unknown third parties had uploaded unauthorized copies of P10's photos to various sites on the web.  Those unauthorized copies showed up in Google Image Search results, with the result that both thumbnail- and full-sized versions of P10's photos appeared on Google's site.  P10 claimed that Google infringed its display rights with both the thumbnail and full-sized versions.  The district court held—and the Ninth Circuit affirmed—that P10 had made a *prima facie* case of direct infringement as to the thumbnail versions, but not the full-sized versions.  The reason for this distinction was the court's application of what it referred to as the "server test."

Under the "server test," "a computer owner that stores an image as electronic information and serves that electronic information directly to the user ('i.e., physically sending ones and zeros over the [I]nternet to the user's browser') is displaying the electronic information in violation of a copyright holder's exclusive display right," but "the owner of a computer that does not store and serve the electronic information to a user is not displaying that information, even if such owner in-line links to or frames the electronic information."  508 F.3d at 1159 (internal citation omitted).

To understand how the server test applied differently to the different sized versions of P10's photos appearing on Google's site, it is necessary to explore what the Ninth Circuit has referred to as "in-line linking."  That court had previously described this process as follows:

> In-line linking allows one to import a graphic from a source website and incorporate it in one's own website, creating the appearance that the in-lined graphic is a seamless part of the second web page.  The in-line link instructs the user's browser to retrieve the linked-to image from the source website and display it on the user's screen, but does so without leaving the linking document.  Thus, the linking party can incorporate the linked image into its own content.  As a

result, although the image in [the end website] came directly from the originating web site and was not copied onto [the end website's] server, <u>the user would not realize that the image actually resided on another web site</u>.

*Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 816 (9th Cir. 2003) (emphasis added) (footnotes omitted).  In *Perfect 10*, Google used this process to present the full-sized versions of P10's images.  The court explained:

> When a user clicks on a thumbnail image, the user's browser program interprets HTML instructions on Google's webpage.  These HTML instructions direct the user's browser to cause a rectangular area (a "window") to appear on the user's computer screen.  The window has two separate areas of information.  The browser fills the top section of the screen with information from the Google webpage, including the thumbnail image and text.  The HTML instructions also give the user's browser the address of the website publisher's computer that stores the full-size version of the thumbnail.  By following the HTML instructions to access the third-party webpage, the user's browser connects to the website publisher's computer, downloads the full-size image, and makes the image appear at the bottom of the window on the user's screen.  Google does not store the images that fill this lower part of the window and does not communicate the images to the user; Google simply provides HTML instructions directing a user's browser to access a third-party website.  However, the top part of the window (containing the information from the Google webpage) appears to frame and comment on the bottom part of the window.  Thus, the user's window appears to be filled with a single integrated presentation of the full-size image, but it is actually an image from a third-party website framed by information from Google's website.

*Perfect 10*, 508 F.3d at 1155–56.

The district court provided an exhibit to give a visual aid to what the in-line linking process looked like to a user:



Exhibit A

*See* 416 F. Supp. 2d at 860; Decl. of Lacy H. Koonce, III ("Koonce Decl.") Ex. 11 (full-sized version of screenshot from published opinion).

　　In arguing that the display of the full-sized versions of the images constituted infringement *by Google*, P10 emphasized that a user could "see all of Perfect 10's best images … full size for free, without ever taking any action to leave Google's website," and that when viewing the images, the user remained "on images.google.com" at all times.  Koonce Decl. Ex. 9 (Declaration of Norman Zada filed in support of P10's motion for preliminary injunction in *Perfect 10*) ¶¶ 38, 40 (emphasis removed).  *See also* Koonce Decl. Ex. 10 (additional exhibits from P10's filings in *Perfect 10* that illustrate the appearance of Google Image Search results, including screenshots of both the thumbnail search results and full-sized images, which appear

17

on webpages with "google.com" as part of the URL in the address bar).  Nevertheless, both the district court and the Ninth Circuit held that Google was not liable for displaying the full-sized images because they appeared on Google's website only via in-line linking and were not actually hosted or served by Google's computers; under the server test, in-line linking was not a direct infringement.  As the district court had held, "the website on which content is stored and by which it is served directly to a user, not the website that in-line links to it, is the website that 'displays' the content."  *Perfect 10*, 416 F. Supp. 2d at 843.  When users would see P10's images on their screen while using Google Image Search, "their computers have engaged in a *direct* connection with third-party websites, which are themselves responsible for transferring content." *Id.*  In other words, providing the in-line link, which consisted only of HTML instructions and not the content itself, did not constitute a "display" of the underlying content, even though the photos plainly appeared on users' screens.[9]

The Ninth Circuit affirmed, grounding its reasoning in "the language of the Copyright Act" itself.  508 F.3d at 1160.  The statute defines "display" of a work as "show[ing] a copy of it, either directly or by means of a film, slide, television image, or any other device or process …." 17 U.S.C. § 101.  To display a work "publicly" is defined as:

> (1) to perform or display it at a place open to the public or at any place where a substantial number of persons outside of a normal circle of a family and its social acquaintances is gathered; or

---

[9] As an alternative approach, the district court also outlined an "'incorporation' test," under which "displaying" could include "the mere act of *incorporating* content into a webpage that is then pulled up by the browser."  416 F. Supp. 2d at 839.  The court acknowledged that both tests could be "susceptible to extreme or dubious results," but concluded that the server test was the better approach, in part because, under the incorporation test, a "website that in-line links to or frames third-party content would risk liability for direct infringement (putting aside the availability of an affirmative defense) even if that website discloses the identity of the actual server of the image." *Id.* at 839-40.  As the court concluded, that test "fails to acknowledge the interconnected nature of the web, both in its physical and logical connections and in its ability to aggregate and present content from multiple sources simultaneously."  *Id.* at 844.

(2) to transmit or otherwise communicate a performance or display of the work to a place specified by clause (1) or to the public, by means of any device or process, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times.

*Id.*  A "copy" is a material object[] … in which a work is fixed … and from which the work can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device."  *Id.*

The court reasoned that, with a digital photograph, the "fixed" "copy" is the file stored on a computer, hard disk or other digital storage device.  *Perfect 10*, 508 F.3d at 1160.  The owner of the storage device "shows a copy 'by means of a … device or process' when the owner uses the computer to fill the computer screen with the photographic image stored on that computer, or by communicating the stored image electronically to another person's computer."  *Id.*  "In sum," the court held, "based on the plain language of the statute, a person displays a photographic image by using a computer to fill a computer screen with a copy of the photographic image fixed in the computer's memory."  *Id.*

Applying this reasoning, the court affirmed that Google was not "displaying" the full-sized images that were being transmitted directly from the underlying third party websites to user's screens.  "Instead of communicating a copy of the image, Google provides HTML instructions that direct a user's browser to a website publisher's computer that stores the full-size photographic image," *id.* at 1161, referring to the text document that comprises the "webpage" that Google transfers to a user's computer when they enter the URL in their browser.  *See id.* at 1155 ("A webpage consists of text interspersed with instructions written in [HTML] that is stored in a computer. No images are stored on a webpage; rather, the HTML instructions on the

webpage provide an address for where the images are stored ….").  The court concluded that

"[p]roviding these HTML instructions is not equivalent to showing a copy" for several reasons:

> First, the HTML instructions are lines of text, not a photographic image.  Second,
> HTML instructions do not themselves cause infringing images to appear on the
> user's computer screen.  The HTML merely gives the address of the image to the
> user's browser.  The browser then interacts with the computer that stores the
> infringing image.  It is this interaction that causes an infringing image to appear
> on the user's computer screen.  Google may facilitate the user's access to
> infringing images.  However, such assistance raises only contributory liability
> issues, and does not constitute direct infringement of the copyright owner's
> display rights.

*Id.* at 1161 (internal citations omitted).  Even though, as is evident from the screenshots from the

case, the presentation of the full-sized screenshots on a page on google.com "gives the

impression that Google is showing the image within a single Google webpage," and users may

"believe they are viewing a single Google webpage," the fact that the full-sized images were

merely in-line linked from other third party sites meant that it was those sites—and not Google—

that was displaying the images to the public.  *Id.*

By contrast, the thumbnail-sized images *were* stored on Google's own servers, and were

communicated directly to users' screens by Google itself.  Applying the server test, the Ninth

Circuit affirmed the district court's holding that P10 had made a *prima facie* case of direct

infringement as to the thumbnail images.  *Id.* at 1160.  However, the Ninth Circuit ultimately

held that the use of thumbnail images in the context of a search engine was sufficiently

transformative to be protected as a fair use.  *Id.* at 1168.

>       2.       **Defendants' Embedding of Tweets Is Not Materially Different from
>                the In-line Linking at Issue in *Perfect 10***

Embedding tweets from Twitter using embed code that directs users' browsers to retrieve

the content directly from Twitter's servers is functionally identical to the in-line linking that the

court in *Perfect 10* held did not directly infringe the public display right:

20

- Similar to the full-sized images in *Perfect 10*, **the Photo was not stored on any of the Defendants' servers with respect to the uses at issue in this motion**.  56.1 Stmt. ¶¶ 38-40.

- **Defendants thus did not communicate a copy** of the Photo to "fill [a user's] computer screen" with the image when a user visited the Websites.  *Perfect 10*, 508 F.3d at 1160.

- Instead, as in *Perfect 10*, when Defendants transmitted the webpages containing the Articles to users, **the webpage documents contained "text interspersed with instructions written in [HTML]," but "[n]o images."**  *Id.* at 1155.  *See* 56.1 Stmt. ¶¶ 11-12, 35.

- As with Google in *Perfect 10*, **the HTML instructions underlying Defendants' websites told users' browser programs to connect directly with servers controlled by third parties** to receive the content directly from those servers.  56.1 Stmt. ¶¶ 14-15. But Defendants' transmitting these "lines of text" "is not equivalent to showing a copy" of the Photo, which was, at all times, served directly to users from Twitter. 508 F.3d at 1161. *See* 56.1 Stmt. ¶¶ 39-40.

- As in *Perfect 10,* even though the embedding of a tweet "gives the impression that [Defendants are] showing the image within a single … webpage" published by the Defendants, under the *Perfect 10* approach, because it is the "interaction" between the users and Twitter that "causes [the Photo] to appear on the user[s'] computer screen[s]," this does not constitute a public display by the publishers of the Websites. *Id.*

For these reasons, just like Google in *Perfect 10*, Defendants are not the parties directly liable for any resulting public "display."

Plaintiff tries to distinguish *Perfect 10* in a variety of ways, which the Court noted in denying the motion to dismiss.  But these purported "distinctions" are either contradicted by the evidence in the record, or are immaterial to the Ninth Circuit's holding.  For example, Plaintiff tries to distinguish Defendants from Google in *Perfect 10* by alleging that "[i]nstead of a thumbnail of the Photo, the defendants prominently displayed the Photo in full and in full color." SAC ¶ 26(a).  But, of course, one of the principle issues in *Perfect 10* was whether Google was liable for the display of the *full-sized*, full color versions of P10's photos that appeared on Google's site.  508 F.3d at 1159.  Liability for the thumbnail versions was an entirely separate issue (and one on which the court reached the opposite conclusion from the full-sized images, since the thumbnails *were* hosted and served by Google).

Plaintiff also contends that Defendants did not provide any "instructions" or an "address" for a site where the Photo could be viewed.  SAC ¶ 26(b).  (In fact, Plaintiff's briefing in his opposition to the motion to dismiss repeatedly characterized the Defendants' incorporation of the Photo as "instructions-free."  *See* ECF No. 81 at 4, 17, 24-27.)  But that is plainly false.  As the evidence shows, the HTLM Document transmitted from Defendants to users contained exactly the same type of HTML "instructions" and URLs (i.e., "addresses") for the tweets containing the Photo, and the URLs for the Photo itself (which all began with the domain name "pic.twitter.com/"), as were provided by Google.  56.1 Stmt. ¶¶ 35-36.[10]

Plaintiff has at times appeared to misread the *Perfect 10* decision's discussion of "instructions" to be in reference to information provided to Google's users about where the

---

[10] *See also* declarations and exhibits cited *supra* note 8.

images could be found on the Internet.  While it's true that Google also provided this information, the Ninth Circuit is quite clear that "instructions" refers to "HTML instructions" that "the user's *browser program* interprets," not textual instructions to the users themselves. 508 F.3d at 1155 (emphasis added).  As the court explains, the HTML instructions "gives the address of the image to the user's *browser*"; "[t]he *browser* then interacts with the computer that stores the infringing image"; and "[i]t is *this* interaction"—between the user's browser program and the computer hosting the image—"that causes an infringing image to appear on the user's computer screen."  *Id.* at 1161 (emphasis added).  That process is identical to what happens when a user's browser software interprets the HTML embed code instructing the browser to "interact" with Twitter to obtain the tweets and the accompanying Photo.  *See* 56.1 Stmt. ¶ 36.

Plaintiff also alleges that the cases are different because, unlike in *Perfect 10*, the Photo was not "framed" the way the P10 photos were framed in Google Image Search (as it operated at the time).  SAC ¶ 26(h).  However, although the presentation of embedded tweets is not identical to the "framing" process used by Google at the time of *Perfect 10*, as is evident in the screenshot above (*see supra* at 10), the embedded tweet containing the Photo, in fact, *is* framed (with a light gray box).  *See also* 56.1 Stmt. ¶ 25.  The framing and overall presentation of an embedded tweet also make it clear that the content comes from Twitter, and includes links to see the tweet in its original context on Twitter's website.  The framing for an embedded tweet arguably makes it even clearer that the content is being delivered from a third party (Twitter) than the in-line linked images in *Perfect 10*, where the court acknowledged the presentation "gives the impression that Google is showing the image within a single Google webpage."  508 F.3d at 1161.

Beyond these flatly wrong distinctions, Plaintiff has also tried to distinguish *Perfect 10* by arguing that its holding is somehow limited to the specific fact pattern of a search engine that

"indiscriminately" sweeps up images from the Internet and where a user is required to "click" on a thumbnail in order to view the full-sized image.  But the reasoning behind the Ninth Circuit's decision does not rely upon, or even address, these purported distinctions at all.   The straightforward application of the "server test" by the Ninth Circuit had nothing to do with whether or not Google had individually selected which of P10's pictures to show on its site or whether the full-sized images appeared as a result of a user's "click" or not.  Instead, the decisive factor was that, when Google transmitted HTML instructions—without actually communicating or transmitting the photos themselves—it was not "displaying" anything as that term is defined in the Copyright Act.  *Id.* at 1161.

Notably, the district court in *Perfect 10* used an illustration of the process of in-line linking that is much closer to the facts of this case than a search engine with the distinctions highlighted by Plaintiff.  The district court described a (hypothetical) website with the URL "SoccerMANIA.com" consisting of a single webpage with the text "We proudly show this photo," with a picture of the soccer player Pelé that was in-line linked "[u]sing standard HTML" but was hosted by a separate website, "SoccerPASSION.com."  416 F. Supp. 2d at 839.  The question the court then answered was "whether SoccerMANIA.com, SoccerPASSION.com, or both have 'displayed' the copyrighted Pelé photo."  *Id.*  After reviewing the precedent in the area, the court determined that the "server test" was the "appropriate" way to determine that answer: that it was the underlying "SoccerPASSION.com" hosting website, and <u>not</u> the in-line linking "SoccerMANIA.com" website, that "displayed" the photo.  *Id.* at 843.  In other words, far from being confined to the search engine context, the district court in *Perfect 10* adopted the server test—subsequently affirmed by the Ninth Circuit—while contemplating a website that featured a single, deliberately chosen photo.  Indeed, the SoccerMANIA.com photo of Pelé

would not even have the clear indicia that the content comes from another site that are present on embedded tweets (or other social media posts).  *See* 56.1 Stmt. ¶ 25.

> **3.**   **No Case Has Rejected the *Perfect 10* "Server Test" Approach for Online Infringement**

Since the Ninth Circuit issued *Perfect 10*, numerous courts have confronted similar questions regarding alleged direct infringement from content appearing on websites.  In every case, the courts have embraced the *Perfect 10* court's reasoning. These decisions only further reinforce the hollowness of the distinctions Plaintiff attempts to draw between this case and *Perfect 10*.

The only other Circuit Court to directly address the server test was the Seventh Circuit, which overturned the district court and embraced the *Perfect 10* approach.  *See Flava Works, Inc. v. Gunter*, 689 F.3d 754 (7th Cir. 2012).  Although *Flava Works* was principally concerned with alleged contributory infringement, the court provided a thorough description of the concept of "embedding" through in-line links similar to the embedding of social media content at issue in this case:

> Patrons of myVidster find videos on the Internet, and if they want to make them available to other patrons of myVidster … "bookmark" (note) them on myVidster's website.  Upon receiving the bookmark myVidster automatically requests the video's "embed code" from the server that hosts (that is, stores) the video. …
>
> The embed code contains the video's web address plus instructions for how to display the video.  Armed with that code, myVidster creates a web page that makes the video appear to be on myVidster's site.  When you visit the site, that video and other videos appear, each in the form of a "thumbnail," a miniature picture of a video's opening screen shot.  A click on a thumbnail activates computer code that connects the visitor's computer to the server; the connection made, the visitor is now watching the video.  He's watching it through a frame that myVidster has put around it, containing ads (it's by selling ads for display on its website that myVidster finances its operation).  He may think, therefore, that he's seeing the video on myVidster's website.  But actually the video is being transmitted directly from the server on which the video is stored to the viewer's

computer.  Someone had uploaded the video to that server, and later a subscriber
to myVidster had come across it and decided to bookmark it.  This led to the
creation of a page on myVidster's website and by clicking on the page other
visitors to myVidster can now view the video—but on the server that hosts the
video, not on myVidster's website; the bookmarked video is not posted on
myVidster's website.

*Id.* at 756.

The court adapted the reasoning of *Perfect 10* to hold that the defendant was not liable for

infringement of the public performance right under the Copyright Act (which is defined similarly

to the public display right).  *Flava Works*, 689 F.3d at 761.  The court likened the HTML

instructions transmitted to a user's browser to a magazine "listing plays and giving the name and

address of the theaters where they are being performed."  *Id.* (citing, *inter alia*, *Perfect 10*, 508

F.3d at 1159-61).   Because the website was not "transmitting or communicating" the videos

themselves—in fact, the defendant "doesn't touch the data stream, which flows directly from one

computer to another, neither being owned or operated by [the defendant]"—it was not publicly

"performing" them (in the same way that Google in *Perfect 10*, and the Defendants here, did not

"display" the photographs at issue).  *Id.*

District Courts in this District have also adopted the reasoning of *Perfect 10* to questions

of direct infringement in a variety of contexts.  In *MyPlayCity, Inc. v. Conduit Ltd.*, No. 10 Civ.

1615(CM), 2012 WL 1107648 (S.D.N.Y. Mar. 30, 2012), *adhered to on recons.*, 2012 WL

2929392 (S.D.N.Y. July 18, 2012), the defendant created customized "toolbar" software that

users could install on their browser programs.  The plaintiff—a video game publisher—

contracted with the defendant to create a branded toolbar that provided access to the plaintiff's

games, but those games resided at all times on plaintiff's own servers.  *Id.* at *2.  After the

contract was terminated, the defendant continued offering the toolbar to customers.  Relying on

*Perfect 10*, the court held that the defendant's distribution of the toolbars did not constitute direct

26

copyright infringement of plaintiff's video games (in that case, of the distribution right) because the evidence showed that the plaintiff's copyrighted games resided at all times on the plaintiff's own servers, and users accessed them directly from there—"[t]he Toolbars did not themselves contain copies of [the plaintiff's] copyrighted software." *Id.* at *13.

More recently, Judge Buchwald held that a defendant was likely not liable for direct infringement of a plaintiff's software program when it "embed[ed] an HTML script tag in the HTML code of its website" to cause the defendant's website to "display a video of a 'walking' and 'talking' personal host to welcome online visitors" to the site. *Live Face on Web, LLC v. Biblio Holdings LLC*, No. 15 Civ. 4848 (NRB), 2016 WL 4766344, at *1 (S.D.N.Y. Sept. 13, 2016). The defendant's website did not store or transmit the software program or video itself. Instead, the embedded code linked to content located on a page from another website, "http://tweople.com," which stored and transmitted the file containing the software to the visitors to defendant's site. *Id.* Relying on *Perfect 10*, the court held that, most likely, "any infringing distribution was done by Tweople," because, based on a review of the HTML code for the website, it was that "third-party server [that] stored and disseminated the infringing file directly to Website visitors." *Id.* at *4. Although the court held it would permit discovery on whether the defendant was directly involved in the transmission of the infringing software from the "Tweople" website, the fact that the defendant intentionally chose to embed the program on its site had no bearing on whether the defendant could be liable for direct infringement when it never actually stored or communicated the software. *Id.* at *2-3. This was so even though the program was prominently featured on the defendant's website without requiring any additional

"click" from the user, and allegedly helped generate revenues and profits for the defendants, by "enhancing the ability of the Website to promote and sell its products." *Id.*[11]

Finally, in another case in this District, Judge Sullivan considered infringement claims over a service that created a market for "used" digital copies of music. *See Capitol Records, LLC v. ReDigi Inc.*, 934 F. Supp. 2d 640 (S.D.N.Y. 2013). While he granted partial summary judgment on Plaintiff's infringement claims involving the reproduction and distribution rights in the sound recordings, he also ruled that factual issues precluded summary judgment on whether the defendant's service violated the public display rights in album cover art associated with the sound recordings. Although other factual issues precluded summary judgment on this issue, the court suggested that *Perfect 10* could be decisive of the display question, noting that "[t]he Ninth Circuit has held that the display of a photographic image on a computer may implicate the display right, though infringement hinges, in part, on where the image was hosted," and citing no other authority (let alone any contrary authority) for the issue. *Id.* at 652 (citing *Perfect 10*, 508 F.3d at 1160).

Decisions in other districts are in accord, and further undermine Plaintiff's attempts to distinguish this case from *Perfect 10*. In *Leveyfilm, Inc. v. Fox Sports Interactive Media, LLC*, No. 13 C 4664, 2014 WL 3368893 (N.D. Ill. July 8, 2014), the work at issue was a photograph that had appeared on the cover of a DVD. The operator of a news website published an article

---

[11] In opposing the motion to dismiss, Plaintiff cited a different case involving the same plaintiff, *Live Face on the Web, LLC v. Smart Move Search, Inc.*, No. 15-4198(JHR/AMD), 2017 WL 1064664 (D.N.J. Mar. 21, 2017), in which the court denied the defendant's motion to dismiss the claim for direct infringement, holding that "by alleging that Smart Move's website causes a copy of the LFOW Software to be distributed to the website visitor's computer," the plaintiff had sufficiently pled a claim. *Id.* at *2. The court expressly held that "[t]he specific technological mechanism by which this is accomplished may be explored during discovery." *Id.* (citation omitted). It is unclear if the defendant's website simply embedded the equivalent of an in-line link to a third party site (like "Tweople," in the *Biblio* case). In any event, the court gives no indication that, if the evidence revealed that an in-line link to a third party site were the "specific technological mechanism" at issue, that the defendant would somehow be liable for direct infringement.

and uploaded an unauthorized copy of the photo, which she had downloaded from the Internet. *Id.* at *1. At some point thereafter, that website entered into an affiliate agreement with the defendant, which operated a site called "Yardbarker," under which the defendant could syndicate the articles from the news website and distribute them via the yardbarker.com site. Thus, the article containing the infringing photograph also appeared on yardbarker.com. However, there was no dispute the photograph remained stored on the servers for the original website, and was never stored on or communicated from Yardbarker's servers. *Id.* at *2. Therefore, relying on *Perfect 10* and the Seventh Circuit's decision in *Flava Works*, the court held the defendant could not be liable for direct infringement. *Id.* *4-5. That the photo was purposely selected to appear in an editorial context, and that Yardbarker had intentionally decided to syndicate the original article containing the photograph, had no bearing on this result.

In *Grady v. Iacullo*, No. 13-cv-00624-RM-KMT, 2016 WL 1559134 (D. Colo. Apr. 18, 2016), the plaintiff alleged that the defendant infringed his copyrights by posting thumbnails of photos and videos owned by the plaintiff on a message board. The defendant argued that, as in *Perfect 10*, he could not be liable because he never copied or stored plaintiff's photographs or videos—he only provided links (albeit in-line links containing thumbnails of the images). *Id.* at *5. The court explained that the "key consideration" in *Perfect 10* was "whether a copyrighted image was *stored* on an alleged infringer's computer." *Id.* The court rejected the plaintiff's argument—similar to Plaintiff's suggestion here—that, "because defendant is a living, breathing person with free will, defendant's decisions to share plaintiff's photographs and videos render that conduct more infringing than Google's." *Id.* at *7. That argument, the court explained, "misses the point that Google's conduct was either infringing or not based on whether Google stored thumbnails or full-sized images on its computers." *Id.* The court summarized that,

"whether or not a person or entity must act with free will or volitionally, … at the very least, the copyrighted work must be stored on the person or entity's computer." *Id.* (citation omitted).[12]

And finally, in *Totally Her Media, LLC v. BWP Media USA, Inc.*, No. CV 13-8379-AB (PLAx), 2015 WL 12659912 (C.D. Cal. Mar. 24, 2015), the Central District of California followed *Perfect 10* to hold that a fashion website where photographs were "posted" by users did not directly infringe the plaintiff's display rights when the images were stored on third-party websites. Quoting *Perfect 10*, the court noted that "'[i]n-line linked images that appear on a user's computer screen' do not, by themselves constitute direct infringement where the website displaying the images does 'not store the photographic images' on its own servers." *Id.* at *11 (quoting 508 F.3d at 1160-61). At most, the website "facilitates th[e] interaction between a third-party user and a third-party server," but "'such assistance raises only contributory liability issues,'" and "'does not constitute direct infringement of the copyright owner's display rights.'" *Id.* (quoting 508 F.3d at 1161).

Over the course of this litigation, Plaintiff has attempted to distinguish these cases in a variety of ways. Defendants concede that these cases did not necessarily arise from identical fact patterns or in precisely the same procedural posture as this case. Yet the very breadth of these cases—and the absence of <u>even a single case</u> that considered the *Perfect 10* analysis and ultimately concluded differently[13]—demonstrate the versatility and appropriateness of the

---

[12] Subsequently, the court in *Grady* granted summary judgment to the plaintiff because the evidence and expert testimony showed that the defendant had, in fact, *downloaded* the files containing the photographs at issue to his computer, he was liable for "direct copyright infringement." *Grady v. Iacullo*, No. 13 Civ. 624, 2017 WL 1176415, at *4 (D. Colo. Mar. 29, 2017). However, the court did not specify which particular right was infringed. In particular, the court did not suggest that the saving of the files on defendant's computer amounted to an infringement of the display right, and such a conclusion would have made little sense. The court also did not revisit or reconsider its prior adoption of *Perfect 10*—in fact, the subsequent decision did not cite *Perfect 10* at all.

[13] The one potential exception was the district court in *Flava Works*, which was then overturned by the Seventh Circuit. *See* 689 F.3d 754.

*Perfect 10* approach, generally.  Plaintiff cannot point to any authority compelling this Court to diverge from this judicial consensus.

> **C.      The *Perfect 10* Test Does Not Foreclose Other Remedies for Content Owners**

Plaintiff has previously argued that, should web publishers be permitted to continue to rely on the test articulated by the *Perfect 10* court in appropriate cases, all photographers will become victims of widespread and unbridled infringement of their content caused by embedding of social media posts.  While the parade of horribles Plaintiff raises is not strictly relevant to the elements of Plaintiff's claims or Defendants' defenses, we briefly address this concern below.

First, photographers and other content owners have a direct remedy for any infringement by persons who unlawfully post content to social media: They can take action directly against that infringer.  Assuming that Plaintiff is correct that the person(s) who posted the Photo on Twitter did so without authorization, Plaintiff could have immediately demanded that the poster delete the Photo (or the entire tweet), and/or could have sought immediate relief in court for direct copyright infringement.  Removal of the Photo would have immediately resulted in the Photo being unavailable anywhere the tweet was embedded, since the embedding web publishers had no control over the underlying content.[14]  *See* 56.1 Stmt. ¶ 44.

Second, content owners may have recourse against social media companies hosting their images.  To be sure, under the Digital Millennium Copyright Act, Internet Service Providers ("ISP") – such as owners of social media platforms – can take advantage of the 17 U.S.C. § 512(c) safe harbor in connection with material stored "at the direction of a user" if the ISP is not aware of the infringing material, and upon receiving notification of infringement "responds

---

[14] In fact, since the Photo, or the tweets containing it, were deleted from Twitter, the Articles embedding those tweets now show only the raw text of the tweet itself and no longer incorporate the Photo.  *See* 56.1 Stmt. ¶ 44.

expeditiously to remove, or disable access to, the material that is claimed to be infringing or to be the subject of infringing activity."  But content owners are empowered to send a takedown notice to a social media platform immediately after learning of an infringing post, and the social media platform is obligated to take the material down expeditiously.  Removal of the post would instantly render it invisible anywhere it had been embedded.

Third, the *Perfect 10* test fits logically within the framework of direct and secondary liability that has developed over the past three decades under copyright law.  Under Supreme Court precedent, direct infringers are those parties that themselves make copies, distribute copies to the public, produce derivative works, publicly perform works, or display works to the public.  *See Am. Broad. Cos. v. Aereo, Inc.*, 573 U.S. __, 134 S.Ct. 2498, 2512 (2014) ("As its name suggests, [direct infringement] applies when an actor personally engages in infringing conduct.") (Scalia, J., dissenting) (citing *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 433 (1984)).  "Secondary liability, by contrast, is a means of holding defendants responsible for infringement by third parties, even when the defendants 'have not themselves engaged in the infringing activity.' ... It applies when a defendant 'intentionally induc[es] or encourag[es]' infringing acts by others or profits from such acts 'while declining to exercise a right to stop or limit [them].'"  *Id.* (quoting *Sony*, 464 U.S. at 435; *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005)).

As noted above, when a party embeds or in-line links to content hosted on a third party's server, it is analogous to opening a window onto the underlying content.  In an appropriate case, this act might well trigger a claim for secondary infringement, if the party opening that window has, for instance, induced the third party to host the infringing content, or continued to link to it after being put on notice that it was infringing.  Indeed, in *Perfect 10*, the Ninth Circuit remanded

the case to the district court for further fact-finding on whether Google could be liable for contributory infringement for the third-party websites hosting infringing copies of P10's to which Google provided access.  508 F.3d at 1172-73.  *See also Perfect 10*, 416 F. Supp. 2d at 843-44 (explaining that, under the server test, "[c]opyright owners may still seek, as P10 does, to impose contributory or vicarious liability on websites for the inclusion of such content").

That is also how courts have viewed the use of hyperlinks that connect users to infringing material.  For instance, in *Pearson Educ., Inc. v. Ishayev*, 963 F. Supp. 2d 239, 250-51 (S.D.N.Y. 2013), it was undisputed that the defendant sent emails "containing hyperlinks to a website called filesonic.com from which [the recipient] could and did directly download the specific requested manuals."  In other words, the defendant fully intended that the recipient click on the hyperlinks and access infringing material.  However, with respect to plaintiff's claim for direct infringement, the court held:

> As a matter of law, sending an email containing a hyperlink to a site facilitating the sale of a copyrighted work does not itself constitute copyright infringement. A hyperlink (or HTML instructions directing an internet user to a particular website) is the digital equivalent of giving the recipient driving directions to another website on the Internet.  A hyperlink does not itself contain any substantive content . . . . Because hyperlinks do not themselves contain the copyrighted or protected derivative works, forwarding them does not infringe on any of a copyright owner's five exclusive rights under § 106.

*Id.* (citing *MyPlayCity*, 2012 WL 1107648, at *12; *Perfect 10*, 508 F.3d at 1161; *Arista Records, Inc. v. Mp3Board, Inc.*, No. 00 CIV. 4660(SHS), 2002 WL 1997918, at *4 (S.D.N.Y. Aug. 29, 2002)).

The *Ishayev* court noted, however, that with respect to providing hyperlinks to infringing content, "in some instances there may be a tenable claim of contributory infringement or vicarious liability."  963 F. Supp. 2d at 250-51 n.11 (citing *Online Policy Grp. v. Diebold, Inc.*, 337 F. Supp. 2d 1195, 1202 (N.D. Cal. 2004)).  In a subsequent decision, the court noted that a

plaintiff can show contributory infringement where "one who, with knowledge of the infringing activity, *induces*, causes *or materially contributes to the infringing conduct of another* ...."  9 F. Supp. 3d 328, 338-39 (S.D.N.Y. 2014) (quoting *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 117 (2d Cir. 2010)).  It then noted that:

> The publishers assert that Ishayev is liable for contributory infringement because he knowingly sold access to hyperlinks, which allowed other individuals to download eight of the publishers' copyright protected works from a website.  If proven with competent evidence, such conduct would lead to liability for contributory copyright infringement—sending hyperlinks that permit others to download protected materials would plainly amount to conduct that encourages or assists in copyright infringement.  Ishayev may assert that he did not know that these materials were protected by copyright, but based on the publishers' registration certificates, he would at least have 'reason to know' of their protected status.

*Id.* (quoting *Arista Records*, 604 F.3d at 117-18); *see, e.g.*, *Perfect 10*, 508 F.3d at 1169-75; *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004 (9th Cir. 2001).

Here, not only has Plaintiff not pleaded a secondary liability claim, he has not – and could not – allege that Defendants knew that the Photo was infringing when they embedded it. However, in a different case, with facts suggesting that a web publisher was knowingly linking to infringing conduct or otherwise contributing to or inducing infringement, a claim for secondary liability provides further recourse for a photographer whose content has been directly infringed by a party posting that content to social media without authorization.

Plaintiff's arguments that applying the server test to this case would somehow leave all photographers, everywhere, at the mercy of infringers simply does not hold water.  Only by ignoring the primary infringer (the party who posted the Photo on social media in the first instance, whom Plaintiff has not sued here), foregoing the protections of the DMCA, and ignoring the availability of secondary liability claims where an embedding party has acted knowingly to further infringement, can Plaintiff even venture such a meritless assertion. This is

simply a red herring. Defendants urge the Court to focus instead on the specific facts necessary to determine that the defendant publishers did not directly infringe Plaintiff's rights in his Photo under well settled law.

Finally, in his Complaint, Plaintiff posits multiple hypotheticals that, he says, demonstrate that the *Perfect 10* test cannot be applied without leading to undesirable results. These theoretical fact patterns go well beyond the facts of this case, and should be disregarded on this motion.  They are also fundamentally misleading.  In each scenario, Plaintiff imagines a web publisher embedding third-party content on its website, *and then doing something else with it:* for example, publicly displaying the web page on a Jumbotron or on a screen at a bar.  *See* SAC  ¶¶ 27-31.  In those circumstances, if the underlying content were infringing, a publisher might well be liable for direct infringement of the display right for providing a public display under the first definition of "public display" provided in 17 U.S.C. § 101 ("display it at a place open to the public or at any place where a substantial number of persons outside of a normal circle of a family and its social acquaintances is gathered"), just as any other party would be who used a screen containing the web page and displayed it in a similar manner.  But under *Perfect 10*, the publisher of the website being shown would *not* be liable for the mere act of embedding or in-line linking to the underlying content hosted by the (infringing) third party.

## CONCLUSION

As the district court in the *Perfect 10* litigation recognized, to adopt the rule urged by Plaintiff, that a website publisher could be liable for an infringing "display" of a copyrighted work whenever the work is visually incorporated into the page, regardless of where the image is actually hosted, "would cause a tremendous chilling effect on the core functionality of the web— its capacity to link, a vital feature of the internet that makes it accessible, creative, and valuable."

*Perfect 10*, 416 F. Supp. 2d at 840.  Indeed, Plaintiff's position—like that of the plaintiff in *Perfect 10*—"fails to acknowledge the interconnected nature of the web, both in its physical and logical connections and in its ability to aggregate and present content from multiple sources simultaneously."  *Id.* at 844. On the facts of this case, the Court should instead follow the rule set forth by the Ninth Circuit (which has been embraced by courts in this District in other contexts) and find that the Defendants have not infringed Plaintiff's copyright as a matter of law.

Because there is no genuine issue of fact as to whether Defendants' embedding of the Photo from Twitter was materially different from the "in-line linking" process described in *Perfect 10*, and because Plaintiff cannot point to any authority for this Court's departure from the *Perfect 10* analysis, this Court should grant Defendants' motion for partial summary judgment and dismiss the claims as to any uses of the Photo that arise solely from embedded tweets.

Dated: New York, New York
      October 5, 2017

Respectfully submitted,

By: */s/ Regina Schaffer-Goldman*
    Regina Schaffer-Goldman (RS-0630)

MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, New York 10178
Tel.: (212) 309-6000
regina.schaffer-goldman@morganlewis.com

Lawrence T. Stanley, Jr. (*pro hac vice*)
MORGAN, LEWIS & BOCKIUS LLP
One Federal Street
Boston, MA 02110
Tel. (617) 341-7700
lawrence.stanley@morganlewis.com

*Attorneys for Defendant Boston Globe Media Partners LLC*

By: */s/ Robert Penchina*
    Robert Penchina

BALLARD SPAHR, LLP
919 Third Avenue, 37th Floor
New York, NY 10022
Tel.: (212) 850-6109
penchinar@ballardspahr.com

*Attorneys for Defendant Gannett Company, Inc.*


By: */s/ Joseph D. Lipchitz*
    Joseph D. Lipchitz (*admitted pro hac vice*)

MINTZ LEVIN COHN FERRIS
GLOVSKY AND POPEO PC
One Financial Center
Boston, MA 02111
Tel.: (619) 542-6000
jdlipchitz@mintz.com

*Attorney for Defendant Herald Media, Inc.*


By: */s/ Stephen M. Kramarsky*
    Stephen M. Kramarsky (SK-6666)
    Joseph P. Mueller (JM-3113)

DEWEY PEGNO & KRAMARSKY LLP
777 Third Avenue, 37th Floor
New York, NY 10017
Tel.: (212) 943-9000
skramarsky@dpklaw.com
jmueller@dpklaw.com

*Attorneys for Defendant New England Sports Network*

By: */s/ Lacy H. Koonce, III*
    Lacy H. Koonce, III (LK 8584)
    Eric J. Feder (EF 8016)

DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, NY  10020
Tel.: (212) 489-8230
Fax: (212) 489-8340
Email: lancekoonce@dwt.com
Email: ericfeder@dwt.com

*Attorneys for Defendants Time Inc. and Vox
Media, Inc.*


By: */s/ Thomas P. Lane*
    Thomas Patrick Lane

WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166
Tel.: (212) 294-6700
Fax: (212) 294-4700
tlane@winston.com

Jennifer A. Golinveaux (*pro hac vice*)
WINSTON & STRAWN LLP
101 California Street
San Francisco, CA 94111
Tel.: (415) 591-1400
jgolinveaux@winston.com

*Attorneys for Defendant Yahoo Holdings, Inc.*