UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
JUSTIN GOLDMAN,

                 Plaintiff,

       - against -                       17 Civ. 3144 (KBF)

BREITBART NEWS NETWORK, LLC;
HEAVY, INC.; TIME, INC.; YAHOO, INC.;
VOX MEDIA, INC.; GANNETT COMPANY, INC.;
HERALD MEDIA, INC.; BOSTON GLOBE
MEDIA PARTNERS, LLC; NEW ENGLAND
SPORTS NETWORK, INC.,

                 Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

PLAINTIFF'S MEMORANDUM OF LAW
<u>IN OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT</u>

Kenneth P. Norwick
Cooper Knowlton
NORWICK & SCHAD
110 East 59th Street
New York, NY 10022
(212) 751-4440
ken@norwickschad.com

Attorneys for Plaintiff

TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

PRELIMINARY COMMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

THE UNDISPUTED FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10

THE UNVARNISHED PERFECT 10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13

      The Facts of Perfect 10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13

      The Genesis of the Perfect 10 Opinion . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14

      The Ninth Circuit's Opinion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   16

      The Legal Fallacy of the Opinion (and Defendants' Adoption of It) . . . . . .   18

A NON-ABSURD SOLUTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   22

THE RELEVANT (OTHER) CASES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   23

      Cases Cited by Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   24

      Cases Not Relied On By Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   28

ABOUT TWITTER (AND OTHER SITES) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   30

THE ABSENCE OF REMEDIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   31

A WORD ABOUT WORDS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   33

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   35

<u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

<u>Agence France Presse v. Morel</u>, 769 F.Supp.2d 295 (S.D.N.Y.
      2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   31n

<u>Agence France Presse v. Morel</u>, 2014 U.S. Dist. LEXIS 112436
      (S.D.N.Y. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   31n

<u>Attia v. Society of the New York Hospital</u>, 201 F.3d 50 (2d Cir. 1999) . . . . . . . .   8

<u>BWP Media USA Inc. v. Polyvore, Inc.</u>, 2016 U.S. Dist.
      LEXIS 92121 (S.D.N.Y. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . .   20n- 21n

<u>Capitol Records, LLC v. ReDigi Inc.</u>, 934 F. Supp. 2d 640
      (S.D.N.Y. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19n, 25-26

<u>EMI Christian Music Grp., Inc. v. MP3-tunes, LLC</u>, 844 F.3d 79
      (2d Cir. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   7

<u>Ennio Morricone Music Inc. v. Bixio Music Grp. LTD</u>, 16 cv 8475,
      Docket No. 39; 2017 U.S. Dist. LEXIS 177643 (S.D.N.Y. 2017) . . . . . . .   36

<u>Flava Works, Inc. v. Gunter</u>, 689 F.3d 754 (7th Cir. 2012) . . . . . . . . . . . . . . . . . .   24

<u>Goldman v. Advance Publications, Inc. et al.</u>, 16 Civ 9031 (ALC) . . . . . . . . . .   5n

<u>Grady v. Iacullo</u>, 2016 U.S. Dist. LEXIS 51584 (D. Colo. 2016) . . . . . . . . . .   27-28

<u>Grady v. Iacullo</u>, 2017 U.S. Dist. LEXIS 47739 (D. Colo. 2017) . . . . . . . . .   29-30

<u>Hard Rock Café International v. Morton</u>, 1999 U.S. Dist.
      LEXIS 8340 (S.D.N.Y. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   28-29

<u>Leveyfilm, Inc. v. Fox Sports Interactive Media, LLC</u>, 2014 U.S.
      Dist. LEXIS 92809 (N.D.Ill. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . .   26

<u>Live Face On Web, LLC v. Biblio Holdings LLC</u>, 2016 U.S. Dist.
      LEXIS 124198 (S.D.N.Y. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   27

<u>Live Face on the Web, LLC v. Smart Move Search, Inc.</u>, 2017 U.S.
      Dist. LEXIS 40247 (D.N.J. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   30

Cases, Continued

MAI Systems Corp. v. Peak Computer, Inc., 991 F.2d 511 (9th Cir. 1993) . . .   18-20

MyPlayCity, Inc. v. Conduit Ltd, 2012 U.S. Dist. LEXIS 473123
    (S.D.N.Y. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   24

New York Times Co., Inc. v. Tasini, 533 U.S. 483 (2001) . . . . . . . . . . . . . .   8, 35

Pearson Education, Inc. v. Ishayev, 963 F.Supp.2d 239
    (S.D.N.Y. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   23n, 24-25

Perfect 10, Inc. v. Amazon.com, Inc., 508 F.3d 1146 (9th Cir. 2007) . . . . . .   passim

Perfect 10, Inc. v. Google, Inc,. 416  F.Supp.2d 828 (C.D.Cal. 2006) . . . .   passim

Sealey v. Olszewski, 2017 U.S. Dist. LEXIS 177974, *36
    (W.D.N.Y. October 25, 2017) .. . . . . . . . . . . . . . . . . . . . . . . . . . . .   36n

The Cartoon Network v. CSC Holdings, Inc., 536 F.3d 121
    (2d Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   20n- 21n

Totally Her Media, LLC v. BWP Media USA, Inc.,
    Case 2:13-cv-08379 (C.D.Cal. 2015) . . . . . . . . . . . . . . . . . . . . . . . .   26-27

Twentieth Century Music v. Aiken, 422 U.S. 151 (1975) . . . . . . . . . . . . . .   36

United States v. Dauray, 215 F.3d 257, 264 (2d Cir. 2000) . . . . . . . . . . . . .   33

Viacom International, Inc. v. YouTube, Inc., 676 F.3d 19 (2d Cir. 2012) . . . . .   9n

Wolk v. Kodak Imaging Network, Inc., 840 F.Supp.2d 724 (S.D.N.Y. 2011),
    aff'd, 569 Fed.Appx. 51 *2d Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . .   9n

Statutes

Digital Millennium Copyright Act, 17 U.S. §512 . . . . . . . . . . . . . . . . . .   9n, 34-35

United States Copyright Act, 17 U.S.C. §106(5)) . . . . . . . . . . . . . . . . . . .   passim

United States Copyright Act, 17 U.S.C. §101 . . . . . . . . . . . . . . . . . . . . . .   passim

PLAINTIFF'S MEMORANDUM OF LAW
<u>IN OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT</u>

<u>PRELIMINARY COMMENTS</u>

Belying all their smoke about the "sharing" of "information," defendants' papers — including those of their <u>amici</u> — exquisitely expose the predation that underlies their plea that this Court on this motion enshrine into (judge-made) law a sweeping industry-wide immunity for all manner of copyright theft on the Internet.  Leaving no doubt on that issue — and on the astonishing contradictions within the industry as to the true nature of embedding — is defendants' <u>amici</u>'s presentation of the process that would (if approved by this Court) allow every website in the world — including pornographic, hate-speech, all shades of political, and entirely commercial/advertising — to help themselves with impunity and without the pesky obligation to pay for it any and all copyrighted content they covet.[1]

Totally mocking the defendants' repeated invocations of the benign-sounding "sharing" of "information" is the hypothetical proffered by their <u>amici</u>, which hypothetical those <u>amici</u> assure this Court is the "analog" to -- the essence of -- what this Court should understand as the real function of embedding.  Here's that hypothetical (emphasis added):

> To better understand how the above process works, imagine that a reporter, Wanda, has written a story about a safety issue in Toyota cars. She prints paper copies of the story, <u>but she doesn't have her own image to illustrate it</u>.  She recalls that her friend Sally, the illustrator, <u>does have such an image</u>.  So Wanda leaves a rectangle of space in her article, with the instructions "Cut out this rectangle, then <u>ask</u> Sally for picture #3, and peer at it through the opening."

---

[1] Specifically, the immunity defendants ask this Court to order would allow them -- and every other website in the world -- to prominently display without authority but with impunity on all their websites -- for any purpose, including advertising -- full-size, full-color, high-resolution versions of any and all copyright-protected creative matter (here photographs) that they see anywhere on the Internet.

Ronald, the reader, gets a copy of the article and <u>decides to follow</u> the <u>instruct-</u><u>ions</u>.  So, he goes to Sally, <u>asks her for picture #3</u>, and <u>she lifts up a picture</u> of a Toyota.  Ronald holds up Wanda's article and sees the picture through the cut-out.  Meanwhile, Wanda is across town, unaware of whether Ronald visited Sally, whether <u>Sally agreed to his request</u>, or whether "picture #3" is still the illustration it was when she last visited Sally.

In the online context, Wanda is the website creator and Sally operates the server where images may be found. <u>Wanda tells readers like Ronald where to go and what image to ask for, and Sally decides how to respond to the request</u>.[2]

Of course, this hypothetical is wholly at odds with the rendition of embedding that defendants proffer on this motion.  Here (unlike in defendants' <u>amici</u>'s "analog") defendants concede that in their version of embedding 1) Ronald (the stand-in website visitor) has no role in obtaining the photo from Sally (the "illustrator" copyright owner) -- he "decides" nothing and "asks for" nothing -- because Wanda (the embedding website) makes that "decision" and does that "asking" for him; 2) only Wanda, and not Ronald, "follows" (her own) "instructions" to enable her to display Sally's photo; 3) it is Wanda, and only Wanda, who does all that is needed to "respond" to (her own) "request" and to then display the photo on her website; and 4) Sally, like Ronald, has no say about and nothing whatever to do with this caper.

Further, by asserting that Sally can control whether Wanda can help herself to the image -- according to the analog, when "asked" "Sally lifts up" a photo and "decides how to respond to the request" -- defendants' <u>amici</u> directly contradict defendants' central argument that no knowledge on the part of and no consent from the copyright owner of the image is needed for the embedding of it.  Indeed, to the extent defendants' <u>amici</u> assume -- as they clearly do -- both that Ronald has the discretion to "decide" to "ask" for the photo and then "follow" "instructions" provided to him

---

[2] <u>Amicus</u> brief of the Electronic Frontier Foundation and Public Knowledge (Docket 143-1), pp. 5-6.

to find it and that Sally controls how to respond, they powerfully reinforce plaintiff's challenge to defendants' argument that no such user-discretion and no such owner-control is needed for the legalized embedding they seek.

As far as plaintiff is concerned, to the extent defendants' <u>amici</u> assert that the relevant copyright owner can control whether or not her creation can be embedded – "<u>and Sally decides how to respond to the request</u>" -- plaintiff has no objection, legal or otherwise, to that rendition of embedding.  And to the extent defendants' <u>amici</u> would require the consent of the copyright owner for embedding, they show (albeit <u>sub silentio</u>) commendable recognition of, and respect for, the rights of copyright owners like Sally (and plaintiff here).  As we understand those <u>amici</u>, they contend that "the activity" at issue in this case "follows" "exactly" the process in their hypothetical, including Sally's control over the embedding of her creation.

But to the extent those <u>amici</u> (somehow) also support defendants' view that no such owner knowledge or consent is needed for immunized embedding, they, like defendants, blow-off the rights and interests of all those owners.  To that extent, those <u>amici</u> lay bare the self-serving, profit-seeking real reason defendants beseech this Court to create wholesale copyright immunity for embedding.  As revealed by that "analog," defendants seek that copyright immunity precisely for the reason presented in the hypothetical: when a website doesn't "have"-- more accurately, doesn't want to pay for -- copyrighted content owned by others, it must be legally free to help itself to that content, precisely as each defendant did in this case.[3]

---

[3] It is telling that defendants' <u>amici</u> chose for their embedding "analog" a copyrighted photo and not such "information" as statistics about Toyota cars, or minutes of a Toyota board meeting, or a court decision concerning Toyota cars.

In yet another important respect, defendants' amici undercut a central contention of the defendants in this case.  Specifically, although defendants repeatedly suggest -- falsely -- that there is something unique about Twitter and tweets when it comes to adjudicating their claim for wholesale legal immunity for embedding, their amici's "analog" makes no reference to any social media and simply reports that Sally's file cabinet is "analogous" to her own website, and not to any tweet.  Defendants' implication that embedding only involves tweets (or even all social media) is the essence of misdirection -- there is nothing in their view of embedding that is limited to social media and, of course, their "North Star" – the Perfect 10 case – had nothing whatever to do with social media.   The reality is that copyrighted content on every website in the world can be the subject (in our view, victim) of the embedding promoted by defendants in this case.

Without exaggeration, the real goal of the requested judicial immunization of embedding is to allow all for-profit websites like defendants' to unilaterally seek-out and then appropriate -- steal -- with legal impunity and without cost valuable copyrighted property owned by others, including every copyrighted photo ever created that they can find on the Internet.

*   *   *   *

The Complaint in this action presented three hypotheticals that demonstrate the impact of a ruling immunizing embedding.  Defendants try, unsuccessfully,[4] to distinguish those hypotheticals, even while they refuse to address them on the merits, leaving them undisputed.  Moreover, as alleged in the Complaint, and as never disputed by anyone, a lawyer for Advance Publications,

_____

[4] Ostensibly misunderstanding those hypotheticals, defendants claim that the parties prominently displaying the copyright works are not the original embedders, which purported construction enables defendants to dodge the questions asked.  They are wrong.  As the hypotheticals make clear, those displaying parties are themselves the actual embedders – on their own computers – thus rendering baseless defendants only excuse for dodging those questions.

Inc., a defendant in the parallel "embed" case,[5] forthrightly acknowledged in response to one of those hypotheticals: "While your '9/11 Bar' hypothetical does a good job of showcasing how the server test can be perceivably absurd, it does not address the fact that the language of the Copyright Act [sic] does not consider in-line links to be infringing."[6]  Right about "absurd," and also right that that hypothetical is directly applicable to the legal issues in this case.[7]

Because defendants purport to dispute the applicability to this motion of plaintiff's three original hypotheticals, here are four more (derived from the Declaration of Ryan LaCorte submitted herewith).  We assume defendants will similarly dodge these as well, thus also leaving them undisputed.  Here they are:

-- Time Magazine maintains a website displaying the "100 Most Influential Images of All Time," located at http://100photos.time.com.  Immunized embedding will allow every other website in the world – including pornographic, hate-speech, all manner of political, and entirely advertising/commercial sites – to easily and freely embed each and every one of those 100 photos and prominently display them on their own sites – with absolutely no way for Time (or the

_____

[5] Goldman v. Advance Publications, Inc. et al., 16 cv 9031 (ALC), Doc. No. 1).

[6] The reference to the "language of the Copyright Act" is discussed infra at pp. 19-20.

[7]It is worth noting what exactly Advance's lawyer considered "absurd": the hypothetical disparate legal treatment of identical displays of the same copyrighted photo, depending on whether one was embedded and the other not.  But that is exactly the situation presented on this motion, where defendants Time, Yahoo, and Boston Globe disclose that they all displayed the Photo several times on their websites, with at least one of those displays by way of embedding and at least one other through more traditional old-fashioned copying.  We agree with Advance that it would be "absurd" for the law to treat those identical displays differently.  We will look forward to defendants' argument to the contrary.

relevant copyright owner) to stop that theft.[8]

     -- Sports Illustrated Magazine maintains a website, located at si.com, that features stunning and newsworthy sports photos.  Immunized embedding will allow every other website in the world, including directly competing sports sites, to easily and freely embed any such sports photos they like and prominently display them on their own sites -- and,  short of removing the photos from its site, there will be nothing SI can do to stop that theft.

     -- The New Yorker Magazine, which maintains a website located at newyorker.com, regularly features brilliant (and some not so much) cartoons.  Immunized embedding will allow every other website in the world, including websites with titles like "Great Cartoons from the New Yorker," to easily and freely embed any such cartoon(s) they like and prominently display them on their sites – again with no meaningful remedy for the magazine.

     -- Prominent photographers – for example, Mario Testino and Patrick Demarchelier – maintain their own websites featuring their work, located at mariotestino.com and demarchelier.com.  Immunized embedding will allow every other website in the world, including websites with titles like "Great Mario Testino Photos" or "The Best of Patrick Demarchelier," to easily and freely embed any such photo they like and prominently display them on their sites – with the only remedy available to the photographers being removal of the embedded photos from their sites.

---

[8] The unavailability of remedies for the copyright-owner victims in these four hypotheticals is discussed infra at pp. 31-33.

* * * *

The Second Circuit just last year reiterated that "Copyright infringement is a strict lia-bility offense in the sense that a plaintiff is not required to prove unlawful intent or culpability." EMI Christian Music Grp., Inc. v. MP3-tunes, LLC, 844 F.3d 79, 89 (2d Cir. 2016). This means that – in all media, not just cyberspace – the risk of guessing wrong about substantial similarity, or fair use, or public domain, or the risk of relying on the wrong supplier or on an erroneous assumption or bad legal advice, falls squarely on the user and not on the innocent (and often legally powerless) copyright owner.

Thus, as here, when a website like those of the defendants makes the decision to display a photo without obtaining a license – whether because it thinks the use is "fair," or because it got the photo from someone who claimed to be its owner, or because it embedded the photo from another website (or Twitter) -- it always assumes the risk that the display may be actionable. That is, quite correctly, the way our copyright system has always worked -- in all media. As a result, any whining that they may guess wrong is no reason to shift -- for embedding alone -- the risk of their mistake to the completely innocent owner of the work.

* * * *

Helpfully – we believe dispositively – defendants now admit that when plaintiff's Photo appeared on their sites, "there can be little doubt that a display is taking place." (Defendants' brief, p. 13, emphasis added.) The United States Copyright Act grants to copyright owners "the exclusive right to display publicly" their copyright works. (17 U.S.C. §106(5)). Further, the Copyright Act defines "display" as follows: "To display a work means to show a copy of it, either directly or by means of a film, slide, television image, or any other device or process . . . ."

(17 U.S.C. §101) (emphasis added).  And even defendants concede that the "display" that is "taking place" is the result of a <u>process</u> – namely the process of embedding.  As far as we can tell, these concessions alone should resolve this motion.

But defendants disagree.  Instead, despite that conceded "process"-enabled "display," defendants argue -- through hypertechnical convolutions -- that they haven't really displayed the Photo at all.  For this, we respectfully refer this Court to the teaching of the Supreme Court in another technology-tinged case, <u>New York Times Co., Inc. v. Tasini</u>, 533 U.S. 483 (2001).  There, the Court, in applying the Copyright Act to the facts of the case before it, made clear, first, that it was addressing the statutory issues in the case "consistent with ordinary English usage"-- as opposed to the contorted, hypertechnical interpretations offered by the alleged infringers (at 503).  And second, the Court made clear, in language directly applicable here, that "we focus on the Articles <u>as presented to, and perceptible to</u>, the user of the Databases" (at 499; emphasis added).

\* \* \* \*

The Second Circuit, speaking through Judge Pierre Leval – the nation's leading beacon on copyright law – has declared as follows:

> <u>The purpose for which the Copyright Acts were adopted was to expand human knowl-edge for the general good by giving creative persons--authors--exclusive control of the copying of their creations as a financial incentive to create.</u> . . . .  See 1 William F.Patry, Copyright Law & Practice 22-36 (1994) ("Patry") (reviewing purposes underlying ad-option of Constitution's Copyright Clause and the first Copyright Act); cf. U.S. Const., art. I, § 8 ("<u>The Congress shall have Power . . . To promote the Progress of . . . useful Arts, by securing for limited Times to Authors . . . the exclusive Right to their . . . Writ-ings</u>") . . . .

<u>Attia v. Society of the New York Hospital</u>, 201 F.3d 50, 54 (2d Cir. 1999) (emphasis added).

8

To their credit, neither defendants nor their <u>amici</u> even try to suggest that the copyright immunity they seek allowing them to help themselves with impunity to the creations of others in any way furthers the purposes of our copyright laws.  This is because, quite obviously, the exact opposite is true: that immunity would do nothing to "promote" creation and would instead deprive creators – here photographers – of the Constitutionally-mandated "financial incentive" to create.  That alone strongly argues for the rejection of the proposed immunity.

*   *   *   *

Nowhere else in this nation's copyright jurisprudence has any court ever judicially created the kind of industry-wide immunity from infringement liability that defendants seek here.  Surely that is the responsibility of Congress in our system and not the courts.[9]  We respectfully submit that this Court should not be the first to judicially legislate such a sweeping immunity, especially where there is no good reason — as a matter of fact or law — to do so.

THE UNDISPUTED FACTS

Each of the following facts is undisputed on this motion:

1.  Plaintiff created -- in the language of the Copyright Act is the "author" of -- a photograph of Tom Brady and others that is set forth as Exhibit "A" to the Declaration of Justin Goldman submitted herewith ("Goldman Dec.," ¶2 ) ("the Photo").

2.  Plaintiff owns the United States copyright in the Photo.  (Goldman Dec., ¶3)

3.  The United States Copyright Office has duly issued an official Certificate confirming

---

[9] A perfect example is the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. §512, in which Congress created a "safe harbor" for certain otherwise infringing displays of user-generated-content on the Internet.  The leading case is <u>Viacom International, Inc. v. You-Tube, Inc.</u>, 676 F.3d 19 (2d Cir. 2012); see also, <u>Wolk v. Kodak Imaging Network, Inc.</u>, 840 F.Supp.2d 724 (S.D.N.Y. 2011), aff'd, 569 Fed.Appx. 51 (2d Cir. 2014).

9

the registration of the Photo with it.  (Goldman Dec., ¶4)

4.  The United States Copyright Act grants to copyright owners "the exclusive right to display publicly" their copyrighted works.  (17 U.S.C. §106(5))

5.  The United States Copyright Act defines "display" as follows: "To display a work means to show a copy of it, either directly or by means of a film, slide, television image, <u>or any other device or process</u>. . ."  (17 U.S.C. §101) (emphasis added).

6.  Plaintiff did not authorize any of the defendants to display or otherwise exploit or appropriate the Photo.  (Goldman Dec., ¶12)

7.  Websites owned by the defendants each displayed -- showed -- plaintiff's copyrighted Photo.  (As they admit, Defendants' Memorandum of Law, p. 13, "when a photo is transmitted [by a "process" contemplated in the Copyright Act's definition of "display"] to users' computer screens, <u>there can be little doubt that a display is taking place</u>" (emphasis added).  (DSUF, ¶¶29-37)

8.  A screenshot of that display by defendant Heavy is set forth as Exhibit "B" to the Goldman Declaration.

9.  A screenshot of that display by defendant Time is set forth as Exhibit "C" to the Goldman Declaration.

10.  A screenshot of that display by defendant Yahoo is set forth as Exhibit "D" to the Goldman Declaration.

11.  A screenshot of that display by defendant Gannett is set forth as Exhibit "E" to the Goldman Declaration.

12. A screenshot of that display by defendant Boston Globe is set forth as Exhibit "F" to the Goldman Declaration.

13. A screenshot of that display by defendant NESN is set forth as Exhibit "G" to the Goldman Declaration.

14. Each of those displays was engineered and published solely by each defendant, without the involvement or consent of any other person or entity. (DSUF, ¶¶29-37)

15. Each of those displays was made possible by embedding, which is a "process" to enable the "showing" of content like the Photo. (DSUF, ¶¶29-37)

16. Every visitor to/user of ("user") each defendant's website at the relevant time was directly confronted with that defendant's display of the Photo, and each had no say and no discretion as to whether he or she wanted to see it. (DSUF, ¶¶29-37)

17. No "instructions" upon which each user could choose to act with respect to each defendant's display of the Photo were provided to each defendant's users. (DSUF, ¶¶29-37)

18. As a viewing of those screenshots makes apparent, each defendant's display of the Photo was not surrounded by any kind of "frame." (Goldman Dec., Exhibits B-F)

19. As a viewing of those screenshots makes apparent, each defendant's display of the Photo was not presented in any kind of "window." (Goldman Dec., Exhibits B-F)

20. Each defendant's website is a profit-seeking enterprise and each defendant's display of the Photo was made for profit-seeking purposes. (DSUF, ¶¶2-5, 7-8)

21. Each defendant's display of the Photo was the result of a deliberate conscious decision by that defendant to seek-out the Photo for display of it on its website. (DSUF, ¶¶29-37)

22. None of the defendants is a search engine. (DSUF, ¶¶ 2-5, 7-8)

11

23.  At least four different tweets, from four different tweeters, included the Photo.  (DSUF, ¶28)

24.  Twitter can only legally transmit copyrighted content if it has the authorization of the copyright owner of that content to do so.  (DSUF, ¶27)

25.  Twitter can only legally authorize or enable the embedding of copyrighted content if it has the authorization of the copyright owner of that content  to do so.   (DSUF,  ¶27)

26  Plaintiff did not himself and did not authorize anyone else to transmit the Photo to or through Twitter.  (Goldman Dec., ¶10)

27.  Content on any website can be embedded for display on any other website.  (LaCorte Dec, ¶¶3-4)

28.  There is no meaningful difference between embedding from a tweet and embedding from any other website.   (LaCorte Dec, ¶¶3-4)

29.  A recent national federal and state Lexis search for "server test" reported that the phrase appears in eight court decisions, emanating from three cases, all by courts in the Ninth Circuit, with the plaintiff in two of those three cases "Perfect 10, Inc."  (Affirmation of Kenneth P. Norwick ("Norwick Aff."),  ¶4)

30.  In response to the hypothetical set forth in Paragraph 27 of the Complaint, a lawyer for Advance Publications, Inc., a defendant in the parallel "embed" case, stated: "While your '9/11 Bar' hypothetical does a good job of showcasing how the server test can be perceivably absurd, it does not address the fact that the language of the Copyright Act does not consider in-line links to be infringing."  (Norwick Aff., ¶4)

12

## THE UNVARNISHED PERFECT 10

Previously, these defendants argued that the Ninth Circuit's 2007 opinion in Perfect 10, Inc. v. Amazon.com, Inc., 508 F.3d 1146 (9th Cir. 2007) ("Perfect 10") was "established" law that should be embraced and followed in toto by this Court and the Second Circuit.  No more.  Effectively conceding that the underlying facts, reasoning, and essential holdings of that opinion do not remotely support them here, defendants now only stress one isolated (and essentially false) cherry-picked (and non-dispositive) element in that case.  This is what defendants' argument is now reduced to: "Defendants' Embedding of Tweets is Not Materially Different from the In-Line Linking at Issue in *Perfect 10*" -- blithely ignoring, inter alia, that Perfect 10 had nothing whatever to do with tweets.[10]

Because we continue to believe that the adjudication of this motion should be based on a full understanding of Perfect 10, and not just (misleading) snippets from it, we will set forth here a full and fair -- unvarnished -- review of that decision.

The Facts of Perfect 10

Although they are essentially ignored in defendants' brief, here are the core facts of Perfect 10: 1) Google's search engine indiscriminately swept-up millions of photos, without affirmatively seeking-out any.  (In contrast, defendants specifically sought-out and displayed the Photo for its own for-profit value to them.)  2) In response to independent volitional searches by its third-party users, Google provided low-resolution thumbnails of those photos.  (In contrast, defendants pro-

---

[10] Not only do defendants essentially abandon the notion that the full Perfect 10 opinion should be adopted by this Court, they also utterly fail to respond to this Court's request that they provide support from Second Circuit law for any such adoption.  This is because there is no such support.

vided no low-resolution thumbnails but instead high resolution full-color full-size renditions of the Photo.)  3) Within those thumbnails, Google provided to its users "instructions" on how they could, by volitionally "clicking" on the thumbnails, view the full photos represented by them.   (In contrast, defendants provided no such instructions to be acted on by their visitors and provided no opportunity to them to volitionally choose to view the Photo; instead, defendants simply took it upon themselves to bypass all those steps and display the full high-resolution Photo for all their visitors to see, whether they wanted to or not.)  4) The full-size renditions of the photos in <u>Perfect 10</u> were presented in "frames" and "windows."  (In contract, as a viewing of the screenshots annexed to the Goldman Declaration establishes, there were no frames or windows around defendants' displays of the Photo.)  5) When Google's users exercised their discretion to view the full photos represented by the thumbnails, then -- and only then -- could the full photos be seen.  (Here, defendants usurped the (Google-provided) discretion to choose (or not) to view the Photo and just displayed it in full for all to see.)  6) Unlike the defendant in <u>Perfect 10</u>, which was a search engine that indiscriminately swept-up photos for indiscriminate thumbnail display, defendants are for-profit editorial websites that specifically sought-out and displayed in full the Photo).

These are the facts of <u>Perfect 10</u> that underlie this motion, although -- to be fair -- defendants contend that none of those facts is even arguably relevant to this Court's adjudication of this motion.  Not one.

<u>The Genesis of the Perfect 10 Opinion</u>

The District Court's opinion in <u>Perfect 10</u> makes clear what that Court understood the case before it to involve.  Here's how that Court explained the underlying facts (underscoring provided; italics in original):

14

"Framing" is a method of "combining multiple pages in a single window so that different content can be viewed simultaneously, typically so that one 'frame' can be used to annotate the other content or to maintain a link with an earlier web page." . . . .   In other words, when a user clicks on a thumbnail returned as the result of a Google Image Search, his computer pulls up a page comprised of two distinct frames, one hosted by Google and a second hosted by the underlying website that originally hosted the full-size image.   The two frames are divided by a gray horizontal line a few pixels high. The upper frame is the Google frame. It contains the thumbnail, retrieved from Google's cache, and information about the larger image, including the original resolution of the image and the specific URL associated with that image. . . .   The Google frame also states that the thumbnail *"maybe scaled down and subject to copyright"* and makes clear that the upper frame is not the original context in which the full-size image was found, stating, "Below is the image in its original context on the page: http://<URL>." The lower frame contains, or shows, the original web page on which the original image was found.  Google neither stores nor serves any of the content (either text or images) displayed in the lower frame; rather, the underlying third party website stores and serves that content. . . . .   However, because it is Google's webpage that composites the two frames, the URL displayed in the browser's address bar displays "images.google.com."

416  F.Supp.2d 828, 833 (C.D.Cal. 2006).

The plaintiff was the copyright owner of photos provided by Google in thumbnails, which thumbnails when clicked by the user generated the full photos represented by the thumbnails.  As relevant here, the plaintiff claimed that the full photo that was generated when the user clicked on the thumbnail constituted direct copyright infringement.  Acknowledging that the issue was essentially one of first impression, the District Court proposed two policy constructs -- i.e., not required by prior law -- to help resolve the case.  It chose what it called the "server test," explaining (underscoring provided; italics in original):  "Merely to index the web so that users can more readily find the information they seek should not constitute direct infringement, but to *host* and *serve* infringing content may directly violate the rights of copyright holders."  416 F.Supp.2d at 844.  (Here, of course, defendants do not even try to argue that they were "merely . . . index-

15

ing the web so that users can more readily find the information they seek"; instead defendants themselves each unilaterally sought-out and displayed the Photo in full for all to see.)

The Ninth Circuit's Opinion

The Complaint in this case sets forth fully and fairly – without spin or embellishment – the essential verbatim components of the Ninth Circuit's opinion in Perfect 10.  But we urge this Court to read for itself the full opinion and determine for itself what it actually holds – and does not hold.   We will not here repeat the Complaint's full rendition of the opinion but will just highlight a few of the most salient and applicable parts.

To start, here's the opinion's opening sentence (emphasis added): "In this appeal, we consider a copyright owner's efforts to stop an Internet search engine from facilitating access to infringing images."  Note: no mention of any other outlets – especially editorial websites like defendants' -- and no mention of actually providing (by showing) full renditions of such images, as compared with only "facilitating" access to them.

And then, here's how the opinion explained the actual facts that underlay its opinion (emphasis added): "Google operates a search engine, a software program that automatically accesses thousands of websites (collections of webpages) and indexes them within a database stored on Google's computers.  When a Google user accesses the Google website and types in a search query, Google's software searches its database for websites responsive to that search query. Google then sends relevant information from its index of websites to the user's computer. . . .  Google Image Search provides search results as a webpage of small images called "thumb-nails," which are stored in Google's servers. The thumbnail images are reduced, lower resolution versions of full-sized images stored on third-party computers."  (Here, of course, defendants'

16

process is exactly opposite: The process is not instigated by a user's search; its retrieval of copy-righted photos is not at all "automatic" but instead the result of affirmative seeking-out of the copyrighted photos it wants to display; and it does not remotely provide to its users "relevant information" about the swept-up photos but instead it simply displays in full high resolution rendition the photos it affirmatively sought-out.)

And then the opinion continued (in a very long paragraph) (emphasis added): "When a user clicks on a thumbnail image, the user's browser program interprets HTML instructions on Google's web-page. These HTML instructions direct the user's browser to cause a rectangular area (a 'window') to appear on the user's computer screen.  The window has two separate areas of information. The browser fills the top section of the screen with information from the Google webpage, including the thumbnail image and text.  The HTML instructions also give the user's browser the address of the website publisher's computer that stores the full-size version of the thumbnail . . . .  By following the HTML instructions to access the third-party webpage, the user's browser connects to the website publisher's computer, downloads the full-size image, and makes the image appear at the bottom of the window on the user's screen.  Google does not store the images that fill this lower part of the window and does not communicate the images to the user; Google simply provides HTML instructions directing a user's browser to access a third-party website.  However, the top part of the window (containing the information from the Google webpage) appears to frame and comment on the bottom part of the window.  Thus, the user's window appears to be filled with a single integrated presentation of the full-size image, but it is actually an image from a third-party website framed by information from Google's website.  The process by which the webpage directs a user's browser to incorporate content from different com-

17

puters into a single window is referred to as 'in-line linking.'"

In contrast, here (again) there is no "clicking" by and no "instructions" to the user on which the user could act – only defendants' unilateral reaching-out for, importing to, and fully displaying the Photo on their websites.

And here is how the Ninth Circuit specifically articulated what it decided in the search engine case before it (emphasis added): "[O]ur ruling that a computer owner does not display a copy of an image when it communicates **only** the HTML address of the copy."  Astonishingly, defendants now argue that that is not really the Court's "ruling" at all and that instead this Court should hold that Perfect 10 really declared that defendants' click-free, communication-free, in-structions-free, user-discretion-free entirely self-initiated display of the Photo is somehow immu-nized by that far more limited ruling -- solely because (defendants claim) they did not "store" a "copy" of the Photo on their "servers."  Absurd indeed.

The Legal Fallacy of the Opinion (and Defendants' Adoption of It)

As stated above, Section 106 of the Copyright Act grants to copyright owners a diverse set of "exclusive rights," including as directly relevant here the "reproduction" (make a copy) right (106(1)) and the "display" right (106(5)).  Understandably, each has spawned its own separate body of caselaw.

Thus, with respect to the reproduction/copy right, the essence of an alleged violation is whether the defendant in fact made a "copy" of the copyrighted work.  Quite obviously, without such a copy, there can be no infringement of that right.  Numerous cases have addressed whether an infringing "copy" was in fact made.  And this is where the Ninth Circuit's 1993 opinion in MAI Systems Corp. v. Peak Computer, Inc., 991 F.2d 511 (9th Cir. 1993) comes in.  A central

18

issue in that case was whether the defendant made a "copy" of the plaintiff's copyrighted software in violation of Section 106(1).  (The case did not mention, and had nothing to do with, the Section 106(5) "display" right.)  And on the "copy" issue, the MAI Systems Court concluded: "The law also supports the conclusion that Peak's loading of copyrighted software into RAM creates a 'copy' of that software in violation of the Copyright Act" (at 518).   An entirely appropriate – indeed innocuous – 106(1) ruling.[11]

The District Court in Perfect 10 notably did not even try to suggest that the policy construct it chose, the "server test," to deal with the specific issues presented by search engines like Google's, was in any way prompted much less required by any previous caselaw.  It was not. Instead, the Court candidly allowed that it was choosing that construct for (its perceived) reasons of convenience in resolving the search engine case before it.

But then, inexplicably and unnecessarily, the Ninth Circuit invoked its earlier 106(1) decision in MAI Systems to provide legal justification for its adoption of the District Court's chosen policy construct.  Indeed, in an astonishing non-sequitur, the Circuit summarized MAI Systems' requirement that the defendant make a "copy" for 106(1) liability and then blithely applied that entirely correct 106(1) holding to the 106(5) search engine "display" case before it. As the Circuit put it (in the same paragraph in which it discussed MAI Systems' 106(1) conclusion):  "In sum, based on the plain language of the statute, a person displays a photographic image by using a computer to fill a computer screen with a copy of the photographic image fixed

---

[11] See also, e.g., Capitol Records, LLC v. ReDigi Inc., 934 F. Supp. 2d 640, 649 (S.D.-N.Y. 2013)  ("the reproduction right is the exclusive right to embody, and to prevent others from embodying, the copyrighted work (or sound recording) in a new material object (or phono-record). See Nimmer on Copyright § 8.02 (stating that 'in order to infringe the reproduction right, the defendant must embody the plaintiff's work in a 'material object'''").

in the computer's memory."   Thus, and this cannot be stressed too strongly, if it means anything the opinion's invocation of  "the plain meaning of the statute" refers to Section 106(1) and not Section 106(5), the <u>only</u> section of the Copyright Act at issue in this case.[12]

To say the least, no court before or after <u>Perfect 10</u> – except maybe for a few that simply parroted that part of the <u>Perfect 10</u> opinion – has even arguably imposed a "copy" requirement on a violation of the display right.  This is because such a requirement makes no sense – not as a matter of construing the relevant statutory language and not as a matter of coherent application.[13]

Surely a defendant can infringe the display right in any number of ways that don't require that it first make its own copy of the copyrighted work.  For example, a live television broadcast and/or a live theatrical performance can indisputably infringe the display right by <u>showing</u> (the statutory verb) a copyrighted photograph or painting or sketch without making a copy of it. Requiring the defendant in a 106(5) display case to have first made its own copy of the copy-righted work before display liability can attach is both utterly unsupported as a matter of statutory and case law and just plain wrong.[14]

_____

[12] In any event, the "server test" was clearly make-weight, and thus dicta, since the Court's "ruling" that "a computer owner does not display a copy of an image when it communicates only the HTML address of the copy" did not in any way depend on or require that "test."  In fact, the "server test" had nothing to do with that "ruling."

[13] We note that although this legal fallacy in <u>Perfect 10</u> was stressed in our previous brief and was actually acknowledged in defendants' previous reply brief, defendants did not there or in their current brief even try to refute, explain, or distinguish our presentation of that fallacy.  De-fendants have clearly chosen to leave that presentation entirely undisputed, apparently conceding that no such dispute is possible.

[14] Defendants' seeking-out, helping themselves to, and prominently displaying the Photo were indisputably volitional acts on their part.  Indeed, each defendant was the <u>only</u> party who acted volitionally with respect to its display of the Photo.  This fully satisfies the law's require-

Dispositive on this issue – we submit – is the actual statutory language.  As noted (more than once) above, the Copyright Act grants to copyright owners "the exclusive right to display publicly" their copyright works.  (17 U.S.C. §106(5)).  And the Act defines "display" as follows: "To display a work means to show a copy of it, either directly or by means of a film, slide, television image, or any other device or process. . ."  (17 U.S.C. §101) (emphasis added).

In this connection, defendants now admit that when plaintiff's Photo appeared on their sites, "there can be little doubt that a display is taking place."  And, too, the defendants also concede that the "display" that they concede is "taking place" is the result of a process – namely the process of embedding.  Quite obviously, when it comes to the "display" right, the Act says nothing about the need to make a "copy" of or to "store" anything.  Any suggestion that the Act requires any such thing would be, to use the legal term, nonsense.  The Act only requires display-by-process, with no further requirements of "copy" and "store."  To be kind, the Ninth Circuit's treatment of this issue is at best muddled – and certainly should not be embraced by this Court.  Indeed, we respectfully repeat, the defendants' concessions that a display "is taking place" as a result of a process engineered solely by them is alone more than enough to resolve this motion.

Defendants seem to bet their entire case on the argument that because the process they concede they employed to enable their display of the Photo is allegedly similar to Google's process in Perfect 10, and because the Ninth Circuit concluded on all the facts of the case (and on a blatant misreading of the Act) that Google didn't "display" the Perfect 10 plaintiff's photos in that search engine case, this Court must reach the same conclusion here.

_____

ment of a "volitional" act by the infringer.  See, e.g., The Cartoon Network v. CSC Holdings, Inc., 536 F.3d 121 (2d Cir. 2008); BWP Media USA Inc. v. Polyvore, Inc., 2016 U.S. Dist. LEXIS 92121 (S.D.N.Y. 2016).

First, we note the obvious facts that Google's <u>process</u> was entirely different from that of the defendants here, if only because Google's <u>process</u> in <u>Perfect 10</u> crucially involved <u>clicking</u> on <u>thumbnails</u> which contained <u>instructions</u> that <u>allowed</u> (but did not force) users to exercise their <u>discretion</u> to view (or not) full-size photos represented by those thumbnails.  And second, defendants' "similar process" argument -- even if accurate -- is legally silly.  Suppose, for example, a court decides on all the facts before it that a party using a tape-recorder did not infringe the plaintiff's copyrighted song.  Do defendants seriously argue that all future cases involving tape-recorders must reach the same ultimate conclusion?  Defendants' (only) argument is baseless.

A NON-ABSURD SOLUTION

We can well understand why defendants -- and probably most if not all similar websites -- would love to be free to prominently display with legal impunity full-size, full-color, high resolution renditions of every photo they see on the Internet.  But that is not the only way those websites can make available those photos to their users – without necessarily violating the rights of the copyright owners of them.

Exhibits "A" and "B" to this brief are screenshots showing how the websites of the Washington Post and Boston Magazine chose to make plaintiff's Photo available to their visitors.  Like the defendants, those websites reported the Brady/Celtics story and -- as highlighted by circles provided by us -- gave their viewers linked <u>instructions</u> that enabled those visitors who so chose, by <u>clicking</u> on the link, discretionary <u>access</u> to the full Photo.  Except for the substitution of

a traditional link for a thumbnail, this is exactly what was found non-infringing in Perfect 10.[15]

Assuming for these purposes only that Perfect 10 was correctly decided and is applicable in this Circuit, which is not the case, this approach to providing website visitors access by clicking on provided instructions is arguably legally supportable, easy to understand and implement, "embed"-friendly, and non-infringing of the copyright owners' 106(5) display rights in their photos.  Probably the only resistence to this possible solution will come from for-profit websites like defendants, which selfishly claim the legal right to exploit and enjoy the full for-profit benefit of every copyrighted work ever created without paying a penny for that use.

THE RELEVANT (OTHER) CASES

Defendants would have this Court believe (and hold) that their position on this motion is supported ("embraced") by numerous courts across the country.  Not so.  We will take a look.  And after examining defendants' cases, we will add a few of our own.  But first, there is this revealing fact: A very recent Lexis search for the term "server test" reports this result:  Since it was invented in Perfect 10 over a decade ago, the term appears in a total of eight court decisions, emanating from three cases, all in the Ninth Circuit, with the plaintiff in two of those three cases "Perfect 10, Inc."  Not exactly a viral national groundswell.

We will first review the cases defendants cite, in the chronological order in which they were decided -- omitting Perfect 10 which has already been fully covered.

---

[15] As stated in Pearson Education, Inc. v. Ishayev, 963 F.Supp.2d 239, 250-51 (S.D.N.Y. 2013), discussed further below, "A hyperlink (or HTML instructions directing an internet user to a particular website) is the digital equivalent of giving the recipient driving directions to another website on the Internet.  A hyperlink does not itself contain any substantive content; in that important sense, a hyperlink differs from a zip file.  Because hyperlinks do not themselves contain the copyrighted or protected derivative works, forwarding them does not infringe on any of a copyright owner's five exclusive rights under §106."

23

Cases Cited by Defendants

    1. <u>MyPlayCity, Inc. v. Conduit Ltd</u>, 2012 U.S. Dist. LEXIS 473123 (S.D.N.Y. 2012): This was not a 106(5) display case but instead a 105(3) "distribution" case; and the defendant was not as here an editorial website in the business of displaying copyrighted material.  The alleged infringement of the distribution right grew out of a prior licensing agreement between the parties.  Most significantly, a visitor's access to the plaintiff's copyrighted work was only triggered by that visitor volitionally clicking on a "Play Now" tab that contained the necessary instructions to import the copyrighted work.  There is not a hint in this decision that supports defendants' claim to be legally entitled to the click-free, instructions-free,[16] user-discretion-free exploitation of every copyrighted work ever created.

    2. <u>Flava Works, Inc. v. Gunter</u>, 689 F.3d 754 (7th Cir. 2012).  This was not a display case and it involved thumbnails of photos that had to be clicked by the visitor to gain access to the underlying copyrighted work.  Here too, there is not a hint in this decision that supports defendants' claim to be legally entitled to the click-free, instructions-free, user-discretion-free exploitation of every copyrighted work ever created.

    3. <u>Pearson Education, Inc. v. Ishayev</u>, 963 F.Supp.2d 239 (S.D.N.Y. 2013).  This was not a display case.  The Court held (emphasis added):

> As a matter of law, sending an email containing a hyperlink to a site facilitating the sale of a copyrighted work does not itself constitute copyright infringement. A hyperlink (or HTML instructions directing an internet user to a particular website) is the digital equivalent of giving the recipient driving directions to another website on the Internet.  A hyperlink does not itself contain any substantive con-

---

[16] Here, and for all purposes in this brief, we intend "instructions" to mean guidance from one party to another party for possible use by that other party, and not entirely self-executing computer programming that only the originating party is aware of and can act on.

tent; in that important sense, a hyperlink differs from a zip file.  Because hyper-
links do not themselves contain the copyrighted or protected derivative works,
forwarding them does not infringe on any of a copyright owner's five exclusive
rights under *§106*.  See <u>MyPlayCity, Inc. v. Conduit Ltd.</u>, . . .  ("Because the
actual transfer of a file between computers must occur, <u>merely providing a 'link' to
a site containing copyrighted material does not constitute direct infringement of a
holder's distribution right</u>.");  see also <u>Perfect 10, Inc. v. Amazon.com, Inc.</u>. . . .
(<u>holding that providing HTML instructions that direct a user to a website housing
copyrighted images "does not constitute direct infringement of the copyright
owner's display rights" because "providing HTML instructions is not equivalent to
showing a copy</u>"); *. . .*

Here too, there is not a hint in this decision that supports defendants' claim to be legally entitled

to the click-free, instructions-free, user-discretion-free exploitation of every copyrighted work

ever created.

    4.  <u>Capitol Records, LLC. v. ReDigi, Inc.</u>, 934 F.Supp.2d 640 (S.D.N.Y. 2013).  This case

had nothing whatever to do with links of any kind or embedding of any kind.  Instead, it was

about the defendant's "streaming thirty-second song clips and exhibiting album cover art to

potential buyers."  At 652.  In a three-sentence table-setting paragraph, not thereafter revisited,

Judge Sullivan wrote (note the double hedge "may" and "in part"):

> The Ninth Circuit has held that the display of a photographic image on a computer
> may implicate the display right, though infringement hinges, in part, on where the
> image was hosted. *Perfect 10, Inc. v. Amazon.com, Inc*., 508 F.3d 1146, 1160
> (9th Cir. 2007).

Defendants apparently contend that that one-sentence hedged dictum that had nothing to do with

the case in which it was made supports the grant of summary judgment it requests on this motion.

We disagree.  And, of course, here too there is not a hint in this decision that supports defend-

ants' claim to be legally entitled to the click-free, instructions-free, user-discretion-free exploit-

ation of every copyrighted work ever created.          .

5. <u>Leveyfilm, Inc. v. Fox Sports Interactive Media, LLC</u>, 2014 U.S. Dist. LEXIS 92809

(N.D.Ill. 2014).   This case involved the defendant's "links" to the plaintiff's work, and the Court

strictly followed both its Circuit's <u>Flava Works</u>, discussed above, which involved thumbnails and

discretionary visitor access-by-clicking, and <u>Perfect 10</u>, which also involved thumbnails and dis-

cretionary visitor access-by-clicking. The Court declared (emphasis added):

> Fox also cites a Ninth Circuit case in which the court reached a similar conclu-
> sion.  See <u>Perfect 10, Inc. v. Amazon.com, Inc.</u>, . . . .  In *Perfect 10*, an owner of
> certain photos sued Google because Google linked to nonparty websites and ser-
> vers that contained infringing copies of the owner's photos. Google saved a
> "thumbnail" or reduced size copy of the photos on its servers but did not save the
> full size image. . . .  The Ninth Circuit held that Google could be liable for making
> the thumbnail size copies on its own servers, but not for linking to the full size
> copies on a server Google did not own . . . . ("<u>Instead of communicating a copy of
> the image, Google provides HTML instructions that direct a user's browser to a
> website publisher's computer that stores the full-size photographic image.  Pro-
> viding these HTML instructions is not equivalent to showing a copy. . . . and does
> not constitute direct infringement of the copyright owner's display rights</u>.")

Although plaintiff here believes that even <u>Perfect 10</u>'s relatively constricted search engine opin-

ion was erroneous, <u>Leveyfilm</u>'s explicit reliance on cases involving thumbnails and access-by-

clicking provides no support whatever for defendants' claim to be legally entitled to the click-

free, instructions-free, user-discretion-free exploitation of every copyrighted work ever created.

6. <u>Totally Her Media, LLC v. BWP Media USA, Inc.</u>, Case 2:13-cv-08379 (C.D.Cal.

2015).  The operative facts of this case, in which the alleged infringer was the plaintiff, were as

follows (emphasis added):  "All of the images identified in the settlement database were stored

on third-party websites, <u>and were only displayed on Plaintiff's website by hypertext links that al-</u>

<u>lowed users to view the material without entering the separate URL where the photographs were</u>

<u>stored</u>. . . .   However, <u>third-party forum users selected that content on their own and linked to</u>

26

that content on their own . . . .   Plaintiff did not review or approve any user posts to its website, including the posts containing the allegedly infringing images."   Here, of course, defendants not only "selected" and "reviewed" and "approved" their respective displays of the Photo -- they alone made that full display possible, without input from anyone else.  Thus, here too, there is not a hint in this decision that supports defendants' claim to be legally entitled to the click-free, instructions-free, user-discretion-free exploitation of every copyrighted work ever created.

7.  Live Face On Web, LLC v. Biblio Holdings LLC, 2016 U.S. Dist. LEXIS 124198 (S.D.N.Y. 2016).  This was a not a "display" case but instead a "distribution" case.  In this case, Judge Buchwald quoted from Conduit (above), which involved a "Play Now" clicking option to access the plaintiff's copyrighted work, to the effect that "providing a 'link' to a site containing copyrighted material does not constitute direct infringement of a holder's distribution right."  But we are not here dealing with a "link" to another site with a discretionary "Play Now" option but with the non-discretionary full unavoidable display of plaintiff's Photo.  Here too there is not a hint in this decision that supports defendants' claim to be legally entitled to the click-free, instructions-free, user-discretion-free exploitation of every copyrighted work ever created.  (In any event, Judge Buchwald declined to rule on this issue, declaring: "Nevertheless, as this sub-ject was hardly briefed and the decisions in *Perfect 10* and *MPC* had the benefit of factual devel-opment, we will permit discovery on the relationship between Tweople and the distribution of the allegedly infringing software.")

8.  Grady v. Iacullo, 2016 U.S. Dist. LEXIS 51584 (D. Colo. 2016).  As in Perfect 10, Flava Works, and other cases discussed above, the defendant in this case merely displayed "thumbnails" of the plaintiff's copyrighted works and the plaintiff's allegation of infringement

centered on whether the defendant's "sharing of links to plaintiff's photographs and videos with other users of a website constituted copyright infringement."  Since this decision seems limited to the "sharing of links" via thumbnails,  not present here, here too there is not a hint in this decision that supports defendants' claim to be legally entitled to the click-free, instructions-free, user-discretion-free exploitation of every copyrighted work ever created.  Moreover, in a subsequent decision, discussed below, the Court actually granted summary judgment to the copyright-owner plaintiff, on reasoning that seems directly applicable to defendants here.

So, to recap defendants' own cases, none -- not one -- even arguably supports their no-clicking-needed, no-instructions needed, no visitor-discretion-needed position on this motion and each thus actually supports plaintiff's position that defendants' egregiously grandiose proffered interpretation of Perfect 10 is utterly unsupported, unlawful, and must be rejected.

Cases Not Relied On By Defendants

In addition to the cases cited above, which offer zero support for defendants' position on this motion, we also note the following:

1. Hard Rock Café International v. Morton, 1999 U.S. Dist. LEXIS 8340 (S.D.N.Y. 1999).   This was a trademark case in which Judge Robert Patterson, Jr., squarely declared as follows (emphasis added):

> Through framing, the Hard Rock Hotel Mark and the Tunes site are combined together into a single visual presentation and the Hard Rock Hotel Mark is used to promote the sale of CDs by Tunes.   Because the Tunes material appears as a window within the original linking page, it is not clear to the computer user that she or he has left the Hard Rock Hotel web site. The domain name appearing at the top of the computer screen, which indicates the location of the user in the World Wide Web, continues to indicate the domain name of Hard Rock Hotel, not that of Tunes. . . The Tunes web page is reached in the same fashion as any other section of the Hard Rock Hotel web site, by clicking on a button labeled "record

store" which resembles the other buttons leading to web pages maintained by
Hard Rock Hotel   The spinning globe, Hard Rock Hotel's logo, appears not only
to the side of the framed Tunes web page, but also within the Tunes menu bar, on
the Tunes page itself. . . .   The Hard Rock Hotel web site and the Tunes web page
are thus smoothly integrated.  In light of this seamless presentation of the Tunes
web page within the Hard Rock Hotel web site, the only possible conclusion is
that the Hard Rock Hotel Mark is used or exploited to advertise and sell CDs.

The District Court in Perfect 10 acknowledged that this decision was contrary to its conclusion

and chose, apparently for that reason, to disregard it.  However, here in the Southern District of

New York this is a never-challenged powerful precedent rejecting defendants' grandiose prof-

fered interpretation of Perfect 10.

2.  In their own presentation of cases that they claim support their position on this motion

-- none of which did any such thing -- defendants included a 2016 decision in Grady v. Iacullo

(discussed above).  However, we note the subsequent decision in that case that was rendered

earlier this year in which the Court granted summary judgment for the copyright-owner plaintiff.

In that decision -- 2017 U.S. Dist. LEXIS 47739 (D. Colo. 2017) -- the Court found that it was

sufficient to impose copyright infringement liability on the defendant that it "browsed" the

underlying web-page for the plaintiff's copyrighted works.  As the Court put it, "[b]ecause

browsing a webpage downloads the contents of that webpage to a computer's hard drive, the

thumbnail images appearing on the website were downloaded to the hard drive of defendant's

computer," thus satisfying the (assumed) applicable law.  In our case, as well, defendants must

have "browsed" the Internet to find the Photo -- since they could not have found it otherwise --

which means that under this Grady opinion even if Perfect 10 were good law it has been fully

satisfied in this case.

3.  And in another 2017 decision, the District of New Jersey, in <u>Live Face on the Web,</u>

<u>LLC v. Smart Move Search, Inc</u>., 2017 U.S. Dist. LEXIS 40247 (D.N.J. 2017), noted that

"'[w]hen a web browser is directed to a website linked to the LFOW Software, the embedded

HTML script tag is read by the web browser and causes the automatic distribution of a copy of

the LFOW Software.  The LFOW Software is automatically saved by the web browser into

cache, and/or a hard drive(s), and loaded into computer memory and/or RAM (random access

memory).'"  The Court concluded (emphasis added): "The Court finds that LFOW has suffici-

ently pled a claim for direct copyright infringement <u>by alleging that Smart Move's website causes</u>

<u>a copy of the LFOW Software to be distributed to the website visitor's computer in cache, mem-</u>

<u>ory and/or hard drive.</u>"  Under this decision, defendants' display of the Photo on their websites

distributed it to their visitor's computers, which satisfied whatever requirements <u>Perfect 10</u> may

be found to impose in this connection.

<u>ABOUT TWITTER (AND OTHER SITES)</u>

Defendants would apparently have this Court believe that because they sought-out and

then displayed the Photo from tweets on Twitter, that somehow absolves them of liability for

copyright infringement.  This is nonsense -- and flagrant misdirection.

First, Twitter has no right – and claims no right – to disseminate copyrighted works with-

out the authorization of the copyright owners of those works.  Even defendants, not to mention

Twitter itself, will stipulate to this.  (For this reason, Twitter requires its users to "represent" that

they are the owners of works posted by them.)  And because Twitter had no right to disseminate

plaintiff's Photo without his consent, which it did not have, it also had no right to authorize any-

one else -- including defendants -- to embed or otherwise exploit it.  Thus, defendants' attempt

30

to hide behind Twitter is unavailing.[17]

Further, the conceded fact – helpfully provided by defendants – that several different tweets (illegally) posted the Photo clearly put all defendants on notice that all those tweeters couldn't be the owner of the Photo.  Did any defendant notice, or care?

But far more important is the fact that the website-industry-wide immunity for embedding that defendants seek on this motion is not limited to embedding from Twitter (or any other user-generated-content social media service).  Instead, as is made clear in the Declaration of Ryan LaCorte submitted herewith, and as defendants nowhere dispute, the embedding that is the subject of this motion can be done from <u>any</u> website source, and not just Twitter and the like.  Thus, as mentioned in the hypotheticals at pages 5-6 <u>supra</u>, embedding is equally possible from non-social media sites like those of famous publications and famous creators.  Alas, defendants' suggestion to this Court that the immunity they seek is somehow limited to embedding from Twitter is manifestly false and misleading.  Indeed, as defendants are well aware, the entire basis for their position – <u>Perfect 10</u> – had nothing whatever to do with Twitter or any other social media site.

THE ABSENCE OF REMEDIES

While claiming complete immunity for themselves for the consequences of their own (conceded) unauthorized displays of the Photo, defendants magnanimously suggest that copyright

---

[17] In a somewhat analogous case involving infringements of photos, where the copyright owner actually posted his photos to Twitter, both Judge Pauley and Judge Nathan rejected the infringers' claims that their uses were lawful because they were taken from Twitter.  See, <u>e.g.</u>, <u>Agence France Presse v. Morel</u>, 2014 U.S. Dist. LEXIS 112436 (S.D.N.Y. 2014) (AJN) ("AFP . . . took Morel's photographs from Twitter without pausing to consider whether it was infringing the copyright owner's rights . . .") (at *46); <u>Agence France Presse v. Morel</u>, 769 F.Supp.2d 295 (S.D.N.Y.  2011) (WHP).

owners like plaintiff have other remedies.  The suggestion is not just meaningless, it is manifestly cynical.

First, in this case, it is indisputable that the "value" of plaintiff's Photo was (alas) seriously time-limited.  The Photo was taken on July 2, 2016 and was prominently displayed by defendants that same or the next day.  But on July 4, 2016 -- two days later -- Kevin Durant spurned the Celtics and chose the Warriors.  http://theplayers tribune.com/kevin-durant-nba-free-agency-announcement/   To the extent the Photo had market value – a matter to be addressed in further proceedings in this case – that value largely evaporated two days after it was created.  Thus, quite obviously, any ability on plaintiff's part to "take down" the Photo after July 4 would do nothing to compensate plaintiff for the defendants' very timely and very damaging displays of the Photo on July 2 and 3 and 4.  Here, the only parties who were directly responsible for the damaging displays and the only parties who benefitted from those displays are the very parties who claim complete immunity from any liability therefor.

Second, let's take note of the fact that these displays allegedly came from Twitter, a user-generated-content site -- which, by virtue of an Act of Congress (and not a Court decision) was itself immune from financial liability in this connection.  (DMCA, §512; see footnote 9 supra.)

So, what are the two "remedies" that defendants proffer as a sufficient substitute for the immunity they seek for themselves?  First, they suggest that plaintiff could have had the Photo "taken-down" from Twitter -- but only after he discovers all the infringing tweets and learns how to do it (on the Fourth of July holiday) -- although he could not seek any other financial compensation from that site.  Thanks, defendants.  And second, they grandly suggest, he could also pursue -- if he could find them, and if they were not judgment-proof -- the people who tweeted

the Photo in the first place.  Apparently defendants believe that that recourse is an acceptable substitute for suing <u>them</u>, the <u>only</u> parties responsible for and to benefit from their deliberate displays.  Thanks again, defendants.

Even more cynical is defendants' blithe ignoring of the fact that the immunity for embedding they here seek would also apply to all non-social media and non-user-generated-content sites, which cannot be required under the DMCA to "take down" infringing content and which are not immune from financial liability under the DMCA -- but will be immune if defendants prevail on this motion.

In short, defendants urge this Court to leave plaintiff completely without any meaningful remedy even while it immunizes them from any responsibility for their displays of – and their benefit from – their admittedly unauthorized prominent displays of the Photo.  Defendants apparently believe this is a fair and just outcome.  We do not.

<u>A WORD ABOUT WORDS</u>

To their credit, although it was unavoidable, defendants now concede that the appearance of the Photo on their websites constitutes "displays" of it within the meaning of Section 106(5) of the Copyright Act.  This concession obviates one of the "word" issues previously presented by their prior motion.  But other such issues remain.

Similarly, in light of the definition of "display" in Section 101 of the Copyright Act, it is also crucial that defendants now concede that the appearance of the Photo on their websites -- the "display" of it there -- was the result of the "process" of embedding.  In one sentence, this is what defendants now unequivocally concede: <u>the Photo was, in fact and in law, "displayed" on their sites through the "process" of embedding</u>.  In our view, those concessions necessarily decide this

33

motion.

The Ninth Circuit in <u>Perfect 10</u> provided its own succinct statement of the case's holding: "Our ruling that a computer owner does not display a copy of an image when it communicates only the HTML address of the copy."  But what did defendants "communicate" in this case?  An "HTML address" (that the "receiver" of the "communication" had no awareness of and could do nothing with) or the full "image" (which was unavoidably front-and-center when all visitors went to defendants' sites)?   The answer seems beyond dispute: there is not a hint of any "address" in any "communication" by defendants to those visitors but only the automatic instantaneous full display of the Photo.  To the extent defendants want to claim that they are complying with <u>Perfect 10</u>, they have to persuade this Court that their self-executing one-party only computer programming that is automatically triggered when a visitor goes to their sites is the kind of "communication" contemplated by <u>Perfect 10</u>.

A similar semantic issue involves the word "instructions."  The Ninth Circuit clearly stated that "<u>[w]hen a user clicks on a thumbnail image</u>, the user's browser program interprets HTML <u>instructions</u> on Google's webpage."  But here, defendants concede that no user "clicking" is required to trigger the "instructions" they claim were provided to all their users.  Thus, in direct contradiction to <u>Perfect 10</u>, defendants argue that their notion of "instructions" -- computer programming that is entirely self-executing and only known to defendants themselves, with no ability on the part of anyone else (including their users) to do anything with or about them – is what the Ninth Circuit had in mind when it used that term.

In closing, we will repeat the teaching of <u>Tasini</u> quoted at the outset of this brief.  There, the Supreme Court, in interpreting the Copyright Act, first made clear that it was addressing the

statutory issues in the case "consistent with ordinary English usage" -- as opposed to the contorted, hypertechnical interpretations offered by the alleged infringers in the case before it (at 503).  And second, the Court made clear, in language directly applicable here, that "we focus on the Articles <u>as presented to, and perceptible to</u>, the user of the Databases" (at 499; emphasis added).

<u>CONCLUSION</u>

We submit that the legal position espoused by defendants in this case is manifestly absurd.  And, of course, the Second Circuit has made clear that the principle guiding the adjudication of this motion is that "A statute [here, the Copyright Act] should be interpreted in a way that avoids absurd results."  <u>United States v. Dauray</u>, 215 F.3d 257, 264 (2d Cir. 2000).

Without a glimmer of support from a single case or statute, defendants ask this Court to hold -- for the first time in U.S. copyright jurisprudence -- that every website in the world can prominently display -- show -- full-size, full-color, high resolution renditions of every copyrighted photograph ever created so long as they don't "store" a "copy" on their "servers."  The Ninth Circuit purported to buttress its so-called "server test" on an egregious misapplication of the underlying law.  <u>Perfect 10</u> is bad law that should certainly not be adopted in this Circuit.  But, at least as far as plaintiff is concerned, this Court does not have to reach that issue to deny defendants' motion, because what defendants did here is utterly unsupported by any law and manifestly infringes plaintiff's copyright, even assuming <u>Perfect 10</u> is applicable in this Circuit, which it is not.

The Supreme Court has declared that the "immediate effect of our copyright law is to secure a fair return for an author's creative labor.  But the ultimate aim is, by this incentive, to

stimulate artistic creativity for the general public good." Twentieth Century Music v. Aiken, 422 U.S. 151, 156 (1975). Defendants' helping themselves to plaintiff's Photo deprived him of the "fair return" to which he is entitled while doing nothing to stimulate creativity. In fact, all it does is increase defendants' profits. Defendants' motion should be denied.

And, in addition to denying defendants' motion for summary judgment, partial summary judgment on the embed issue should be granted to plaintiff. Such a reverse grant of summary judgment is exactly what this Court did in a copyright case just a few weeks ago -- Ennio Morricone Music Inc. v. Bixio Music Grp. LTD, 16 cv 8475, Docket No. 39; 2017 U.S. Dist. LEXIS 177643 (S.D.N.Y. 2017) -- and this is what should be done here.[18] Specifically, this Court should grant partial summary judgment to plaintiff striking defendants' asserted defenses based on embedding.

Dated: November 6, 2017

Respectfully submitted,

s/ Kenneth P. Norwick
Kenneth P. Norwick
Cooper Knowlton
NORWICK & SCHAD
110 East 59th Street
New York, NY 10022
(212) 751-4440
ken@norwickschad.com
Attorneys for Plaintiff

---

[18] A recent opinion from the Western District of New York declared: "Fed.R.Civ.P. 56(f) permits the Court to grant summary judgment against the movant, provided that the movant has notice of the grounds upon which judgment is granted and an opportunity to present evidence. [Citation omitted]. Such a 'sua sponte award of summary judgment may well be appropriate if it is clear that all of the evidentiary material a party might submit is before the court and no material issue of fact exists.' [Citation omitted]." Sealey v. Olszewski, 2017 U.S. Dist. LEXIS 177974, *36 (W.D.N.Y. 2017).