UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT NEW YORK

------------------------------------------------------------- x

JUSTIN GOLDMAN,

                          Plaintiff,

                   v.

BREITBART NEWS NETWORK, LLC; HEAVY,
INC.; TIME, INC.; YAHOO, INC.; VOX MEDIA,
INC.; GANNETT COMPANY, INC.; HERALD
MEDIA, INC.; BOSTON GLOBE MEDIA
PARTNERS, LLC; NEW ENGLAND SPORTS
NETWORK, INC.,

                       Defendants.

:     17 Civ. 3144 (KBF)

------------------------------------------------------------- x

**REPLY MEMORANDUM IN FURTHER SUPPORT OF
DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

**<u>TABLE OF CONTENTS</u>**

<u>**Page**</u>

PRELIMINARY STATEMENT ................................................................................................. 1

I.    THE UNDISPUTED EVIDENCE ESTABLISHES THAT THIS CASE IS
      FUNCTIONALLY INDISTINGUISHABLE FROM *PERFECT 10* AND ITS
      PROGENY ................................................................................................................... 3

      A.    Plaintiff Does Not Dispute Any of the Facts Put Forth by Defendants ................ 3

      B.    Plaintiff Fails to Distinguish this Case from *Perfect 10* ........................................ 5

II.   THIS COURT SHOULD APPLY *PERFECT 10* AND ITS PROGENY HERE ............... 9

      A.    The *Perfect 10* Server Test Is Consistent With the Plain Language of the
            Copyright Act ........................................................................................................ 10

      B.    Courts and Publishers Have Continued to Rely on *Perfect 10*, Even After the
            Supreme Court's Decision in *Aereo* ..................................................................... 13

      C.    Plaintiff and his *Amici* Ignore Alternative Remedies ........................................... 14

      CONCLUSION ........................................................................................................................ 15

**TABLE OF AUTHORITIES**

**Page(s)**

**Federal Cases**

*Adams v. Montefiore Med. Ctr.*,
No. 15-CV-5082 (KBF), 2017 WL 4417695 (S.D.N.Y. Oct. 3, 2017) ...................................5

*American Broadcasting Cos. v. Aereo, Inc.*,
134 S. Ct. 2498 (2014)....................................................................................................13, 14

*Authors Guild, Inc. v. HathiTrust*,
755 F.3d 87 (2d Cir. 2014)......................................................................................................8

*Authors Guild v. Google, Inc.*,
804 F.3d 202 (2d Cir. 2015)....................................................................................................8

*BWP Media USA, Inc. v. T & S Software Assocs., Inc.*,
852 F.3d 436 (5th Cir. 2017) ................................................................................................14

*Capitol Records, LLC v. ReDigi Inc.*,
934 F. Supp. 2d 640 (S.D.N.Y. 2013)...................................................................................10

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993)................................................................................................................3

*Dow Jones & Co. v. Ablaise Ltd.*,
606 F.3d 1338 (Fed. Cir. 2010)...............................................................................................6

*Flava Works, Inc. v. Gunter*,
689 F.3d 754 (7th Cir. 2012) ...........................................................................................2, 12

*Florists' Transworld Delivery Inc. v. Originals Florist & Gifts Inc.*,
No. 00-C-4458, 2000 WL 1923321 (N.D. Ill. Nov. 9, 2000) ..................................................7

*Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*,
443 F.2d 1159 (2d Cir. 1971)................................................................................................12

*The Leader's Institute, LLC v. Jackson*,
Civ. Action No. 3:14-cv-3572-B, 2017 WL 5629514 (N.D. Tex. Nov. 22,
2017) .......................................................................................................................................9

*Live Face on Web, LLC v. Biblio Holdings LLC*,
No. 15 Civ. 4848 (NRB), 2016 WL 4766344 (S.D.N.Y. Sept. 13, 2016) ..............................10

*MAI Systems Corp. v. Peak Computer, Inc.*,
991 F.2d 511 (9th Cir. 1993) ................................................................................................10

*Mereigh v. N.Y. & Presbyterian Hosp.*,
No. 16-CV-5583 (KBF), 2017 WL 5195236 (S.D.N.Y. Nov. 9, 2017) ...................................5

*MyPlayCity, Inc. v. Conduit Ltd.*,
No. 10 Civ. 1615(CM), 2012 WL 1107648 (S.D.N.Y. Mar. 30, 2012),
*adhered to on recons.*, 2012 WL 2929392 (S.D.N.Y. July 18, 2012) .....................................9

*Perfect 10, Inc. v. Amazon.com, Inc.*,
508 F.3d 1146 (9th Cir. 2007) ..................................................................... *passim*

*Perfect 10 v. Google, Inc.*,
416 F. Supp. 2d 828 (C.D. Cal. 2006) .................................................................7, 14

*Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*,
756 F.3d 73 (2d Cir. 2014).............................................................................8

*T.Y. v. N.Y.C. Dep't of Educ.*,
584 F.3d 412 (2d Cir. 2009).............................................................................3

*Wells Fargo & Co. v. WhenU.com, Inc.*,
293 F. Supp. 2d 734 (E.D. Mich. 2003)..................................................................7

**Federal Statutes**

17 U.S.C.
§ 101...............................................................................................10, 11
§ 512(c) ...............................................................................................2, 15

Copyright Act.................................................................................... *passim*

**Rules**

Federal Rules of Evidence 702 .............................................................................3

Local Civil Rule
56.1..................................................................................................1, 3, 4
56.1(b)................................................................................................3
56.1(c) ...............................................................................................3

**Other Authorities**

4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright
§ 12B.01[A][2][b] (2017) ................................................................................5

Matthew Humphries, *Photobucket Breaks Image Links Across the Internet*,
PCMag (June 30, 2017), https://www.pcmag.me/a/2519358 ...............................................15

SPORTS ILLUSTRATED Web Site and Application Terms and Conditions of Use,
https://subscription.timeinc.com/storefront/privacy/si/privacy_terms_service.html...............15

## PRELIMINARY STATEMENT

Defendants[1] put forward evidence confirming what they repeatedly told Plaintiff before he even filed this lawsuit: that Defendants' embedding of tweets using Twitter's embed code was functionally and technologically indistinguishable from the in-line linking that the Ninth Circuit found to be non-infringing in *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1156 (9th Cir. 2007) ("*Perfect 10*").

In opposing Defendants' motion, Plaintiff does not dispute any of Defendants' proffered facts or evidence.  He does not dispute Defendants' description of the functionality of their websites or the mechanics of embedding content from third-party websites like Twitter.  He does not assert that Defendants hosted or transmitted his Photo from their servers.  He does not dispute that Defendants, instead, transmitted text-based source code containing HTML instructions that directed the web browser software of users visiting Defendants' websites to retrieve audio-visual content—including Plaintiff's Photo—directly from the third-party sites that host that content.  Indeed, Plaintiff did not even submit a response to Defendants' Local Civil Rule 56.1 Statement of Undisputed Facts, instead submitting his own statement of facts that relies on *Defendants'* Statement and evidence.

Because there are no disputes of material fact, the Court can proceed directly to the straightforward legal question before it:  whether to reject the long-established *Perfect 10* framework for assessing whether a website publisher is liable for direct infringement when it embeds content hosted by, transmitted by and, at all times controlled by third parties.  While in-line linking to third-party content might constitute *contributory* infringement under some circumstances (not present here), where the content is transmitted directly from a third party to

---

[1] Capitalized terms bear the same definitions as in Defendants' Memorandum of Law in Support of their Motion for Summary Judgment (ECF No. 121) ("Defs. Mem.").  Defendant Herald Media, Inc. was originally among the movants, but the claims against it have been dismissed.  *See* ECF No. 141.

the user, and the website publisher "doesn't touch the data stream," there can be no *direct*

infringement by the website publisher. *Flava Works, Inc. v. Gunter*, 689 F.3d 754, 761 (7th Cir.

2012). *See* Defs. Mem. at 25-31 (discussing *Perfect 10* progeny). As the *Perfect 10* court held,

this conclusion "comports with the language of the Copyright Act":

> a computer owner that stores an image as electronic information and serves that
> electronic information directly to the user ("i.e., physically sending ones and
> zeroes over the [I]nternet to the user's browser" . ..) is displaying the electronic
> information in violation of a copyright holder's exclusive display right. . . .
> Conversely, the owner of a computer that does not store and serve the electronic
> information to a user is not displaying that information, even if such owner in-line
> links to or frames the electronic information.

508 F.3d at 1159 (citations omitted).

Plaintiff's rhetoric thus stands reality on its head when he insists that applying this

consistent line of case law would "enshrine into (judge-made) law a sweeping industry-wide

immunity for all manner of copyright theft on the Internet" found "[n]owhere else in this nation's

copyright jurisprudence." Opp. at 1, 9. On the contrary, Defendants are not asking the Court to

"judicially create[]" a new "industry-wide immunity," *id.* at 9—they are asking the Court to

leave the status quo in place. Indeed, that status quo already includes multiple options for a

copyright owner to address alleged infringement of which Plaintiff failed to avail himself,

including sending a take-down notice to Twitter pursuant to 17 U.S.C. § 512(c) and enforcing

against the individuals who actually uploaded the Photo to the Web—who, based on Plaintiff's

Declaration, appear likely to have been friends of his.

Plaintiff spends much of his opposition attacking an argument that Defendants have never

made: that *Perfect 10* is solely applicable to embedding content from social media. He submits

a declaration from a "professional 'web developer'" to show that content can be embedded from

a variety of websites, including those owned and operated by the Defendants. Declaration of

Ryan La Corte ("La Corte Decl.") ¶¶ 1, 4.[2]  But Defendants never asserted otherwise.  The

*Perfect 10* decision plainly contemplates that the "server test" may have broad applicability, and

the cases embracing that approach encompass a wide range of situations, from news reporting to

virtual assistant video software.  However, the Court need not decide whether a website called

"Great Cartoons from the New Yorker" comports with the Copyright Act.  All that is before the

Court is the Defendants' (industry-standard) embedding of tweets using Twitter's own embed

code, which allows Defendants to provide links to content hosted and transmitted by Twitter.

*See* Defs. 56.1 Stmt. ¶¶ 25-26.   On the undisputed evidence in the record, such embedding falls

squarely within the scope of *Perfect 10* and its progeny.

**I.    THE UNDISPUTED EVIDENCE ESTABLISHES THAT THIS CASE IS FUNCTIONALLY INDISTINGUISHABLE FROM *PERFECT 10* AND ITS PROGENY**

**A.    Plaintiff Does Not Dispute Any of the Facts Put Forth by Defendants**

As an initial matter, Plaintiff does not dispute any of the facts in Defendants Rule 56.1

Statement, as he did not respond to Defendants' submission.  Local Civil Rule 56.1(b) (opposing

party must "include a correspondingly numbered paragraph responding to each numbered

paragraph in the [56.1] statement of the moving party.")  Instead, he submitted his own

"Statement of Undisputed Facts" that does not contradict Defendants' 56.1 Statement and,

indeed, cites extensively to Defendants' 56.1 Statement as the "evidence" supporting Plaintiff's

factual assertions.  *See* Pl. 56.1 Stmt. ¶¶ 7, 14-17, 20-25.  Under the Local Rules, the statements

set forth in Defendants' 56.1 Statement "will be deemed to be admitted for purposes of the

motion."  Local Civil Rule 56.1(c).  *See T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir.

2009) ("A nonmoving party's failure to respond to a Rule 56.1 statement permits the court to

---

[2] La Corte's declaration is in the vein of expert testimony, but Plaintiff makes no effort to establish that his testimony meets the standards of Fed. R. Evid. 702.  Because the testimony is ultimately irrelevant to the merits of the motion, it is unnecessary for the Court to engage in any Rule 702/*Daubert* inquiry here.

conclude that the facts asserted in the statement are uncontested and admissible.").

Even setting aside Local Civil Rule 56.1, Plaintiff pointedly does not dispute <u>any</u> of Defendants' evidence demonstrating the functionality of their websites and the mechanics of embedding links to content stored and served by third-party websites.  In their motion papers, Defendants demonstrated with sworn testimony and authenticated printouts of the relevant webpages and source code that, when each Defendant embedded a tweet containing Plaintiff's Photo, the Photo was not stored on or transmitted from Defendants' servers.  *See* Defs. 56.1 Stmt. ¶ 38.  Instead, Defendants merely communicated the text of the webpage and HTML instructions directing users' browser software to connect directly to Twitter's servers to retrieve from Twitter the content of the embedded tweet.  *Id.* ¶¶ 35-36.  Plaintiff's Photo was transmitted directly from Twitter's servers to each user visiting the page.  *Id.* ¶ 39.

Despite being provided the opportunity by the Court to take discovery to challenge any of these facts, Plaintiff simply falls back on hyperbolic rhetoric and an apparent willful misreading of the technology and case law.  For example, Plaintiff does not dispute that Defendants transmit source code containing HTML instructions to the browser programs of users who visit their websites.  Instead, he states that "[n]o 'instructions' upon which each *user* could choose to act with respect to each defendant's display of the Photo were provided to each defendant's users" (and cites to Defendants' 56.1 Statement in support).  Pl. 56.1 Stmt. ¶ 17 (emphasis added).  Based on this assertion, he repeatedly refers to the embedded tweets at issue as "instructions-free."  But, as discussed further below, the "instructions" relevant to the direct infringement inquiry in *Perfect 10* were not written instructions to users—they were the HTML instructions to users' browser programs.  It was not the presence or absence of "instructions" in general that affected the *Perfect 10* analysis—it was the fact that Google (like the Defendants here)

transmitted *only* HTML instructions, and not copies of the images themselves.

This Court has held that, where a non-moving plaintiff "neither admits nor denies a fact, but rather (1) adds additional facts, (2) quibbles with defendants' characterization of the fact; or (3) makes legal arguments," the facts asserted by Defendants are "deemed admitted to the extent they are properly supported." *Adams v. Montefiore Med. Ctr.*, No. 15-CV-5082 (KBF), 2017 WL 4417695, at *1 n.1 (S.D.N.Y. Oct. 3, 2017); *see also Mereigh v. N.Y. & Presbyterian Hosp.*, No. 16-CV-5583 (KBF), 2017 WL 5195236, at *1 n.3 (S.D.N.Y. Nov. 9, 2017) (holding that where nonmoving party "'disputes' a fact in form," but "does not actually controvert the fact in substance," the asserted facts will be deemed admitted). That is precisely what Plaintiff does here, and Defendants' asserted facts are all well supported by testimony and evidence. Defendants' facts should therefore be deemed admitted.

### B.      Plaintiff Fails to Distinguish this Case from *Perfect 10*

The Ninth Circuit's holding in *Perfect 10* on direct infringement of the display right is in fact straightforward, notwithstanding Plaintiff's efforts to cloud the issue. The leading treatise on copyright law, after noting that the Ninth Circuit first held that Google violated the display right when it communicated thumbnail images stored on its <u>own</u> servers, boils the crucial aspects of the decision down to the following:

> Turning to the same claim against Google for the full-size infringing images, however, parallel reasoning exonerated Google, which did not store those photographic images. Instead of being responsible for the images' unauthorized display, Google merely framed in-line linked images that, in turn, appeared on users' screens. Adverting to the statutory definition of "copy," the Ninth Circuit concluded that "Google does not have any 'material objects . . . in which a work is fixed . . . and from which the work can be perceived, reproduced, or otherwise communicated' and thus cannot communicate a copy."

4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 12B.01[A][2][b] & n.122 (2017) (noting in footnote the Ninth Circuit's explanation that "communicating a copy" involves

providing HTML instructions that give the user's browser an address for the image). A review of the undisputed record in the instant case confirms that the same key facts that animated the *Perfect 10* holding are present here:

- Like Google, Defendants' servers "do not store the photographic images," and thus Defendants "do[] not have a copy of the images for purposes of the Copyright Act," and "cannot communicate a copy." 508 F.3d at 1160-61. *See* Defs. 56.1 Stmt. ¶ 38.

- Like Google, "[i]nstead of communicating a copy of the image, [Defendants] provide[d] HTML instructions that direct[ed] a user's browser to a website publisher's computer that stores the full-size photographic image." 508 F.3d at 1161. *See* Defs. 56.1 Stmt. ¶¶ 35-36.

- As in *Perfect 10*, the HTML code transmitted by Defendants "merely gives the address of the image to the user's browser"; "[t]he browser then interacts with the computer that stores the infringing image"; and "[i]t is this interaction that causes an infringing image to appear on the user's computer screen." 508 F.3d at 1161. *See* Defs. 56.1 Stmt. ¶¶ 15, 36-39.

Much of this case stems from Plaintiff's misapprehension of what the court meant when it referred to "instructions." 508 F.3d at 1155. Although Plaintiff waxes incredulous that the Ninth Circuit could have been referring to "computer programming that is entirely self-executing and only known to defendants themselves, with no ability on the part of anyone else (including their users) to do anything with or about them," Opp. at 34, the court was clear it was indeed referring to the underlying "*HTML* instructions" (not verbal, English instructions perceivable by users) that are "interpret[ed]" by the "*user's browser program*" (not "acted on by [Google's] visitors," Opp. at 14). 508 F.3d at 1155 (emphases added).[3] Courts have noted—and the undisputed evidence confirms—that "HTML code does not itself appear on the screen; instead, it contains the *instructions* that generate the text, pictures and links that appear[] on the screen."

_____

[3] Courts frequently refer to the HTML code underlying a website as "instructions." For example, in 2010, the Federal Circuit—noting that by 1995, "HTML was well known to persons of ordinary skill in the art of Web design"—defined HMTL as "a language embodying sets of *instructions* that control the format of a Web page displayed on the browser application of a user's PC." *Dow Jones & Co. v. Ablaise Ltd.*, 606 F.3d 1338, 1340 (Fed. Cir. 2010) (emphasis added).

*Florists' Transworld Delivery Inc. v. Originals Florist & Gifts Inc.*,  No. 00-C-4458, 2000 WL 1923321, at *4 (N.D. Ill. Nov. 9, 2000) (emphasis added).[4]  *See* Defs. 56.1 Stmt. ¶¶ 15-18. Whether Plaintiff accepts it or not, *Perfect 10*'s discussion of "HTML instructions" refers precisely to the "self-executing" "computer programming" present here.  Opp. at 34.

Plaintiff also continues to insist—despite undisputed evidence to the contrary—that Defendants' embedding of tweets was unlike Google's in-line linking because Google "communicate[d] only the HTML address of the copy [of an image]."  508 F.3d at 1161. Plaintiff asks rhetorically, "what did defendants 'communicate' in this case? An 'HTML address' … or the full 'image' …?"  Opp. at 34.  But Plaintiff ignores the fact that, in *Perfect 10*, when Google "communicate[d] only [an] HTML address," users saw this:



*See Perfect 10 v. Google, Inc.*, 416 F. Supp. 2d 828, 860 (C.D. Cal. 2006).  The *Perfect 10* court held the above image was not a display *by Google* because the copy of the image was transmitted directly from the underlying host website to the user, and Google only transmitted an HTML

---

[4] *See also Wells Fargo & Co. v. WhenU.com, Inc.*, 293 F. Supp. 2d 734, 747 (E.D. Mich. 2003) (explaining that "[w]hen a user accesses a website," "[a]ll that exists on the computer screen is an image generated by the user's web browser based on *instructions received from the text-based HTML code of the webpage*" (emphasis added)).

document instructing the user's browser program to make that direct connection.  The undisputed evidence shows that exactly the same process took place here.  Defs. 56.1 Stmt. ¶¶ 37-40.

In trying to distinguish *Perfect 10*, Plaintiff also harps on factual details irrelevant to the court's holding on in-line linking.  In addition to its conclusions on direct infringement for Google's transmittal of thumbnail images and in-line linking of full-sized images, the *Perfect 10* court held Google's display of the thumbnail images was protected as fair use and examined whether Google could be secondarily liable for copyright infringement.  508 F.3d at 1163-77.[5]

It goes without saying that a fact relevant to a fair use or secondary infringement inquiry may or may not be relevant to a direct infringement analysis.  The fact that Google "indiscriminately swept-up photos," Opp. at 14, with no ability to control the infringing activities of third-party websites, was clearly relevant to the vicarious liability inquiry, *see* 508 F.3d at 1174, but had no bearing on the court's analysis of whether in-line linking constituted direct infringement.  Similarly, the fact that the case arose in the context of an "Internet search engine … facilitating access" to images was central to the court's conclusion that Google's display of the thumbnail images was protected as fair use.  *See, e.g., id.* at 1166 (finding fair use based on the "significantly transformative nature of Google's search engine, particularly in light of its public benefit").  But, despite Plaintiff's effort to limit the decision to the "search engine" context, that fact does not come up <u>at all</u> in the court's discussion of whether Google was liable for direct infringement when it in-line linked to full-sized images located on third-party websites.  Indeed, it is perfectly clear from the opinion that the search engine functionality did <u>not</u> factor

---

[5] The fair use portion of the *Perfect 10* decision has been cited with approval by the Second Circuit in three different major fair use decisions.  *See Authors Guild v. Google, Inc.*, 804 F.3d 202, 216-17, 227 & n.17, 19 (2d Cir. 2015); *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 84, 90  (2d Cir. 2014); *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 95, 97 (2d Cir. 2014).  Plaintiff argues that Defendants have "abandon[ed] the notion that the full *Perfect 10* opinion should be adopted by this Court."  Opp. at 13 n.10.  Setting aside that Defendants never suggested that all of *Perfect 10's* holdings are relevant to this case, the Second Circuit has embraced the fair use portion of the *Perfect 10* decision.

into that part of the Court's decision.  Finally, in holding that the "server test" approach to direct

liability for third-party-hosted content "comports with the language of the Copyright Act," *id.* at

1160, the court did not rely on—or even allude to—the facts that: (1) the images at issue

appeared as the result of "independent volitional searches by its third-party users"; (2) users were

given information (which Plaintiff calls "instructions") for how they could view the full-size

photos; or (3) users had to "volitionally" "click" on the thumbnails to see full-sized images.

Opp. at 13-14.[6]

Plaintiff cannot create a genuine issue of material fact by repeating his "click-free,

instructions-free, user-discretion-free" mantra when those "distinctions" have nothing to do with

*Perfect 10*'s holding.

## II.    THIS COURT SHOULD APPLY *PERFECT 10* AND ITS PROGENY HERE

Because the undisputed record shows plainly that the provision of a link to a Photo from

Twitter by Defendants is functionally identical to the in-line linking by Google in *Perfect 10*, the

only issue for the Court to decide is whether to apply *Perfect 10* and its progeny here.

Plaintiff (and his *amici*) struggle to show either that *Perfect 10* was wrongly decided or

that the many nearly-unanimous[7] decisions adopting the Ninth Circuit's approach (including

multiple cases in this District[8]) are all distinguishable.  But the *Perfect 10* approach makes

---

[6] Plaintiff asserts that Defendants did not "frame" his Photo in a separate "window." Opp. at 11. This is technically incorrect, as embedded Tweets do appear in a light-gray frame, but regardless, the court's holding was ultimately not based on the fact that the full-sized images happened to be "framed."

[7] *But see The Leader's Institute, LLC v. Jackson*, Civ. Action No. 3:14-cv-3572-B, 2017 WL 5629514, at *3 (N.D. Tex. Nov. 22, 2017), finding that where a party "framed" the entirety of a competitor's website such that "[it] caused [the competitor's] website to appear within and under the plaintiffs' registered domain names," the framing violated the original website owner's copyright. This case distinguished *Perfect 10* (in conclusory fashion) and rejected the Ninth Circuit's holding that an infringer must have a copy of the underlying work to directly infringe the display right.  For all of the reasons set forth in Defendants' opening Memorandum of Law and this Reply, this decision flies in the face of the language and logic of *Perfect 10* and the Copyright Act and is wrongly decided.

[8] *See MyPlayCity, Inc. v. Conduit Ltd.*, No. 10 Civ. 1615(CM), 2012 WL 1107648 (S.D.N.Y. Mar. 30,

sense—particularly in the context of embedding content from third-party social media sites—and is fully consistent with the language and structure of the Copyright Act.  And whatever distinctions can be drawn between the post-*Perfect 10* cases in this District and this case, they all support the basic principle that merely providing a link to (whether via in-line link, embedding or otherwise) content hosted and controlled by third parties does not constitute direct infringement.

### A.    The *Perfect 10* Server Test Is Consistent With the Plain Language of the Copyright Act

*Perfect 10*'s holding that merely providing a link to content served from a third-party server does not directly infringe the display right is grounded squarely in the definition of "display" in the Copyright Act.  As the Ninth Circuit noted, to "display" a work is to "show a copy of it, either directly or by means of a film, slide, television image, or any other device or process."  17 U.S.C. § 101.  The "copy" of a digital image is the computer disk/drive that physically stores the image file.[9]  In order to "show" that copy, a defendant would have to use a "device or process" to "fill [a] computer screen with the photographic image *stored on that computer*," or otherwise "communicat[e] the stored image electronically to another person's computer."  *Id.* (emphasis added). A website publisher that merely links to an image hosted and controlled by third parties is not showing a "copy" of the image because it doesn't have any copy

2012), *adhered to on recons.*, 2012 WL 2929392 (S.D.N.Y. July 18, 2012); *Live Face on Web, LLC v. Biblio Holdings LLC*, No. 15 Civ. 4848 (NRB), 2016 WL 4766344, at *1 (S.D.N.Y. Sept. 13, 2016); *Capitol Records, LLC v. ReDigi Inc.*, 934 F. Supp. 2d 640 (S.D.N.Y. 2013).

[9] *Perfect 10*'s citation to its earlier decision in *MAI Systems Corp. v. Peak Computer, Inc.*, 991 F.2d 511 (9th Cir. 1993), was not an "astonishing non-sequitur."  Opp. at 19.  The court cited *MAI Systems* for the now established principle that a file saved on a computer or storage device constitutes a "copy" because the file is "fixed" in the computer's memory.  *See Perfect 10*, 508 F.3d at 1160.  The court did not use the discussion of the distribution right in *MAI Systems* to define the contours of the display right—it used *MAI Systems* to define a "copy" in the context of computer files.  Plaintiff does not dispute that the file containing his Photo, as saved on a computer, constitutes a "copy" of the work, nor that Defendants never stored or transmitted a copy of his work when they embedded links to tweets containing the Photo.

to show.  Nothing in the Copyright Act or its legislative history (as discussed by Plaintiff's

*amici*) supports the imposition of *direct* liability on a party that never touches a copy of the work.

Plaintiff's argument distorts the Copyright Act's language.  He claims that, because a

display of his Photo is taking place when Defendants embedded links to tweets containing his

Photo, and because embedding is a type of "process," Defendants are necessarily the ones

making the public display of the Photo.  But the statute's definitions require more than a

"showing" and a "process"—to "display" a work, the defendant must "show a copy" of the work

"*by means of*" that "process."  17 U.S.C. § 101 (emphasis added).  Linking by embedding or in-

line linking may be a "process," but it is a "process" of providing information and instructions

that merely *facilitate* a third party's (i.e., the server that actually hosts and transmits the image)

showing of the work.  It is the third party that does the displaying.  As *Perfect 10* held, merely

"facilitat[ing]" access to an infringing image "raises only contributory liability issues, and does

not constitute direct infringement of the copyright owner's display rights."  508 F.3d at 1161.

Plaintiff misreads *Perfect 10* as requiring that, in order to display a work, a defendant

must "first make its own copy of the copyrighted work."  Opp. at 20.  But the Ninth Circuit says

nothing about *creating* a new copy—it just requires that the defendant have a copy to show,

regardless of who created it.  Plaintiff's *amici* likewise read the decision as turning on the

"physical location" of the work.  Pl. Amici Br. at 3, 4.  But the issue in *Perfect 10* was not the

physical location of the servers hosting the allegedly infringing images—it was the fact that

those servers were controlled by third parties, and not Google.  Google thus did not communicate

or transmit the copies of the images to users.

Plaintiff's *amici* ultimately argue that the "only question" for direct infringement of the

display right is "whether the defendant *caused* the work to be viewed by members of the public."

Pl. Amici Br. at 5 (emphasis added).  But if Congress wanted to define "display" of a work to mean "causing it to be viewed by others," it could have done so.  Instead, "display" of a work requires that the defendant "show" a "copy," which Defendants did not do here.  As courts applying *Perfect 10* have recognized, to impose direct infringement liability on anyone who merely "causes" the work to be viewed by others would "blur the distinction between direct and contributory infringement."  *Flava Works*, 689 F.3d at 761.  Indeed, "causing" infringement is part of the traditional definition of contributory infringement.  *See, e.g.*, *Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971) (defining contributory infringer as "one who, with knowledge of the infringing activity, induces, *causes* or materially contributes to the infringing conduct of another" (emphasis added)).

    To translate the concept to the analog world, if a building owner hung a large poster of Plaintiff's Photo on the outside wall of a building, the building owner would be potentially liable for directly infringing Plaintiff's public display right.  But if another person stood on the street in front of the building and stopped a passerby to show them the poster hung by the building owner, that person is not displaying the poster under the Copyright Act.  The building owner had the copy of the Photo; the building owner posted it in a place where it could be seen by the public; and the building owner had control at all times over whether the Photo would continue to be shown or taken down.  The person on the street was never in a position to "show" the copy of the Photo, even if they "caused" the Photo "to be viewed" by pedestrians who may not have otherwise looked up when they walked by.  Conceivably, the person on the street could be liable for contributory infringement (though only if, at a minimum, they were aware that the building owner was not authorized to display the Photo), but that person was never in control over the process of showing the Photo to the public.  Indeed, if the building owner removed the poster,

the person on the street could keep drawing pedestrians' attention to the building, but they would be looking at an empty wall.

That is exactly what happens when a website publisher provides embedded links to content hosted and controlled by a third party.  In *Perfect 10*, when Google transmitted text-based HTML instructions to the browser programs of its users directing the viewers to the underlying sites hosting the images, the court held the "HTML instructions d[id] not themselves cause infringing images to appear on the user's computer screen."  508 F.3d at 1161.  Rather, it was the direct "interaction" between the user's computer and the hosting computer that "cause[d] an infringing image to appear."  *Id.*  Google's "facilitat[ion]" of, or "assistance" with, that interaction "raise[d] only contributory liability issues."  *Id.*  As with the building owner, the underlying site is in control over whether the content will be displayed.  Thus, here, when the tweets containing the Photo were removed, the Photo instantly disappeared from any sites where the tweets were embedded.[10]  *See* Defs. 56.1 Stmt. ¶ 44.

### B.    Courts and Publishers Have Continued to Rely on *Perfect 10*, Even After the Supreme Court's Decision in *Aereo*

Plaintiff's *amici* argue that *Perfect 10* is "inconsistent" with the Supreme Court's "intervening" decision in *American Broadcasting Cos. v. Aereo, Inc.*, 134 S. Ct. 2498 (2014). But *Aereo* has no bearing on the issues in this case.  That case involved a company that used a

---

[10] Plaintiff inadvertently illustrates this principle perfectly with his examples of a "Non-Absurd Solution." As the source code for those articles (which Plaintiff holds up as what Defendants *should* have done) confirms, the publishers, in fact, did *exactly the same thing* as Defendants: They embedded tweets containing the Photo hosted on Twitter's servers.  *See* Supp. Decl. of Lacy H. Koonce, III ¶¶ 4-7 and Exs. 24-25. In fact, the *Boston Magazine* article embeds the very same Rob H Tweet (containing the Photo) embedded by several Defendants here.  The reason the embedded tweets in the *Washington Post* and *Boston Magazine* articles do not now show the Photo on the page is not because the publishers followed a different practice, but *because the tweets containing the Photo were removed at some point prior to the date Plaintiff took a screenshot of the articles!*  Because—like Defendants here—all those publishers provided was HTML embed code, not the underlying content itself, once the content has been removed from the server on which it resided, it no longer appears when a user visits the web page for the articles. Plaintiff was apprised of this reality when he tried the same argument in his opposition to the motion to dismiss, but, heedless of the facts, he nevertheless rehashes the argument at the summary judgment stage.

system of tiny antennas to stream broadcast television signals to subscribers online without paying the retransmission rates imposed on cable providers.  The Supreme Court held that the company infringed the television networks' public performance rights because, despite the design of the system, the service was "for all practical purposes a traditional cable system," and Congress had previously amended the Copyright Act specifically to address cable network retransmissions.  *Id.* at 2507.  But the Court was careful to cabin its "limited holding" to the specific technology at issue, and expressly disclaimed any application of the decision to "technologies not before [the Court]."  *Id.* at 2510-11.  *See also BWP Media USA, Inc. v. T & S Software Assocs., Inc.*, 852 F.3d 436, 442 (5th Cir. 2017) (noting that the Court "limited its holding to the technology at issue").  No court has read *Aereo* as limiting or undermining *Perfect 10*.

Moreover, *Aereo* involved a defendant exploiting an apparent technological loophole in an effort to disrupt a well-established (and heavily-regulated) industry.  Here, embedding third-party content is and has been integral to how information and content are shared online.  *See generally* EFF Amici Br. at 8-10.  Even Plaintiff's own witness acknowledges that social media sites, "like Twitter, encourage and facilitate embedding."  La Corte Decl. ¶ 3.  As the district court in *Perfect 10* recognized, holding that this now commonplace, widely encouraged practice constitutes direct copyright infringement, "would cause a tremendous chilling effect on the core functionality of the web—its capacity to link, a vital feature of the internet that makes it accessible, creative, and valuable."  416 F. Supp. 2d at 840.

## C.     Plaintiff and his *Amici* Ignore Alternative Remedies

It bears repeating that a content owner is not helpless to prevent embedding of its works on other websites.  Plaintiff (and his "expert") invoke the possibility of photos from Sports

14

Illustrated's website (which is published by defendant Time) being embedded across the Internet. *See* Opp. at 6.  But Plaintiff ignores that the Terms of Service for sites like sportsillustrated.com can and do expressly prohibit this practice, regardless of whether it is an infringement of copyright.[11]  And sites can employ technical measures to block their content from being embedded elsewhere.  Recently, a popular image hosting service changed its pricing structure so that users were required to pay a subscription fee if they wanted the images they uploaded to be embeddable on other websites.  *See* Matthew Humphries, *Photobucket Breaks Image Links Across the Internet*, PCMag (June 30, 2017), https://www.pcmag.me/a/2519358.  The hosting service did not seek to hold each of the millions of sites embedding the photos liable as direct infringers; the service simply altered the site's code, so that any photo embedded from a non-paying account was replaced with a generic placeholder image.  *See id.*[12]

And of course, Plaintiff also retained the option to use the remedy provided by Congress of providing notice of infringement to Twitter or any other hosting service pursuant to 17 U.S.C. § 512(c), or to go after the actual infringers who first uploaded the Photo to the Web—who, based on Plaintiff's Declaration, appear likely to have been friends of his.  The fact that these individual users do not have the perceived deep pockets of a publication does not justify rewriting the Copyright Act and upending a decade of case law.

<u>**CONCLUSION**</u>

This Court should grant Defendants' motion for partial summary judgment and dismiss the claims as to any uses of the Photo that arise solely from embedded tweets.

---

[11] *See* SPORTS ILLUSTRATED Web Site and Application Terms and Conditions of Use, ¶ 11, https://subscription.timeinc.com/storefront/privacy/si/privacy_terms_service.html ("[Y]ou agree that ... you are not permitted to link directly to any image hosted on the Web Site or our services, such as using an 'in-line' linking method to cause the image hosted by us to be displayed on another web site.").

[12] By Plaintiff's logic, when the hosting service changed its code, the embedding websites were instantly transformed from displayers to non-displayers despite taking no action to alter their websites.

Dated: New York, New York
          November 29, 2017

Respectfully submitted,


By: */s/ Regina Schaffer-Goldman*
          Regina Schaffer-Goldman (RS-0630)

MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, New York 10178
Tel.: (212) 309-6000
regina.schaffer-goldman@morganlewis.com

Lawrence T. Stanley, Jr. (*pro hac vice*)
MORGAN, LEWIS & BOCKIUS LLP
One Federal Street
Boston, MA 02110
Tel. (617) 341-7700
lawrence.stanley@morganlewis.com

*Attorneys for Defendant Boston Globe Media
Partners LLC*


By: */s/ Robert Penchina*
          Robert Penchina

BALLARD SPAHR, LLP
919 Third Avenue, 37th Floor
New York, NY 10022
Tel.: (212) 850-6109
penchinar@ballardspahr.com

*Attorneys for Defendant Gannett Company, Inc.*


By: */s/ Stephen M. Kramarsky*
          Stephen M. Kramarsky (SK-6666)

DEWEY PEGNO & KRAMARSKY LLP
777 Third Avenue, 37th Floor
New York, NY 10017
Tel.: (212) 943-9000
skramarsky@dpklaw.com

*Attorneys for Defendant New England Sports
Network*

By: */s/ Lacy H. Koonce, III*
    Lacy H. Koonce, III (LK 8584)
    Eric J. Feder (EF 8016)

DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, NY  10020
Tel.: (212) 489-8230
Fax: (212) 489-8340
Email: lancekoonce@dwt.com
Email: ericfeder@dwt.com

*Attorneys for Defendant Time Inc.*

By: */s/ Thomas P. Lane*
    Thomas Patrick Lane

WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166
Tel.: (212) 294-6700
Fax: (212) 294-4700
tlane@winston.com

Jennifer A. Golinveaux (*pro hac vice*)
WINSTON & STRAWN LLP
101 California Street
San Francisco, CA 94111
Tel.: (415) 591-1400
jgolinveaux@winston.com

*Attorneys for Defendant Yahoo Holdings, Inc.*

By: */s/ Marc A. Lebowitz*
    Marc A. Lebowitz (ML 7381)
    Keith M. Getz (KG 6091)

LEBOWITZ LAW OFFICE LLC
747 Third Avenue, 23rd Floor
New York, NY 10017
Tel.: (212) 682-6818
marc@lebolaw.com

*Attorneys for Defendant Heavy, Inc.*