UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X

JUSTIN GOLDMAN,                                  :
                                                 :
                              Plaintiff,         :
                                                 :
         -v-                                     :
                                                 :
BREITBART NEWS NETWORK, LLC,                     :
HEAVY, INC., TIME, INC., YAHOO, INC.,            :
VOX MEDIA, INC., GANNETT COMPANY,               :
INC., HERALD MEDIA, INC., BOSTON                 :
GLOBE MEDIA PARTNERS, INC., and NEW             :
ENGLAND SPORTS NETWORK, INC.,                    :
                                                 :
                              Defendants.        :

------------------------------------------------------------ X

17-cv-3144 (KBF)

OPINION &  ORDER

KATHERINE B. FORREST, District Judge:

    When the Copyright Act was amended in 1976, the words "tweet," "viral," and "embed" invoked thoughts of a bird, a disease, and a reporter.  Decades later, these same terms have taken on new meanings as the centerpieces of an interconnected world wide web in which images are shared with dizzying speed over the course of any given news day.  That technology and terminology change means that, from time to time, questions of copyright law will not be altogether clear.  In answering questions with previously uncontemplated technologies, however, the Court must not be distracted by new terms or new forms of content, but turn instead to familiar guiding principles of copyright.  In this copyright infringement case, concerning a candid photograph of a famous sports figure, the Court must construe how images shown on one website but stored on another website's server implicate an owner's exclusive display right.

Today, many websites embed Twitter posts into their own content; for those familiar with digital news or other content, this is common knowledge.  Here, plaintiff Justin Goldman's copyrighted photo of Tom Brady went "viral"—rapidly moving from Snapchat to Reddit to Twitter—and finally, made its way onto the websites of the defendants, who embedded the Tweet alongside articles they wrote about Tom Brady actively helping the Boston Celtics recruit basketball player Kevin Durant.

Plaintiff, claiming he never publicly released or licensed his photograph, filed suit against the defendant websites, claiming a violation of his exclusive right to display his photo, under § 106(5) of the Copyright Act.

With the consent of the parties, this Court divided the litigation into two phases—the first to determine whether defendants' actions violate the exclusive right to display a work (here an embedded Tweet), and the second to deal with all remaining issues, such as the liability (or non-liability) for other defendants and any defenses that have been raised.

Defendants filed a motion for partial Summary Judgment on October 5, 2017. (ECF No. 119.)  The Court heard oral argument on January 16, 2018.

Having carefully considered the embedding issue, this Court concludes, for the reasons discussed below, that when defendants caused the embedded Tweets to appear on their websites, their actions violated plaintiff's exclusive display right; the fact that the image was hosted on a server owned and operated by an unrelated third party (Twitter) does not shield them from this result.

2

Accordingly, defendants' motion for partial Summary Judgment is DENIED. Partial Summary Judgment is GRANTED to the plaintiff.

I.     FACTUAL BACKGROUND

The parties agree that the principle issue briefed on this motion is a legal one and amenable to summary judgment.  The following facts are materially undisputed and all inferences are drawn in favor of the plaintiff.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

A.  The Tom Brady Photo

On July 2, 2016, plaintiff Justin Goldman snapped a photograph of Tom Brady (the "Photo"), Danny Ainge, and others on the street in East Hampton.  (ECF No. 149, Goldman Declaration ("Goldman Decl.") ¶ 2.)  Shortly thereafter, he uploaded the photograph to his Snapchat Story.[1]  (Id. ¶ 5.)  The Photo then went "viral," traveling through several levels of social media platforms—and finally onto Twitter, where it was uploaded by several users, including Cassidy Hubbarth (@cassidyhubbarth), Bobby Manning (@RealBobManning), Rob H (@rch111), and Travis Singleton (@SneakerReporter).  (Id. ¶ 6–10; ECF No. 120, Defendants' Statement of Undisputed Facts Pursuant to Local Rule 56.1 ("Defs.' 56.1 Statement") ¶ 28.)  These uploads onto Twitter are referred to as "Tweets."

Defendants in this case are online news outlets and blogs who published articles featuring the Photo.  Each of defendants' websites prominently featured the Photo by "embedding" the Tweet into articles they wrote over the course of the next

---

[1] Snapchat is a social media platform where users share photographs and messages; a Snapchat story is a series of photos a user posts—each photo is available for twenty-four hours only.

forty-eight hours; the articles were all focused on the issue of whether the Boston Celtics would successfully recruit basketball player Kevin Durant, and if Tom Brady would help to seal the deal.

It is undisputed that plaintiff holds the copyright to the Photo.

B. Embedding

None of the defendant websites copied and saved the Photo onto their own servers. Rather, they made the Photo visible in their articles through a technical process known as "embedding." Some background is helpful to an understanding of the embedding process.

A webpage is made up of a series of instructions usually written by coders in Hypertext Markup Language ("HTML"). These instructions are saved to a server (a computer connected to the internet), and when a user wishes to view a webpage, his or her computer's browser connects with the server, at which point the HTML code previously written by the coder instructs the browser on how to arrange the webpage on the user's computer. The HTML code can allow for the arrangement of text and/or images on a page and can also include photographs. When including a photograph on a web page, the HTML code instructs the browser how and where to place the photograph. Importantly for this case, the HTML code could instruct the browser either to retrieve the photograph from the webpage's own server or to retrieve it from a third-party server.

"Embedding" an image on a webpage is the act of a coder intentionally adding a specific "embed" code to the HTML instructions that incorporates an image,

hosted on a third-party server, onto a webpage.  To embed an image, the coder or web designer would add an "embed code" to the HTML instructions; this code directs the browser to the third-party server to retrieve the image.  An embedded image will then hyperlink (that is, create a link from one place in a hypertext document to another in a different document) to the third-party website.  The result: a seamlessly integrated webpage, a mix of text and images, although the underlying images may be hosted in varying locations.  Most social media sites— Facebook, Twitter, and YouTube, for example—provide code that coders and web designers can easily copy in order to enable embedding on their own webpages.

Here, it is undisputed that none of the defendant websites actually downloaded the Photo from Twitter, copied it, and stored it on their own servers.  Rather, each defendant website merely embedded the Photo, by including the necessary embed code in their HTML instructions.  As a result, all of defendants' websites included articles about the meeting between Tom Brady and the Celtics, with the full-size Photo visible without the user having to click on a hyperlink, or a thumbnail, in order to view the Photo.

## II.   LEGAL PRINCIPLES

### A.  Summary Judgment Standard

This Court applies the well-known summary judgment standard set forth in Rule 56 of the Federal Rules of Civil Procedure.  Summary Judgment may not be granted unless a movant shows, based on admissible evidence in the record, "that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). When the moving party does not bear the ultimate burden on a particular claim or issue, it need only make a showing that the non-moving party lacks evidence from which a reasonable jury could find in the non-moving party's favor at trial. Id. at 322–23.

In making a determination on summary judgment, the court must "construe all evidence in the light most favorable to the non-moving party, drawing all inferences and resolving all ambiguities in its favor." Dickerson v. Napolitano, 604 F.3d 732, 740 (2d Cir. 2010) (citing LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp., 424 F.3d 195, 205 (2d Cir. 2005)). Once the moving party has discharged its burden, the opposing party must set out specific facts showing a genuine issue of material fact for trial. Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009). "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," as "mere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks, citations, and alterations omitted).

"In considering a motion for summary judgment, if our analysis reveals that there are no genuine issues of material fact, but that the law is on the side of the non-moving party, we may grant summary judgment in favor of the non-moving party even though it has made no formal cross-motion." Orix Credit Alliance, Inc. v.

Horten, 965 F. Supp. 481, 484 (S.D.N.Y. 1997) (citing Int'l Union of Bricklayers v.

Gallante, 912 F. Supp. 695, 700 (S.D.N.Y. 1996); see also Coach Leatherware Co. v.

AnnTaylor, Inc., 933 F.2d 162, 167 (2d Cir. 1991) ("[I]t is most desirable that the

court cut through mere outworn procedural niceties and make the same decision as

would have been made had defendant made a cross-motion for summary judgment."

(citing Local 33, Int'l Hod Carriers v. Mason Tenders Dist. Council, 291 F.2d 496,

505 (2d Cir. 1961))).  "Summary judgment may be granted to the non-moving party

in such circumstances so long as the moving party has had an adequate opportunity

to come forward with all of its evidence." Orix Credit Alliance, 965 F. Supp. at 484.

(citing Cavallaro v. Law Office of Shapiro & Kreisman, 933 F. Supp. 1148, 1152

(E.D.N.Y. 1996)).

> B. The Copyright Act

"From its beginning, the law of copyright has developed in response to

significant changes in technology." Sony Corp. of America v. Universal City

Studios, Inc., 464 U.S. 417, 430 (1984).  Copyright protections "subsists . . . in

original works of authorship fixed in any tangible medium of expression."  17 U.S.C.

§ 102(a).  The Copyright Act of 1976, enacted in response to changing technology,

gives a copyright owner several "exclusive rights," including the exclusive right to

"display the copyrighted work publicly."  17 U.S.C. § 106(5).  To display a work,

under the Act, is to "show a copy of it, either directly or by means of a film, slide,

television image, or any other device or process."  17 U.S.C. § 101 (emphasis added).

The Act's Transmit Clause defines that exclusive right as including the right to

"transmit or otherwise communicate . . . a display of the work  . . . to the public, by means of any device or process." Id.  It further defines "device or process" as "one now known or later developed." Id.

A review of the legislative history reveals that the drafters of the 1976 Amendments intended copyright protection to broadly encompass new, and not yet understood, technologies.  Indeed, on the first page of the House Report, the drafters proclaimed that the Amendments were necessary in part because "technical advances have generated new industries and new methods for the reproduction and dissemination of copyrighted works;" furthermore, Congress did "not intend to freeze the scope of copyrightable subject matter at the present stage of communications technology."  H.R. Rep. 94-1476, 47, 51 (1976).

Specifically, in considering the display right, Congress cast a very wide net, intending to include "[e]ach and every method by which the images  . . . comprising a . . . display are picked up and conveyed," assuming that they reach the public. Id. at 64 (emphasis added).  It further noted that "'display' would include the projection of an image on a screen or other surface by any method, the transmission of an image by electronic or other means, and the showing of an image on a cathode ray tube, or similar viewing apparatus connected with any sort of information storage and retrieval system." Id.  (emphasis added).  Indeed, an infringement of the display right could occur "if the image were transmitted by any method (by closed or open circuit television, for example, or by a computer system) from one place to members of the public elsewhere." Id. at 80 (emphasis added).

8

The Register of Copyrights testified during hearings that preceded the passage of the Act: "[T]he definition [of the display right] is intended to cover every transmission, retransmission, or other communication of [the image]," beyond the originating source that might store the image, but including "any other transmitter who picks up his signals and passes them on." H. Comm. On the Judiciary, 89th Cong., Copyright Law Revision Part 6: Supplementary Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law: 1965 Revision Bill, at 25 (Comm. Print. 1965).  He highlighted the importance of the display right in light of changing technology, specifically warning that "information storage and retrieval devices . . . when linked together by communication satellites or other means . . . could eventually provide libraries and individuals throughout the world with access to a single copy of a work by transmission of electronic images" and therefore that "a basic right of public exhibition should be expressly recognized in the statute." Id. at 20 (emphasis added).

### C.   American Broadcasting Cos., Inc. v. Aereo, Inc.

The Supreme Court most recently considered the intersection of novel technologies and the Copyright Act in the Aereo decision, rendered in 2014. American Broadcasting Cos., Inc. v. Aereo, Inc., 134 S. Ct. 2498 (2014).  The issue in Aereo was the performance right; the Court was deciding whether Aereo "infringed this exclusive right by selling its subscribers a technologically complex service that allows them to watch television programs over the Internet at about the same time as the programs are broadcast over the air." Id. at 2503.  Aereo charged a monthly

fee to allow subscribers to watch broadcast television programming over the internet; it maintained a vast number of servers and antennas in a central warehouse.  When a user wanted to watch a program, he would visit Aereo's website and select a show; in turn, Aereo's servers would select an antenna, tune it to the on-air broadcast, and transmit it via the internet to the subscriber.  Aereo argued that since the user chose the programs and Aereo's technology merely responded to the user's choice, it was the user and not Aereo who was in fact "transmitting" the performance.

The Court rejected this analysis, comparing Aereo to the cable companies that parts of the 1976 Amendments were intended to reach.  When comparing cable technology (where the signals "lurked behind the screen") to Aereo's technology (controlled by a click on a website), the Court stated: "[T]his difference means nothing to the subscriber.  It means nothing to the broadcaster.  We do not see how this single difference, invisible to subscriber and broadcaster alike, could transform a system that is for all practical purposes a traditional cable system into 'a copy shop that provides its patrons with a library card.'"  Id. at 2507.

Even the dissent, which would have found no liability based on the lack of Aereo's volition in choosing which programming to make available, stated that where the alleged infringer plays no role in selecting the content, it cannot be held directly liable when a customer makes an infringing copy: "Aereo does not 'perform' for the sole and simple reason that it does not make the choice of content."  Id. at 2514 (Scalia, J., dissenting).

D. The "Server Test"

Defendants urge this Court to define the scope of the display right in terms of what they refer to as the "Server Test."  According to defendants, it is "well settled" law and the facts of this case call for its application.  As set forth below, the Court does not view the Server Test as the correct application of the law with regard to the facts here.  Nevertheless, it is useful to briefly chronicle the body of law that has developed in that area and explain why it is inapplicable.

In Perfect 10, Inc. v. Amazon.com, Inc., 508 F.3d 1146 (9th Cir. 2007) ("Perfect 10 II"), the Ninth Circuit considered a claim of direct infringement of the display right against Google based upon Google Image Search.  The district court addressed two different questions: 1) did the thumbnail images that automatically pop up when a user types in a search term constitute direct infringements of the display right; and 2) did the full size images that appeared on the screen after a user clicked on a thumbnail constitute direct infringements of the same display right.  In answer, the court made a sharp distinction between the two based upon where the images were hosted.  Perfect 10 v. Google, Inc., 416 F. Supp. 2d 828, 839 (C.D. Cal. 2006) ("Perfect 10 I").  First, it found the thumbnails to be infringing, based on the fact that they were stored on Google's server.  Id. at 844.  Conversely, it held that the full size images, which were stored on third-party servers and accessed by "in-line linking"—which works, like embedding, based upon the HTML code instructions—were not infringements.  Id.  In so doing, the court rejected the plaintiff's proposed Incorporation Test, which would define display as the "act of

incorporating content into a webpage that is then pulled up by the browser." Id. at 839.  It adopted instead the Server Test, where whether a website publisher is directly liable for infringement turns entirely on whether the image is hosted on the publisher's own server, or is embedded or linked from a third-party server.

On appeal, the Ninth Circuit affirmed.[2]  In the Ninth Circuit, therefore, at least as regards a search engine, the "Server Test" is settled law.

Defendants here argue that Perfect 10 is part of an "unbroken line of authority" on which this Court should rely in determining broadly whether a copyright owner's display right has been violated.  Outside of the Ninth Circuit, however, the Server Test has not been widely adopted.  Even a quick survey reveals that the case law in this area is somewhat scattered.  Of the other Circuits, only the Seventh Circuit has weighed in thus far—in Flava Works, Inc. v. Gunter, 689 F.3d 754 (7th Cir. 2012), the question before the court was whether the defendant was a contributory infringer.  Defendant in that case, a "social bookmarker," whose service involved enabling individuals who share interests to point each other towards online materials (in this case, videos) that cater towards that taste, through embedding the code for the video onto its website.  The videos remained hosted on the original servers.  As with Perfect 10, upon arriving on defendant's website, thumbnails would appear; after clicking on one, the user would retrieve content from plaintiff's website.  The Flava Court found that defendants were not contributory infringers; the question of direct infringement was never reached.  The

---

[2] It found, however, that "Google is likely to succeed in proving its fair use defense" as to the thumbnail images.

12

lower court, however, had opined that "[t]o the extent that <u>Perfect 10</u> can be read to stand for the proposition that inline linking can <u>never</u> cause a display of images or videos that would give rise to a claim of direct copyright infringement, <u>we respectfully disagree</u>.  <u>In our view, a website's servers need not actually store a copy of the work in order to 'display' it</u>."  <u>Flava Works, Inc. v. Gunter</u>, 2011 WL 3876910, at *4 (N.D. Ill. Sept. 1, 2011), <u>rev'd on other grounds</u>, 689 F.3d 754 (7th Cir. 2012) (emphasis added).

Four courts in this District have discussed the Server Test and <u>Perfect 10</u>'s holding; none adopted the Server Test for the display right.  First, in <u>Live Face on Web, LLC v. Biblio Holdings LLC</u>, 2016 WL 4766344 (S.D.N.Y. Sept. 12, 2016), the issue before the court was the distribution right, not the display right.  Defendant argued that a distribution had not occurred, since the alleged infringing content was hosted on a third-party server, and not its own.  The court noted that defendant cited no legal authority for this proposition, but stated that "such authority <u>may</u> exist," citing <u>Perfect 10</u>.  <u>Id.</u> at *4.  The court did not adopt the Server Test; rather, it held that additional discovery was necessary as the issue had "hardly" been briefed.  <u>Id.</u> at *5.  Second, in <u>MyPlayCity, Inc., v. Conduit Ltd.</u>, 2012 WL 1107648 (S.D.N.Y. Mar. 30, 2012), the distribution right was again at issue.  In that case, when the user clicked a "play now" button on the defendant's customized tool bar, it would be able to play games hosted on the plaintiff's servers.  The court cited <u>Perfect 10</u> and then found that, due to the fact that <u>plaintiff's</u> servers "'actually disseminated' the copies of [plaintiff's] copyrighted games, [defendant] cannot be

held liable for infringing on [plaintiff's] distribution rights." Id. at *14.  Third, in Pearson Education, Inc. v. Ishayev, 963 F. Supp. 2d 239 (S.D.N.Y. 2013), the court held that standard text hyperlinks (not including images) that users click in order to view and visit other sites were not a use of infringing content, relying in part on Perfect 10; the exclusive right at issue here, too, was the distribution right.

Only the fourth case in this District, Capitol Records, LLC v. ReDigi Inc., 934 F. Supp. 2d 640 (S.D.N.Y. 2013) squarely dealt with the § 106(5) display right. There, however, the court did no more than offer a simple factual statement, "The Ninth Circuit has held that the display of a photographic image on a computer may implicate the display right, though infringement hinges, in part, on where the image was hosted." Id. at 652 (emphasis added).  It then proceeded to deny summary judgment based on material disputes as to the content of the allegedly infringing issues.  Id.

Additionally, in a trademark decision rendered in this District prior to Perfect 10, when considering whether defendant Tunes was liable for trademark infringement to the Hard Rock Café for "framing" the Hard Rock logo on their website, the court held that it was.  Hard Rock Café Int'l v. Morton, 1999 WL 717995 (S.D.N.Y. Sept. 9, 1999).  After considering both the fact that "it [was] not clear to the computer user that she or he has left the [plaintiff's] web site" and the fact that there was a "seamless presentation" on the website, the court found that "the only possible conclusion is that the Hard Rock Hotel Mark is used or exploited to advertise and sell CDS." Id. at *25.

Only a handful of other district courts have considered the issue.[3]  In Grady v. Iacullo, 2016 WL 1559134 (D. Colo. Apr. 18, 2016), the court considered the exclusive reproduction and distribution rights, and, relying on Perfect 10, reopened discovery in order to allow plaintiff an opportunity to show that defendant stored the allegedly infringing images on his own computer.[4]  In another recent district court case, plaintiff survived the motion to dismiss stage in a distribution case, based on the theory that each time a user used defendant's website, it "cause[d] a copy of [plaintiff's] software to be distributed to the website visitor's computer in cache, memory, or hard drive" and that the "[defendant's] website distributed copies of the code to each of the website's visitors."  Live Face on Web, LLC v. Smart Move Search, Inc., 2017 WL 1064664 (D.N.J. Mar. 21, 2017), at *2.

Finally, in The Leader's Institute, LLC v. Jackson, 2017 WL 5629514 (N.D. Tex. Nov. 22, 2017), at issue on summary judgment was, inter alia, whether plaintiffs infringed defendant's exclusive display rights by "framing" defendant's websites.  The court rejected Perfect 10, holding that by "framing the defendant's copyrighted works, the plaintiffs impermissibly displayed the works to the public." Id. at *10.  It distinguished Perfect 10 on its facts, noting that, "[U]nlike Google, [plaintiffs' website] did not merely provide a link by which users could access [defendant's] content but instead displayed [defendant's] content as if it were its own."  Id. at *11.  It further stated:  "[T]o the extent Perfect 10 makes actual

---

[3] The Court does not here review district court cases from the Ninth Circuit, as they are appropriately controlled by Perfect 10's analysis.

[4] It subsequently granted summary judgment to the plaintiff upon a showing that the defendant had, in fact, downloaded the images onto his computer.

possession of a copy a necessary condition to violating a copyright owner's exclusive right to display the copyrighted works, the Court respectfully disagrees with the Ninth Circuit. . . . The text of the Copyright Act does not make actual possession of a work a prerequisite for infringement." Id.

In sum, this Court is aware of only three decisions outside of the Ninth Circuit considering the display right in light of Perfect 10; one from the Seventh Circuit which adopted the Server Test for contributory liability, one from the Southern District which stated as a factual matter only that Perfect 10 existed, and one from the Northern District of Texas rejecting Perfect 10.

III.   DISCUSSION

Defendants' argument is simple—they have framed the issue as one in which the physical location and/or possession of an allegedly infringing image determines liability under the § 106(5) exclusive display right.  Defendants argue that—despite the seamless presentation of the Brady Photo on their webpages—they simply provided "instructions" for the user to navigate to a third-party server on which the photo resided.  According to defendants, merely providing instructions does not constitute a "display" by the defendants as a matter of law.  They maintain that Perfect 10's Server Test is settled law that should determine the outcome of this case.

Plaintiff maintains both 1) that to apply the Server Test leads to results incongruous with the purposes and text of the Copyright Act; and 2) even if the Server Test is rightfully applied in a case such as Perfect 10, or another case in

which the user takes a volitional action of his own to display an image, it is inappropriate in cases such as those here, where the user takes no action to "display" the image.  He and his amici[5] caution that to adopt the Server Test broadly would have a "devastating" economic impact on photography and visual artwork licensing industries, noting that it would "eliminate" the incentives for websites to pay licensing fees, and thus "deprive content creators of the resources necessary to invest in further creation."  (ECF No. 145-1 at 4.)

The Court agrees with plaintiff.  The plain language of the Copyright Act, the legislative history undergirding its enactment, and subsequent Supreme Court jurisprudence provide no basis for a rule that allows the physical location or possession of an image to determine who may or may not have "displayed" a work within the meaning of the Copyright Act.  Moreover, the Court agrees that there are critical factual distinctions between Perfect 10 and this case such that, even if the Second Circuit were to find the Server Test consistent with the Copyright Act, it would be inapplicable here.

A.  The Copyright Act

Nowhere does the Copyright Act suggest that possession of an image is necessary in order to display it.  Indeed, the purpose and language of the Act support the opposite view.  The definitions in § 101 are illuminating.  First, to display a work publicly means to "to transmit . . . a  . . . display of the work . . . by

---

[5] Getty Images, the American Society of Media Photographers, Digital Media Licensing Association, National Press Photographers Association, and North American Nature Photography Association submitted an amicus brief supporting plaintiff. (ECF No. 145-1.)

means of <u>any device or process</u>." 17 USC § 101. To transmit a display is to "communicate it by <u>any device or process</u> whereby images or sounds are received beyond the place from which they are sent." <u>Id.</u> (emphasis added). Devices and processes are further defined to mean ones "now known or later developed." <u>Id.</u> This is plainly drafted with the intent to sweep broadly.

Here, defendants' websites actively took steps to "display" the image. A review of just a few of the declarations proffered by defendants illustrates the point. For defendant Heavy.com:

> [I]n order to embed the SneakerReporter Tweet, Heavy.com navigated to Twitter and copied the SneakerReporter Tweet's URL. Heavy.com then used out of the box content management functionality provided by WordPress to embed the SneakerReporter Tweet within the Heavy.com Article.

(ECF No. 130, Nobel Decl. ¶ 5.).

Defendant Boston Herald "pasted a code line into its blog/article that contains Twitter HTML instructions." (ECF No. 137, Emond Decl. ¶ 16.)

Defendant The Big Lead submitted a declaration in which the managing editor stated, "My entering the URL for the RealBobManningTweet into the field for embedded content in the CMS [content management system] caused this URL to be inserted into embedding code that became part of the HTML code for the Big Lead Article." (ECF No. 127, Lisk Decl. ¶ 7.)

Defendant Gannett submitted a declaration in which the Vice President stated that:

> [I]f I wanted that web page to <u>display</u> a photo that a third party user had posted to a site like Twitter, I could do so without me ever having

18

to make a copy of the photo.  I would simply include in my HTML code
some additional coding containing a link to the URL of the Twitter page
where the photo appeared.

(ECF No. 126, Hiland Decl. ¶ 6) (emphasis added).

It is clear, therefore, that each and every defendant itself took active steps to

put a process in place that resulted in a transmission of the photos so that they

could be visibly shown.  Most directly this was accomplished by the act of including

the code in the overall design of their webpage; that is, embedding.  Properly

understood, the steps necessary to embed a Tweet are accomplished by the

defendant website; these steps constitute a process.  The plain language of the

Copyright Act calls for no more.

Indeed, and as discussed above, the Copyright Act's authors intended to

include "each and every method by which images . . . comprising a . . . display are

picked up and conveyed;" moreover they went as far as to note that an infringement

of the display right could occur "if the image were transmitted by any method (. . .

for example, by a computer system) from one place to members of the public

elsewhere."  H.R. Rep. 94-1476, 64, 70 (1976). Persuasive as well is the warning of

the Register of Copyrights that a "basic right of public exhibition" was necessary to

the 1976 Amendments precisely because "information storage and retrieval devices .

. . when linked together by communication satellites or other means . . . could

eventually provide libraries and individuals throughout the world with access to a

single copy or a work by transmission of electronic images."  H. Comm. On the

Judiciary, 89th Cong., Copyright Law Revision Part 6: Supplementary Report of the

19

<u>Register of Copyrights on the General Revision of the U.S. Copyright Law: 1965</u>
<u>Revision Bill</u>, at 25 (Comm. Print. 1965).

In sum, this Court sees nothing in either the text or purpose of the Copyright
Act suggesting that physical possession of an image is a necessary element to its
display for purposes of the Act.

B. <u>Aereo's Impact</u>

Moreover, though the Supreme Court has only weighed in obliquely on the
issue, its language in <u>Aereo</u> is instructive.  At heart, the Court's holding eschewed
the notion that Aereo should be absolved of liability based upon purely technical
distinctions—in the end, Aereo was held to have transmitted the performances,
despite its argument that it was the user clicking a button, and not any volitional
act of Aereo itself, that did the performing.  The language the Court used there to
describe invisible technological details applies equally well here:  "This difference
means nothing to the subscriber.  It means nothing to the broadcaster.  We do not
see how this single difference, <u>invisible to subscriber and broadcaster alike</u>, could
transform a system that is for all practical purposes a traditional cable system into
a 'copy shop that provides patrons with a library card.'"  <u>Aereo</u>, 134 S. Ct. at 2507.

Of course, in <u>Aereo</u> there was no argument about the physical location of the
antennae, which were without dispute located in Aereo's warehouses; similarly
there was no dispute that Aereo's servers saved data from the on-air broadcasts
onto its own hard drives.  On the other hand, Aereo was arguably a more passive
participant in transmitting the performance right than is a user in the case here—

who has no choice in what is displayed to him when he navigates to one of defendant's webpages.  Furthermore, the principles that undergird the Aereo decision—chief among them that mere technical distinctions invisible to the user should not be the lynchpin on which copyright liability lies—apply with equal vigor here.

As noted above, even the dissent implies that were Aereo to engage in any sort of curatorial process as to content, that liability might lie: "In sum, Aereo does not perform for the sole and simple reason that it does not make the choice of content." Id. at 2514 (Scalia, J., dissenting).  This adds credence to the notion that where, as here, defendants are choosing the content which will be displayed, that they would indeed be displaying.

In sum, this Court reads Aereo, while not directly on point, as strongly supporting plaintiff's argument that liability should not hinge on invisible, technical processes imperceptible to the viewer.

C. Perfect 10

The Court declines defendants' invitation to apply Perfect 10's Server Test for two reasons.  First, this Court is skeptical that Perfect 10 correctly interprets the display right of the Copyright Act.  As stated above, this Court finds no indication in the text or legislative history of the Act that possessing a copy of an infringing image is a prerequisite to displaying it.  The Ninth Circuit's analysis hinged, however, on making a "copy" of the image to be displayed—which copy would be stored on the server.  It stated that its holding did not "erroneously collapse the

21

display right in section 106(5) into the reproduction right in 106(1)." <u>Perfect 10 II</u>, 508 F.3d at 1161.  But indeed, that appears to be exactly what was done.

The Copyright Act, however, provides several clues that this is not what was intended.  In several distinct parts of the Act, it contemplates infringers who would not be in possession of copies—for example in Section 110(5)(A) which exempts "small commercial establishments whose proprietors merely bring onto their premises standard radio or television equipment and turn it on for their customer's enjoyment" from liability.  H.R. Rep. No. 94-1476 at 87 (1976).  That these establishments require an exemption, despite the fact that to turn on the radio or television is <u>not</u> to make or store a copy, is strong evidence that a copy need not be made in order to display an image.

Second, even if it correctly interprets the Act, to the degree that defendants interpret <u>Perfect 10</u> as standing for a <u>broadly-construed</u> Server Test, focusing on the physical location of allegedly infringing images, this Court disagrees.  Rather, <u>Perfect 10</u> was heavily informed by two factors—the fact that the defendant operated a search engine, and the fact that the user made an active choice to click on an image before it was displayed—that suggest that such a broad reading is neither appropriate nor desirable.

In <u>Perfect 10</u>, the district court's Opinion, while not strictly cabining its adoption of the Server Test to a search engine like Google, nevertheless relied heavily on that fact in its analysis.  It stated, for example, that adopting the Server Test "will merely preclude <u>search engines</u> from being held directly liable for in-line

linking and or framing infringing contents stored on third-party websites." <u>Perfect 10 I</u>, 416 F. Supp. 2d at 844 (emphasis added).  It went on: "<u>Merely to index the web so that users can more readily find the information they seek</u> should not constitute direct infringement . . . ." <u>Id.</u> (emphasis added).  On appeal, the Ninth Circuit began its statement of the case by saying, "we consider a copyright owner's efforts to stop an <u>Internet search engine</u> from facilitating access to infringing images." <u>Perfect 10 II</u>, 508 F.3d at 1154.

 In addition, the role of the user was paramount in the <u>Perfect 10</u> case—the district court found that users who view the full-size images "<u>after clicking</u> on one of the thumbnails" are "engaged in a <u>direct</u> connection with third-party websites, which are themselves responsible for transferring content." <u>Perfect 10 I</u>, 416 F. Supp. 2d at 843.

In this Court's view, these distinctions are critical.  In <u>Perfect 10</u>, Google's search engine provided a service whereby the user navigated from webpage to webpage, with Google's assistance.  This is manifestly not the same as opening up a favorite blog or website to find a full color image awaiting the user, whether he or she asked for it, looked for it, clicked on it, or not.  Both the nature of Google Search Engine, as compared to the defendant websites, and the volitional act taken by users of the services, provide a sharp contrast to the facts at hand.

In sum, the Court here does <u>not</u> apply the Server Test.  It is neither appropriate to the specific facts of this case, nor, this Court believes, adequately

grounded in the text of the Copyright Act.  It therefore does not and should not control the outcome here.

   D. <u>Defenses</u>

  Defendants warn that to find for plaintiff here would "cause a tremendous chilling effect on the core functionality of the web." (ECF No. 121, Defs.' Mem. of Law in Supp. at 35) (quoting <u>Perfect 10 I</u>, 426 F. Supp. 2d at 840).  Their amici[6] warn that not adopting the Server Test here would "radically change linking practices, and thereby transform the Internet as we know it."

  The Court does not view the results of its decision as having such dire consequences.  Certainly, given a number as of yet unresolved strong defenses to liability separate from this issue, numerous viable claims should not follow.

  In this case, there are genuine questions about whether plaintiff effectively released his image into the public domain when he posted it to his Snapchat account.  Indeed, in many cases there are likely to be factual questions as to licensing and authorization.  There is also a very serious and strong fair use defense, a defense under the Digital Millennium Copyright Act, and limitations on damages from innocent infringement.

---

[6] The Electronic Frontier Foundation, a non-profit foundation dedicated to free expression, and Public Knowledge, a not-for-profit public interest advocacy and research organization, submitted an amicus brief at ECF No. 143-1.  (Amicus Brief of the Electronic Frontier Foundation and Public Knowledge in Support of Defendants' Motion for Partial Summary Judgment.)

In sum, for all the reasons discussed above, the Court DENIES defendants' motion for partial summary judgment and GRANTS partial summary judgment to the plaintiff.

IV.    CONCLUSION

For the reasons stated above, defendants' motion for partial Summary Judgment is DENIED.  The Court GRANTS partial Summary Judgment to the plaintiff.  The Clerk of Court is directed to terminate the motion at ECF No. 119.

SO ORDERED.

Dated:        New York, New York
              February 15, 2018

_____
KATHERINE B. FORREST
United States District Judge